UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE FREDERICK DOUGLASS FOUNDATION, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Civil Action No. 20-3346 (JEB) |

DEFENDANT'S MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT OF OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND CROSS-MOTION TO DISMISS PLAINTIFFS' COMPLAINT

INTRODUCTION

Plaintiffs[1] seek a preliminary injunction to enjoin the District of Columbia (the District) from enforcing the Anti-Intimidation and Defacing of Public or Private Property Criminal Penalty Act of 1982 (the Defacement Ordinance or Ordinance), to allow the painting of "Black Pre-Born Lives Matter" on a public street or sidewalk. Plaintiffs' motion should be denied, and the Complaint should be dismissed, because plaintiffs fail to meet the requirements for injunctive relief and do not have the right to deface public property.

Plaintiffs are unlikely to succeed on the merits of their claim under the Free Speech Clause because, under binding precedent in this Circuit, plaintiffs cannot

---

[1]     Plaintiffs are The Frederick Douglass Foundation, Inc.; Students for Life of America; William Cleveland; Robert L. Gurley, Jr.; and Angela Tina Whittington.

show that enforcement of the Defacement Ordinance amounts to a content-based restriction or that it fails to satisfy constitutional scrutiny. Plaintiffs also are unlikely to succeed on the merits of their equal protection claim under the Due Process Clause because the District has not acted with discriminatory purpose or treated plaintiffs differently from any other persons or organizations that are similarly situated. Even if plaintiffs could establish an underlying constitutional violation based on their free speech or equal protection rights, plaintiffs cannot show that those constitutional violations were attributable to the District through an official policy or custom, and thus cannot establish municipal liability under 42 U.S.C. § 1983. In addition, plaintiffs are unlikely to succeed on the merits of their freedom of assembly claim because the content-neutral Defacement Ordinance permits plaintiffs to assemble and allows ample alternative channels for communication. And plaintiffs are not likely to succeed on their claims under the Religious Freedom Restoration Act (RFRA) or Free Exercise Clause because the Ordinance does not impose a substantial burden on plaintiffs' religious exercise and is neutral and generally applicable.

Additionally, plaintiffs cannot show that they will suffer irreparable harm absent injunctive relief because plaintiffs have not demonstrated an injury, and the balance of the equities and public interest weigh in favor of denying injunctive relief given the District's significant interest in keeping its sidewalks and roadways free of markings. Accordingly, plaintiffs' motion for preliminary injunction should be denied, and because plaintiffs fail to state a claim for relief under any of their five theories, the Court should grant the District's cross-motion to dismiss the Complaint.

# BACKGROUND

## I.     Laws and Policies Governing First Amendment Assemblies in the District

The District's First Amendment Rights and Police Standards Act of 2004 states that "[i]t is the declared public policy of the District of Columbia that persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways." D.C. Law 15-352, § 102 (Apr. 13, 2005) (codified at D.C. Code § 5-331.03). However, the right to participate in First Amendment assemblies is "subject to reasonable restrictions designed to protect public safety, persons, and property, and to accommodate the interest of persons not participating in the assemblies to use the streets, sidewalks, and other public ways." *Id.* Prior notice to the District or approval for an assembly plan is required for First Amendment assemblies on streets, sidewalks and public ways. *See* D.C. Code § 5-331.05(a). The purpose of this process is "to avoid situations where more than one group seeks to use the same space at the same time" as well as "to provide the Metropolitan Police Department (MPD) and other District agencies the ability to provide appropriate police protection, traffic control, and other support for participants and other individuals." *Id.* § 5-331.05(b).

Under MPD's Standard Operating Procedure for First Amendment Assemblies (SOP), MPD "provides trained personnel to respond to the scene of First Amendment assemblies in our city in order to preserve peace while protecting the constitutional and statutory rights of people to assemble peacefully and exercise free speech." MPD SOP 16-01, *Handling First Amendment Assemblies and Mass Demonstrations* at 3

(Dec. 13, 2016), *available at* https://go.mpdconline.com/GO/SOP_16_01.pdf. At planned First Amendment assemblies that MPD "is aware of in advance, either through the submission of a permit request or other means that allow for the advance planning of resources and response procedures," the Chief of Police is required to "designate command officials to serve as area or incident commanders at various sites to manage events." *Id.* at 4. The SOP further states that "[i]n order to perform its mission of protecting the rights of demonstrators, counter-demonstrators, and non-demonstrators alike, it is the policy of the MPD to engage in advance planning to facilitate demonstrations where the Department is provided advance notification through the permit application process or learns of a planned First Amendment assembly." *Id.*

One of the laws that the District enforces in connection with First Amendment assemblies is the Defacement Ordinance. Ex. A, Declaration of Guillermo Rivera (Rivera Decl.) ¶ 4. Under the Defacement Ordinance, it is unlawful for any person to "write, mark, draw, or paint" on public or private property "without the consent of the owner or proprietor thereof." D.C. Code § 22-3312.01. MPD makes an effort to identify violations of the Ordinance for defacement of public and private property. *Id.* ¶ 5. In some cases, MPD will send out notices to the public seeking assistance with identifying suspects for violations of the Defacement Ordinance. *Id.*; *see, e.g.,* Metropolitan Police Department, Suspects Sought in a Defacing Private/Public Property Offense:  5400 Block of 5th Street, Northwest (Nov. 9, 2020), https://mpdc.dc.gov/release/suspects-sought-defacing-privatepublic-property-offense-

5400-block-5th-street-northwest. MPD did this on several occasions around the time of the Black Lives Matter protests in the summer of 2020. Rivera Decl. ¶ 5; *see, e.g.,* Metropolitan Police Department, Persons and Vehicles of Interest: May to September 2020 at 5, 167, 239, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/POIs%20and%20Vehicles%20of%20Interest_1062020_Reduced.pdf (photographs of persons of interest for crimes of defacing property). Between May 30 and December 31, 2020, MPD made 22 arrests for violations of the Defacement Ordinance, including 6 arrests in connection with the Black Lives Matter protests. Rivera Decl. ¶ 5; *see* Metropolitan Police Department, Unrest-Related Arrest Data as of January 17, 2021, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/Unrest-Related%20Arrest%20Data%20as%20of%20January%2017%202021_0.pdf (listing six defacement arrests related to civil unrest between May 30, 2020 and the end of 2020).

## II.     The Black Lives Matter and Defund the Police Murals

On June 5, 2020, at Mayor Muriel Bowser's direction, artists commissioned by the D.C. Department of Public Works (DPW) painted "Black Lives Matter" on a two-block stretch of 16th Street. *See* Black Lives Matter, MuralsDC, and the Making of History, MuralsDC, *available at* https://muralsdcproject.com/black-lives-matter-muralsdc-the-making-of-history/. The artists from MuralsDC, a program within DPW, painted the mural in large yellow letters. *Id.* City officials have stated that the mural was commissioned to honor the protestors advocating for changes to law

enforcement practices in the wake of George Floyd's death, and to honor the peaceful protestors who were the victims of aggression by federal law enforcement on June 1, 2020. Fenit Nirappil, et al., *'Black Lives Matter': in Giant Yellow Letters, D.C. Mayor Sends Message to Trump*, Wash. Post. (June 5, 2020), *available at* https://www.washingtonpost.com/local/dc-politics/bowser-black-lives-matter-street/2020/06/05/eb44ff4a-a733-11ea-bb20-ebf0921f3bbd_story.html.

After the District commissioned the Black Lives Matter mural, activists painted over the three stars that appear at the top of the District's flag at the edge of the mural and added the words "Defund the Police" in the same color paint and typeface as "Black Lives Matter." *See* Rachel Sadon et al., *Activists Painted Defund the Police Next to the New Black Lives Matter Mural*, NPR (June 8, 2020), *available at* https://www.npr.org/local/305/2020/06/08/872234932/activists-painted-defund-the-police-next-to-the-new-black-lives-matter-mural. The effect was that the mural appeared to state "Black Lives Matter = Defund the Police." *Id.* The Defund the Police mural was not made as part of an event permitted by the MPD and MPD was unaware of the protesters' plans to paint the mural. Rivera Decl.¶ 6.

The next day, District employees restored the paint on the original mural and repainted the three stars on the image of the flag. *See* Sadon et al., above. District employees subsequently removed the Defund the Police mural in the process of completing pre-planned roadwork. *See* Matt Blitz, *City Says 'Defund the Police' Message At BLM Plaza Was Erased Due to Road Work*, DCIST (Aug. 17, 2020),

*available at* https://dcist.com/story/20/08/17/dc-defund-police-black-lives-matter-plaza-mural/.

III.   <u>Plaintiffs' "Black Pre-Born Lives Matter" Protest</u>

On the morning of August 1, 2020, plaintiffs Students for Life of America and the Frederick Douglass Foundation held a joint protest outside of Planned Parenthood's Carole Whitehill Moses Center on 4th Street, N.E. in Washington, D.C. as a part of their "campaign to highlight the impact of abortion on Black communities." Margaret Barthel, *Anti-Abortion Groups Sue D.C. After Not Being Allowed To Paint Slogan On City Street,* WAMU 88.5 (Nov. 19, 2020), *available at* https://www.npr.org/local/305/2020/11/19/936651995/anti-abortion-groups-sue-d-c-after-not-being-allowed-to-paint-slogan-on-city-street; Emily Davies, *Two protesters arrested while chalking 'Black Pre-Born Lives Matter' on sidewalk*, Wash. Post (Aug. 1, 2020 7:23 p.m.), *available at* https://www.washingtonpost.com/local/two-protesters-arrested-for-chalking-black-pre-born-lives-matter-onsidewalk/2020/08/01/6d966d90-d41f-11ea-9038-af089b63ac21_story.html. Plaintiffs had previously sought and received a permit for the gathering; however, the permit did not grant plaintiffs approval to paint or otherwise mark the street. Ex. B, Permit. The permit stated that the organizers were "permitted to possess bullhorns, music stand and signs" but added that "[m]arking or painting the street is not permitted." *Id.* In addition, the permit stated that all participants in the assembly "must comply with all the conditions of this assembly approval plan and applicable regulations and instructions issued by the Metropolitan Police Department" and that MPD "reserves the right to

revoke this Assembly Plan Approval at any time, should the event present a clear and present danger to public health or safety, or if any conditions of this approval plan are violated by the applicant." *Id.*

Consistent with MPD's SOP for First Amendment assemblies, 28 MPD officers and 4 sergeants arrived outside Planned Parenthood early on the morning of August 1, 2020 to ensure the safety of the assembly's attendees and any bystanders. Ex. C, Declaration of Carlos Mejia (Mejia Decl.) ¶ 4. Some of the attendees wanted to paint the street, but the officers present told them that doing so was not permitted because it would violate the Defacement Ordinance. *Id.* ¶ 5. The attendees wanted to use chalk to write their message as an alternative, but the officers informed them that doing so would also violate the Ordinance. *Id.*

Despite MPD's multiple prior warnings during the assembly, two participants proceeded to write the words "Black Pre-Born Lives Matter" in chalk on the sidewalk. An MPD officer gave the two participants warnings that they would be arrested for defacement of property if they continued to chalk the sidewalk, and then, after the participants began writing their message, issued an order for their arrest. *See id.* ¶ 6. This exchange was captured on video. *See* Mary Margaret Olohan, *DC Police Reveal Why They Arrested Teens Writing Pro-Life Messages In Chalk*, Daily Caller (Aug. 1, 2020, 1:07 p.m.), *available at* https://dailycaller.com/2020/08/01/dc-police-pro-life-students-arrest-chalk/. In the video, the arrestees and other members of the assembly can be heard informing the MPD officers present that they had written protest messages outside of Planned Parenthood before as an effort to persuade

women not to get abortions, and that they had not been arrested on those prior occasions. *Id.* Immediately after the arrest, a Students for Life organizer stated in front of the MPD officers that the event would continue with protesters holding posters stating "Black Pre-Born Lives Matter" instead of writing their message in chalk *Id.*; *see* Jordan Lancaster, *Pro-Life Students Arrested for Writing 'Black Preborn Lives Matter' On Sidewalk Outside Of DC Planned Parenthood*, Daily Caller (Aug. 1, 2020, 12:03 p.m.), *available at* https://dailycaller.com/2020/08/01/pro-life-students-arrested-black-preborn-lives-matter-dc-planned-parenthood/ ("We are moving on with our event today, that is not going to stop us … . If anything, this just added some fuel to our fire." (quoting Students for Life eastern regional director Michele Hendrickson)).

The two participants who were arrested were held by MPD for about an hour and then they returned to the assembly, which "continued long after the early-morning arrests." *See* Davies, above. After the arrests, the participants gathered at Frederick Douglass Court for a prayer and then marched back to Planned Parenthood holding posters that spelled out the words "Black Pre-Born Lives Matter." *Id.* During a press conference that plaintiffs held as a part of the assembly, one of the two participants who had been arrested spoke to attendees through a bullhorn while standing adjacent to a Black Pre-Born Lives Matter poster. *Id.*

## IV.   Plaintiffs' Allegations

Plaintiffs filed their Complaint on November 18, 2020, raising an as-applied challenge to the District's enforcement of the Defacement Ordinance in their efforts

to paint a "Black Pre-Born Lives Matter" message on a District street or sidewalk. Compl. ¶¶ 1, 3. Plaintiffs bring claims under the Free Speech Clause, Due Process Clause, Freedom of Assembly Clause, RFRA and Free Exercise Clause. *Id.* ¶¶ 71-140. In their prayer for relief, plaintiffs request that the Court declare that the Defacement Ordinance is unconstitutional as applied to them, issue preliminary and permanent injunctive relief enjoining the District from enforcing the Ordinance against them, and award actual and nominal damages, costs and attorney's fees. *Id.* at 31. On December 18, 2020, plaintiffs filed a motion for preliminary injunction. In their motion, plaintiffs stated that they are planning to hold an event outside Planned Parenthood on March 27, 2021, and that they wish to paint their proposed mural on a District street or sidewalk at that event. Pls.' Mot for Prelim. Inj. (Pls.' Mem.) at 10.

## LEGAL STANDARD

### I. <u>Preliminary Injunction</u>

A preliminary injunction "is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "The primary purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (internal quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips

in his favor, *and* that an injunction is in the public interest." *Winter*, 555 U.S. at 20
(emphasis added). The last two factors merge when the government opposes an
injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A plaintiff bears the burden of
proving all four prongs of the standard before relief can be granted. *Davis v. Pension
Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

## II.   <u>Motion to Dismiss</u>

A case must be dismissed when a party fails to set forth "a claim upon which
relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a
complaint must contain sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although well pleaded
factual allegations must be taken as true, a plaintiff must offer "more than labels and
conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*,
550 U.S. at 555; *see Jackson v. District of Columbia*, 826 F. Supp. 2d 109, 120 (D.D.C.
2011). Courts need not accept as true conclusory "assertions devoid of further factual
enhancement," *Iqbal*, 556 U.S. at 679, and "need not … accept inferences drawn by a
plaintiff if such inferences are unsupported by the facts set out in the complaint."
*Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (alterations adopted)
(internal quotation marks omitted).

In evaluating a motion under Rule 12(b)(6), the Court "may consider … the
facts alleged in the complaint, any documents either attached to or incorporated in
the complaint, and matters of which [the Court] may take judicial notice." *EEOC v.*

*St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Laughlin v. Holder*, 923 F.Supp.2d 204, 209 (D.D.C. 2013).

## ARGUMENT

I.   <u>Plaintiffs Are Not Entitled to a Preliminary Injunction.</u>

    A.   <u>Plaintiffs Are Not Likely To Succeed on the Merits of Any of Their Claims.</u>

Demonstrating a likelihood of success on the merits is a free-standing requirement for a preliminary injunction, *Sherley*, 644 F.3d at 393 (quotation omitted), and "a failure to show a likelihood of success on the merits is alone sufficient to defeat a preliminary-injunction motion," *Smith v. Henderson*, 944 F. Supp. 2d 89, 96 (D.D.C. 2013). The Court need not conclude that plaintiffs will lose on the merits, only that they have not met the extraordinary burden of showing a clear entitlement to immediate, extraordinary relief. *Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013). They must show not merely that success is a "possibility" but that it is "likely." *Winter*, 555 U.S. at 20-22. Here, for the reasons below, plaintiffs have not met their burden because they have not demonstrated that success on the merits is a possibility, let alone a likelihood.

        1.   **Plaintiffs Are Not Likely To Succeed on the Merits of Their Free Speech Clause Claim Because Plaintiffs Do Not Have a Right To Deface Public Property and the District's Application of the Ordinance Against Plaintiffs Is Content-Neutral and Withstands Constitutional Scrutiny.**

In their motion, plaintiffs argue that the District's enforcement of the Defacement Ordinance against them in their efforts to paint a "Black-Preborn Lives matter" mural violates the Free Speech Clause by unconstitutionally discriminating

against them based on the content of their speech. Pls.' Mem. at 15. But as plaintiffs themselves admit, the District's application of the Ordinance does not prevent them from speaking their message; it merely prevents them from communicating that message in "their desired manner." *Id.* at 1. Plaintiffs are not likely to succeed on the merits of their claim under the Free Speech Clause because they do not have a First Amendment right to communicate their message in whichever manner they want, and they certainly do not have a right to deface public property. *See Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (holding that "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired"). Moreover, the D.C. Circuit has already held in *Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011), that the District's application of the Defacement Ordinance in virtually identical circumstances was content-neutral and withstood constitutional scrutiny. Plaintiffs do not even mention this binding precedent; their claim under the Free Speech Clause fails on the merits just like the plaintiff's claim in *Mahoney*.

> a. **Plaintiffs Do Not Have a First Amendment Right To Deface Public Property, and They Ignore the D.C. Circuit's Binding Decision in *Mahoney*.**

Plaintiffs contend that they should have the right to paint their message on a street or sidewalk outside of Planned Parenthood—defacing public property in violation of the Defacement Ordinance—because the streets and sidewalks are traditional public forums. Pls.' Mem. at 11-12. But none of the cases plaintiffs cite stand for this novel proposition. To the contrary, "[i]t is well established that the 'First

Amendment does not guarantee access to property simply because it is owned or controlled by the government,'" *see Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 100 (D.D.C. 2017) (quoting *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981)), and "[n]o one has a First Amendment right to deface government property," *Mahoney*, 642 F.3d at 1122 (Kavanaugh, J. concurring).

Although streets and sidewalks are generally public forums, they are also "[s]ubject to the traditional time, place, and manner restrictions." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 578 (1980). One of those restrictions pertains to defacement of public property. Although it is true that the streets have "immemorially been held in trust for the use of the public and, time out of mind, … used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," Pls.' Mem. at 12 (quoting *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 152 (1969)), the enforcement of restrictions on defacement of public property does not prevent plaintiffs from communicating their thoughts or "discussing public questions."

*Mahoney* is on point. There, the plaintiff had given MPD and the Department of the Interior advance notice that he intended to carry out a chalk art demonstration outside of the White House as a protest to then-President Obama's position on abortion. *Mahoney*, 642 F.3d at 1114-15. MPD granted the plaintiff a permit for the demonstration but the permit did not include permission for chalking, and MPD warned the plaintiff that chalking the sidewalk in front of the White House would

violate the Defacement Ordinance. *Id.* at 1115. The plaintiff ignored this warning and, two days later, began chalking outside the White House and was stopped by MPD officers. *Id.* Like the plaintiffs in this case, the plaintiff in *Mahoney* subsequently raised an as-applied challenge to the District's enforcement of the Defacement Ordinance in his efforts to communicate his views against abortion. *Id.* at 1115-16. The plaintiff claimed that he should be permitted to chalk the street or sidewalk because the District had previously allowed similar chalking events such as a youth chalk art contest and a "Chalk for Peace" event. *Id.* at 1115.

As the D.C. Circuit stated in *Mahoney*, "[t]he District's ability to restrict expressive conduct in a traditional public forum is limited to the enforcement of time, place, and manner regulations, provided the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Id.* at 1117 (quoting *United States v. Grace*, 461 U.S. 171, 177 (1983)). Although the court found that the street was a public forum,[2] it concluded that "[e]ven under the standard that applies to speech

---

[2]     In *Mahoney*, the court applied a public forum analysis on the theory that "the defacement at issue is temporary and can be cured." 642 F.3d at 1117, 1119. Based on plaintiffs' Complaint and motion for preliminary injunction, it is unclear to the District whether plaintiffs intend for their proposed mural to remain for longer than the duration of their planned event on March 27, 2021. To the extent that plaintiffs wish for their message to remain long term, the streets and sidewalks should not be treated as a public forum for that purpose. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009) ("[A]lthough a park is a traditional public forum for speeches and other transitory expressive acts, the display of a permanent monument in a public park is not a form of expression to which forum analysis applies.").

restrictions in a traditional public forum" the chalking ban withstood constitutional scrutiny as applied to the plaintiff. *Id.* at 1118.

As the D.C. Circuit explained, the Defacement Ordinance is "indisputably content neutral" because "[i]t prohibits certain conduct (i.e. disfiguring, cutting, chipping, defacing or defiling), including certain expressive conduct (i.e. writing, marking, drawing, or painting), without reference to the message the speaker wishes to convey," and there is no evidence that the District passed the Ordinance as a way of silencing any particular viewpoints or messages with which it disagrees. *Id.* The court also found that "the District's interest in controlling the esthetic appearance of the street in front of the White House is substantial," and the District has a "weighty" interest in "proscribing intrusive and unpleasant formats for expression." *Id.* (quoting *Members of the City Council of the City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 806 (1984)). Further, the court determined that the Defacement Ordinance was "sufficiently tailored to serve the District's esthetic interest" because "[i]t is the tangible medium—chalking—that creates the very problem the Defacement Statute seeks to remedy." *Id.* And even if "the defacement at issue is temporary" the District's enforcement is still narrowly tailored because "[t]he government can proscribe even temporary blight." *Id.* at 1119. Finally, the court concluded that the plaintiff still had alternative channels of communication available because, like plaintiffs here, *see* Background above, the plaintiff in *Mahoney* was granted a permit that allowed him to use signs and banners to convey his message, which were ample alternative avenues of communication. *Id.* at 1119. As the court concluded, the plaintiff "was free

to announce any 'verbal' message he chose," and he could also "depict visual messages on signs, banners, and leaflets." *Id.*

Here, just like in *Mahoney*, the District's enforcement of the Defacement Ordinance is constitutional as applied to plaintiffs because it is content-neutral, it is "substantially justified by the District's esthetic interest in combatting the very problem [plaintiffs'] proposed [painting] entails—the defacement of public property," and the District allowed plaintiffs to protest without curtailing plaintiffs' other means of expression. *Id.*; *see id.* at 1122 (Kavanaugh, J., concurring) ("When, as here, the Government applies a restriction on defacement in a content-neutral and viewpoint-neutral fashion, there can be no serious First Amendment objection."). Plaintiffs fail to distinguish—or even mention—*Mahoney* in their motion.

None of the cases plaintiffs rely on suggest that this Court should reach a contrary conclusion. Two of the cases plaintiffs cite, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) and *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92 (1972), involved different statutes that, unlike the Defacement Ordinance, contained express content-based restrictions. Plaintiffs also heavily rely on *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819 (1995), Pls.' Mem. at 13, 15, and *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357 (1997), Pls.' Mem. at 11, but these cases are also not analogous. The plaintiffs in *Rosenberger* challenged a university's policy that prevented religious-based student organizations from applying for funds from the university's Student Activities Fund. 515 U.S. at 824-25. The university's decision to deny the plaintiffs'

17

application for funds was "solely on the basis of its religious editorial viewpoint." *Id.* at 827. Here, there was no denial of access to government property based on viewpoint; rather, there was a denial of access based on a facially neutral policy that *made no distinctions* on viewpoint. Although, as the Court found in *Schenck*, "commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment," 519 U.S. at 377, *see* Pls.' Mem. at 11, plaintiffs here are in no way prevented from commenting, unlike the plaintiffs in *Schenck*. There, the Court struck down a 15-foot floating buffer zone law on grounds that it would "restrict the speech of those who simply line the sidewalk or curb in an effort to chant, shout, or hold signs peacefully," 591 U.S. at 380, but nothing about the District's application of the Ordinance prevents plaintiffs from "chant[ing], shout[ing], or hold[ing] signs peacefully." Plaintiffs cannot explain how the District's application of its facially neutral Defacement Ordinance violates the Free Speech Clause.

   b.   **As in *Mahoney*, the District's Enforcement of the Ordinance Is Content-Neutral.**

As in *Mahoney*, the District's application of the Ordinance is content-neutral. Because the court in *Mahoney* already held that application of the Ordinance in virtually identical circumstances was content-neutral, plaintiffs' viewpoint discrimination claim fails at the outset. *Cf. United States v. Barnes*, Criminal Action No. 18-mj-54, 2020 WL 4933600, at *5 (D.D.C. Aug. 24, 2020) (finding that prior D.C. Circuit decision, which "already held that [a statute], as a general matter, … '[was] a reasonable, *viewpoint-neutral*—and thus permissible—means of vindicating the

18

government's important interests …,'" was binding) (quoting *Hodge v. Talkin*, 799 F.3d 1145, 1170 (D.C. Cir. 2015) (emphasis in original)).

Although plaintiffs argue that the District "failed to act on … many instances of speech and protest art," Pls.' Mem. at 18, the presence of other artwork on public and private property does not give plaintiffs the right to deface District streets or sidewalks. Simply put, "[p]ointing to a handful of instances of allegedly inconsistent enforcement is not enough to justify declaring the statute unconstitutional as applied to conduct the parties do not dispute falls under its purview." *Barnes*, 2020 WL 4933600, at *5. Even if plaintiffs could establish viewpoint discrimination, "[v]iewpoint-discriminatory enforcement practices do not transform otherwise viewpoint-neutral laws."[3] *Id.* Regardless, plaintiffs cannot establish viewpoint discrimination in this case because the few instances of allegedly inconsistent enforcement that plaintiffs point to are not truly inconsistent.

Plaintiffs first point to the Black Lives Matter mural, which as they concede, was commissioned by the Mayor. Pls.' Mem. at 4. Because that mural was painted at the direction of the Mayor by artists participating in a District government program, *see* Background above, it qualifies as government speech. Plaintiffs cannot establish viewpoint discrimination based on the government's failure to, in effect, enforce the Defacement Ordinance against itself. And, of course, plaintiffs are not similarly situated to the government because the government is not a private citizen; the Free

---

[3]     At most, plaintiffs would have "a claim for selective prosecution," *Barnes*, 2020 WL 4933600, at *5; however, as discussed below, *see* Section I.A.2, plaintiffs are not likely to succeed on the merits of any selective prosecution claim either.

Speech Clause does not even apply to the government. *See Summum*, 555 U.S. at 467 ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").

Plaintiffs also point to the Defund the Police mural, which plaintiffs allege was "approved by" the District, Pls.' Mem. at 2, 14, but that mural also qualifies as government speech. Even though the Defund the Police mural was not originally commissioned by the District, government speech also includes "decisions about what pieces of art it will patronize and display" on public property. *Raven v. Sajet*, 334 F. Supp. 3d 22, 30 (D.D.C. 2018), *aff'd sub nom. Raven v. United States*, No. 18-05346, 2019 WL 2562945 (D.C. Cir. May 17, 2019); *see People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 30-31 (D.C. Cir. 2005) (finding that the First Amendment's Free Speech Clause "does not apply to the government as communicator" when the government chose which works of art to display in public spaces). Even if the Defund the Police mural were not government speech, as plaintiffs also concede, "[t]here has been no indication that a permit was obtained for the 'Defund the Police' mural." Pls.' Mem. at 5. MPD was not even aware of these unidentified protesters' plans to paint the mural, Rivera Decl. ¶ 6, much like the Saturday chalk art events plaintiffs claim to have held in the past—events that they did not inform MPD about and were not arrested for. That was not the case with the chalk art display at plaintiffs' event on August 1, 2020: Plaintiffs informed the District about their plans to mark the street ahead of time, and the event participants attempted to chalk their message (in violation of the Defacement Ordinance) in front

of the police, despite multiple warnings that they would be arrested for it. Notably, the arrests at plaintiffs' event were not the only time the District has enforced the Defacement Ordinance. The District has made 22 arrests for violations of the Ordinance between May 30, 2020 and December 31, 2020, including 6 arrests made in connection with the racial justice protests that began in late May. *Id.* ¶ 5. This directly undermines plaintiffs' claim of viewpoint discrimination.

Finally, plaintiffs point to protest art that appeared on construction scaffolding attached to the headquarters of the Chamber of Commerce that they claim the District "permitted to remain." Pls.' Mem. at 6. But that artwork was on private property, so the District would not have had authority to remove it. Additionally, the Chamber consented to the presence of the artwork and even worked with activists to have it replaced after it was removed. *See* Matt Blitz, *Protest Artists Come Out On A Rainy Sunday To 'Reclaim' H Street Art Tunnel Near BLM Plaza*, DCIST (Aug. 16, 2020, 5:59 p.m.), *available at* https://dcist.com/story/20/08/16/protest-artists-come-out-on-a-rainy-sunday-to-reclaim-h-street-art-tunnel-near-blm-plaza/; *see also* U.S. Chamber of Commerce, U.S. Chamber to Preserve Historic Black Lives Matter Artwork in Partnership with Washington D.C.-based Institutions (Aug. 10, 2020), *available    at* https://www.uschamber.com/press-release/us-chamber-preserve-historic-black-lives-matter-artwork-partnership-washington-dc. That means that the artwork did not implicate the Defacement Ordinance because it only makes it unlawful to "write, mark, draw, or paint" on private property "without the consent of the owner." D.C. Code § 22-3312.01.

21

Even if the District should have enforced the Defacement Ordinance in these instances, that does not mean that the District committed viewpoint discrimination by enforcing it against plaintiffs when, as plaintiffs appear to admit, their conduct violated the Ordinance. And as the D.C. Circuit has opined, "it is of no moment" that in certain situations law enforcement "might opt to allow" acts of protest as an exercise of discretion "in unique circumstances." *Hodge*, 799 F.3d at 1162 (holding that law enforcement allowing 200 racial justice protestors to occupy the off-limits Supreme Court plaza did not convert the plaza into a public forum). Imperfect enforcement of the Ordinance simply cannot create a constitutional license for anyone to deface public property.

As for MPD's exercise of discretion in enforcing the Ordinance at plaintiffs' August 1 protest, plaintiffs assert that "Mayor Bowser apparently ordered the Metropolitan Police Department to be present at the FDF and SFLA event in order to stop the painting and chalking." Compl. ¶ 61. But the police were merely present in accordance with MPD's SOP for First Amendment assemblies. Mejia Decl. ¶ 4. There was nothing discriminatory about MPD's presence at the event, or about MPD's enforcement of the Ordinance at the event. Thus, plaintiffs cannot establish a likelihood of success on their viewpoint discrimination claim.

      c.    **As in *Mahoney*, the District's Application of the Defacement Ordinance Is Narrowly Tailored To Promote the District's Interest in Maintaining the Aesthetic Condition of Public Streets and Sidewalks.**

As the Supreme Court has held, and the D.C. Circuit acknowledged in *Mahoney*, "municipalities have a weighty, essentially esthetic interest in proscribing

22

intrusive and unpleasant formats for expression." *Taxpayers for Vincent*, 466 U.S. at 806; *see Mahoney*, 642 F.3d at 1118. Plaintiffs concede that the government has an interest in preventing defacement of public property, but merely claim that the District has "abandoned" that interest by not enforcing the Defacement Ordinance in other cases. Pls.' Mem. at 16. Plaintiffs are mistaken. The District has not abandoned its interest in the aesthetic condition of the streets and sidewalks by enforcing the Ordinance against plaintiffs any more than it did by enforcing the same Ordinance against the plaintiff in *Mahoney*.

Citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), plaintiffs contend that the District must no longer have an interest in the aesthetic condition of its streets and sidewalks because it has not eliminated *all* street art. Pls.' Mem. at 16-17. That is not correct, and regardless, *Lukumi Babalu* is not analogous. There, a local government passed an ordinance to criminalize killing animals in direct response to a religious organization that committed animal sacrifices. *Lukumi Babalu*, 508 U.S. at 526. The law at issue was also underinclusive toward its stated ends in preventing the unnecessary killing of animals because it did not prohibit other conduct such as hunting or fishing; the law only targeted the killing of animals for religious purposes. *Id.* at 537-38. Not so here. The Defacement Ordinance was not passed for a discriminatory purpose, as the D.C. Circuit noted in *Mahoney*, 642 F.3d at 1118, and by its express terms, the Ordinance prohibits the defacement of public property regardless of the purpose.

23

Even if the District had isolated lapses in enforcement, that does not mean that it has abandoned its interest in the appearance of public property. Like the plaintiff in *Mahoney*, *see* 642 F.3d at 1115, plaintiffs claim that the District did not enforce the Ordinance against several other displays. *See* Pls.' Mem. at 4-9. Therefore, plaintiffs argue, the District must have abandoned its interest in the condition of public property. *Id.* at 16. Not so. The D.C. Circuit already concluded in *Mahoney* that the District maintains its interest in the aesthetic condition of the streets and sidewalks under virtually identical circumstances. 642 F.3d at 1118. That decision is controlling here.

Moreover, as the D.C. Circuit also concluded in *Mahoney*, the Defacement Ordinance is narrowly tailored to advancing that interest on its face, as was the District's enforcement of the Ordinance in those virtually identical circumstances. *Id.* at 1118-19. The District's enforcement of the Ordinance burdens no more speech than necessary because "[i]t is the tangible medium—chalking—that creates the very problem the Defacement Statute seeks to remedy." *Id.* at 1118. Because "the substantive evil—visual blight—is not merely a possible by-product of the activity, but is created by the medium of expression itself" it is necessary to restrict this activity to accomplish the government's purpose. *Taxpayers for Vincent*, 466 U.S. at 810. It makes no difference that this prevents plaintiffs from utilizing one particular mode of speech; even a complete ban on one mode of speech can be narrowly tailored if it is necessary to advance the government's interest. *See Frisby v. Schultz*, 487 U.S. 474, 484, 487-88 (1988) (holding that city's "complete ban" on one "particular medium

of expression"—picketing in residential neighborhoods—was narrowly tailored to government interest in protection of residential privacy). Though plaintiffs argue that allowing the painting of their message would be a less restrictive means, Pls.' Mem. at 18, that alternative would in no way advance the District's interest in aesthetics. Plaintiffs narrow-tailoring arguments therefore fail.

> ### d. As in *Mahoney*, the District's Application of the Defacement Ordinance Leaves Open Alternative Channels of Communication.

Finally, as in *Mahoney*, there are alternative channels of communication available to plaintiffs other than writing their message on government property. Plaintiffs state that "[t]he purpose of the event was for SFLA and FDF to come together to declare that 'Black Pre-Born Lives Matter.'" Compl. ¶ 51. Plaintiffs could still "declare" that message without painting it or chalking it on a street or sidewalk. And, in fact, they did declare it. Even though the Defacement Ordinance prevents them from writing the message on the street "there is no reason to believe that these same advantages cannot be obtained through other means," such as the other means plaintiffs used to communicate their message before and after the arrests. *Taxpayers for Vincent*, 466 U.S. at 812.

In essence, plaintiffs argue that they should be able to communicate their preferred message by every possible means, a conclusion that the D.C. Circuit squarely rejected in *Mahoney* and *Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001). In *Henderson*, the plaintiffs challenged a National Park Service regulation that prevented certain commercial transactions on the National Mall, such as the

sale of t-shirts. 253 F.3d at 14. The rationale for the regulation was that excessive commercialism on the Mall had "degraded aesthetic values" and converted the Mall into a "flea market." *Id.* (quoting National Capital Region Parks; Sales, 59 Fed. Reg. 25,855, 25,857 (May 18, 1994)). The plaintiffs challenged the regulation because they wanted to communicate their religious views "by all available means," *id.* at 15, but the D.C. Circuit upheld the regulation, finding that it restricted only "one of *a multitude* of means" for the plaintiffs to express their views, *id.* at 17 (emphasis added). The court thus found the regulation to be a valid time, place and manner restriction that was content-neutral, narrowly tailored to achieve the government's interest in preserving the aesthetic integrity of the Mall, and left open alternative channels of communication. *Id.* at 19. As in *Mahoney* and *Henderson*, the fact that plaintiffs here cannot communicate their message through *every* possible means does not show that they lack alternative channels of communication.

## 2.   Plaintiffs Cannot Succeed on the Merits of Their Equal Protection Claim Under the Due Process Clause.

Plaintiffs also argue that the District has violated the equal protection component of the Due Process Clause by enforcing the Defacement Ordinance against them but not others who defaced public and private property. Pls.' Mem. at 20-21. However, plaintiffs' equal protection claim fails because they have not shown that the District enforced the Ordinance against them without enforcing it against others who were similarly situated, or that the District enforced the Ordinance with a discriminatory purpose.

Under the Equal Protection Clause of the Fourteenth Amendment—applicable to the District through the Fifth Amendment, *Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996)—a State cannot "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.14. It "requires States"—including the District—"to treat similarly situated persons alike." *Women Prisoners*, 93 F.3d at 924. To state an equal protection claim, "a plaintiff must assert facts that support the allegation that the government intentionally treated [him or her] differently from others who were similarly situated." *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 34 (D.D.C. 2015) (citation omitted). The different treatment of dissimilarly situated people is permitted under the Equal Protection Clause. *See Women Prisoners*, 93 F.3d at 924 ("[D]issimilar treatment of dissimilarly situated persons does not violate equal protection.") (quoting *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994)).

Here, the fact that plaintiffs seek to write "nearly identical words" to the words painted on the Black Lives Matter and Defund the Police murals does not establish that they were similarly situated to the individuals who created those murals. Pls.' Mem. at 21. As noted above, *see* Section I.A.1.b, plaintiffs are not similarly situated to the government, unnamed protesters who did not previously inform the District of their intent to deface public property or to other individuals who drew messages on private property with the owners' consent; thus, plaintiffs' equal protection claim cannot succeed. *See Archdiocese of Wash.*, 281 F. Supp. 3d at 115 (finding that because plaintiff could not show that WMATA treated it differently from "similarly

situated religious groups," plaintiff's equal protection claim was unlikely to succeed "for the same reason that its inconsistent and discriminatory enforcement claim" failed under the First Amendment).

This conclusion is further supported by the D.C. Circuit's decision in *Henderson*, where the court rejected a similar equal protection claim based on the alleged selective enforcement of a ban on t-shirt sales on the National Mall. The plaintiffs' theory in that case was that they should be allowed to sell t-shirts on the Mall because certain vendors had been allowed to sell t-shirts during demonstrations, and the Park Service had not taken enforcement actions against those individuals. *Henderson*, 253 F.3d at 17-18. The court found that this was "a claim plaintiffs have not come close to making out." *Id.* It rejected the plaintiffs' argument that the Park Service allowing vendors to sell concessions on the Mall was disparate treatment, finding that plaintiffs were not concessionaires and therefore not similarly situated to these other individuals. *Id.* at 18. The court noted that "[i]n essence" plaintiffs were asking the court "to hold that equal protection requires the Park Service to ban t-shirt sales by all possible vendors, or by none," a claim that was doomed to fail because "[i]t is not a requirement of equal protection that all evils of the same genus be eradicated or none at all." *Id.* (quoting *Ry. Express Agency v. New York*, 336 U.S. 106, 110 (1949)) (alteration in original). Additionally, much like the District here, the defendants in *Henderson* submitted a declaration from a law enforcement official stating that the Park Service "seeks to monitor the activities of permittees on parkland to ensure permit and regulatory compliance" and that "[w]henever

violations are discovered ... action is taken to ensure compliance with permits and regulations." *Id.* Similar to the Park Service's efforts to enforce its t-shirt ban regulation, MPD enforces *known* violations of the Defacement Ordinance, Rivera Decl. ¶ 4, as when it enforced the Ordinance in response to the chalking at plaintiffs' protest. Like in *Henderson*, this is fatal to plaintiffs' equal protection claim.

Even if plaintiffs were similarly situated to other individuals who were not arrested, plaintiffs' equal protection claim still could not succeed because plaintiffs have simply alleged that there have been "lapses in enforcement." *Henderson*, 253 F.3d at 18; *see* Pls.' Mem. at 4-9. Plaintiffs must allege more than mere lapses in enforcement to establish an equal protection violation based on selective prosecution. As the Supreme Court has held, the government's individual decisions on whether to prosecute are "particularly ill-suited to judicial review" and "are not readily susceptible to the kind of analysis the courts are competent to undertake." *Wayte v. United States*, 470 U.S. 598, 607 (1985); *see United States v. Armstrong*, 517 U.S. 456, 464 (1996) (noting that "[a] selective-prosecution claim asks a court to exercise judicial power over a 'special province' of the Executive" (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985))). Therefore, to succeed in a selective prosecution claim, plaintiffs must show that the government's discretionary enforcement decisions had a discriminatory effect *and* that they were motivated by a discriminatory purpose. *Wayte*, 470 U.S. at 608. Even if plaintiffs could show that the District's enforcement of the Defacement Ordinance had a discriminatory effect on them because they were prosecuted and others were not, plaintiffs still could not show that they were

prosecuted for a discriminatory purpose. All plaintiffs have shown is that they were selected for prosecution because they "in effect selected themselves for prosecution" by notifying the government of their intent to break the law and then continuing to break the law after being warned by police officers that they would be arrested. *Id.* at 610. Plaintiffs' equal protection claim cannot succeed.

### 3. Even If Plaintiffs Could Establish Violations of the Free Speech or Due Process Clause, the Violations Would Not Be Attributable to the District Through an Official Policy or Custom.

Plaintiffs are also not likely to succeed on the merits of their claims under the Free Speech Clause and Due Process Clause for another reason:  They cannot establish that those underlying constitutional violations are attributable to the District through an official policy or custom. Where, as in this case, plaintiffs raise claims under 42 U.S.C. § 1983 (Section 1983), a municipal government cannot be sued "for an injury inflicted solely by its employees or agents." *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978). For a plaintiff to state a Section 1983 claim against a municipal government, the plaintiff must allege that the purported constitutional injury was caused by an official policy or custom of the municipality. *Id.* Although plaintiff alleges that it has suffered a constitutional injury based on MPD's enforcement of the Defacement Ordinance in violation of their free speech and equal protection rights, they do not allege, much less establish, that these purported violations are attributable to the District.

In support of their free speech and equal protection claims, plaintiffs merely state in conclusory fashion that "[t]he District has a policy and practice of enforcing

the Defacement Ordinance against speech it disagrees with and not enforcing against speech it prefers." Compl. ¶¶ 86, 100. As the D.C. Circuit has held, "a plaintiff must plead the elements of the relevant type of municipal liability" because it is "not [the court's] role" to "try to surmise which theory of municipal liability has the strongest support in the complaint." *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015). "The fact that this claim arises under section 1983 does not relieve [a party] of the obligation to satisfy the criteria established in *Iqbal* and *Twombly*." *Hodges v. District of Columbia*, 975 F. Supp. 2d 33, 54 (D.D.C. 2013).

In short, plaintiffs cannot state a claim for relief against the District without explaining how the allegedly unconstitutional acts of the District's employees or agents are attributable to the District itself through an official policy or custom. Plaintiffs have not provided that explanation, and are unlikely to succeed on their free speech and equal protection claims on that basis alone.

### 4. Plaintiffs Cannot Succeed on Their Assembly Clause Claim Because Plaintiffs Were Not Denied the Right to Freely Associate and They Have Alternative Channels of Communication.

Plaintiffs allege that the District's application of the Defacement Ordinance violated their right to freely assemble, *see* Pls.' Mem. at 21, but plaintiffs *did* assemble in a gathering permitted by the MPD and had ample channels to communicate their message, *see* Background above. Plaintiffs' contention that the restriction on one manner in which they wished to express their views amounted to a "suppression of ideas," Pls.' Mem. at 22, falls flat because the Defacement Ordinance is a time, place

and manner restriction, and the District's application of the Ordinance was content-neutral, *see* Section I.A.1.b above.

"The right of peaceable assembly" is "[s]ubject to the traditional time, place, and manner restrictions." *Richmond Newspapers, Inc.*, 448 U.S. at 578. If the restriction is content-neutral, "any incidental effect it has on speech is subject to the intermediate scrutiny," meaning that it "must be 'narrowly tailored to serve a significant governmental interest' and 'leave open ample alternative channels for communication of the information.'" *A.N.S.W.E.R. Coal. v. Basham*, 845 F.3d 1199, 1212-13 (D.C. Cir. 2017) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1527 (D.C. Cir. 1984) (finding time, place and manner restrictions permissible "so long as the restrictions are content-neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication").

Plaintiffs argue that the Defacement Ordinance has not been neutrally applied and, therefore, should be subject to strict scrutiny. Pls.' Mem, at 21-22. This is not correct. A law restricting speech is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. But, as noted above, *see* Section I.A.1.b, the Defacement Ordinance is content neutral on its face, and the District has enforced it in a content-neutral manner. Thus, the Ordinance only has to satisfy intermediate scrutiny by being narrowly tailored to serve a significant governmental interest, which—as discussed in Section I.A.1.c—it

does. And even if strict scrutiny applied, the restriction withstands that scrutiny for the same reasons described above. *See* Section I.A.1.c above.

Moreover, as discussed above, the District's enforcement of the Defacement Ordinance left plaintiffs with ample alternative means of communication. Plaintiffs wrongly assert that the District "prohibited Plaintiffs' association and speech altogether." Pls.' Mem. at 22. This is not true. In fact, plaintiffs were granted a permit "to possess bullhorns, music stands and signs" at their gathering. *See* Ex. B, Permit. Although MPD could have revoked the permit based on plaintiffs' failure to comply with the conditions, *see* Background above, MPD did not revoke the permit and allowed plaintiffs to assemble after the arrests, despite the violation that occurred when two of the attendees wrote in chalk on the sidewalk. Plaintiffs, therefore, had other means available to communicate their message and took full advantage of those opportunities at their assembly on August 1, 2020. The Defacement Ordinance does not prevent plaintiffs from holding a similar event on March 27, 2021, in compliance with District law.

> ### 5. Plaintiffs Cannot Succeed on Their RFRA Claim Because Enforcement of the Defacement Ordinance Is Not a Substantial Burden on Plaintiffs' Religious Conduct.

Plaintiffs argue that the District's enforcement of the Defacement Ordinance against them violates RFRA because it substantially burdens their exercise of religion. Pls.' Mem. at 24-25. But plaintiffs' assertion is meritless. The District has not pressured or compelled plaintiffs to violate their religious beliefs or engage in

activity their religion forbids. And without showing a substantial burden on plaintiffs' religious conduct, plaintiffs cannot succeed on their RFRA claim.[4]

RFRA provides that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it can demonstrate the application of the burden: "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b).12.[5] But plaintiffs do not show that the Defacement Ordinance substantially burdens their exercise of religion and, even if plaintiffs could, the Ordinance furthers a compelling government interest while using the least restrictive means to do so.

To demonstrate a substantial burden on their religious exercise, plaintiffs would have to show that the District "put[ ] 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)). "RFRA decisions turn on an element of compulsion," *Archdiocese of Wash.*, 281 F. Supp. 3d at 114, and the element of compulsion required to establish a substantial burden under RFRA is not present here.

---

[4]    Only plaintiffs Whittington, Cleveland and Gurley bring a claim under RFRA.

[5]    Although the Supreme Court struck down the portion of RFRA regulating state and local governments, *City of Boerne v. Flores*, 521 U.S. 507 (1997), RFRA remains applicable to the District as a "covered" federal entity, *see* 42 U.S.C. § 2000bb-2(1)-(2); *Potter v. District of Columbia*, 558 F.3d 542, 546 (D.C. Cir. 2009).

Plaintiffs' argument that the application of the Defacement Ordinance constitutes a substantial burden on their religious exercise relies on *Sherbert v. Verner*, 374 U.S. 398 (1963), which is distinguishable. Pls.' Mem. at 24. In *Sherbert*, the Supreme Court held that a state could not deny unemployment benefits to a claimant who had refused employment that would have required her to work on Saturday in violation of her religious beliefs. *Id.* at 403. The Court noted that there was no "doubt that the prohibition against Saturday labor is a basic tenet of" the claimant's religion, *id.* at 399 n.1, and the state's policy forced her to choose between "abandoning one of the precepts of her religion" and receiving benefits, *id.* at 404. Here, there is no such government coercion that forces plaintiffs to choose between violating the Defacement Ordinance and violating a basic tenet of their religion. Plaintiffs merely allege that "pro-life advocacy is an exercise of ... their religious beliefs," Pls.' Mem. at 25, but the Defacement Ordinance does not prohibit plaintiffs from engaging in that advocacy. The Defacement Ordinance's prohibition on one form of spreading their religious message does not compel plaintiffs to violate a core tenet of their religious beliefs and, therefore, does not amount to a substantial burden.

The circumstances here are more aptly compared to the well-established line of cases in this Circuit holding that a prohibition on one particular means of spreading the gospel is not a "substantial burden" on the exercise of religion. *See Mahoney*, 642 F.3d at 1121 (finding that application of Defacement Ordinance to prevent chalking anti-abortion messages on sidewalks was not a substantial burden); *Henderson*, 253 F.3d at 17 (rejecting a challenge to regulations preventing

individuals from selling t-shirts on the National Mall even though plaintiffs alleged that their religion required them to spread the gospel by "all available means"); *Archdiocese of Wash.*, 281 F. Supp. 3d at 115 (finding that ban on religious advertisements on public transit vehicles was not a substantial burden). Under binding precedent in this Circuit, "when a restriction merely prohibits one of a multitude of methods of spreading the gospel, and it does not 'force[] [parties] to engage in conduct that their religion forbids' or prevent 'them from engaging in conduct their religion requires,' those parties are not 'substantially burdened.'" *Mahoney*, 642 F.3d at 1121 (alterations original) (quoting *Henderson*, 253 F.3d at 16). In *Mahoney,* the D.C. Circuit found that the Defacement Ordinance did not substantially burden the plaintiff's religious exercise because "the District's threatened use of the Defacement [Ordinance] prohibits only 'one of a multitude of means' of conveying [plaintiff's] religious message." *Id.* The D.C. Circuit concluded that the plaintiff could "still spread his message through picketing, a public prayer vigil, or other similar activities in which he has previously engaged." *Id.* The same is true here, *see* Section I.A.1.d above, and the prohibition of one form of communication is not a substantial burden.

Moreover, the sincerity of plaintiffs' belief that they should engage in pro-life advocacy is not in dispute. Plaintiffs' characterization that the inability to chalk sidewalks with their chosen message is a "substantial burden," *see* Pls.' Mem. at 25, is a "legal conclusion, cast as a factual allegation," which does not provide "facts sufficient to state a substantial burden," *Kaemmerling*, 553 F.3d at 679. In other

words, "the existence of [a] belief, and even the sincere desire to act in accordance with it, is not enough to sustain a [RFRA] claim." *Archdiocese of Wash.*, 281 F. Supp. 3d at 114. Indeed, "to make religious motivation the critical focus is ... to read out of RFRA the condition that only substantial burdens on the exercise of religion trigger the compelling interest requirement." *Id.* In using the approach, the D.C. Circuit cautioned against "expanding [the] RFRA's coverage beyond what Congress intended … [by] reduc[ing RFRA claims] into questions of fact, proven by the credibility of the claimant." *Mahoney*, 642 F.3d at 1121. Here, as in *Henderson*, *Mahoney* and *Archdiocese of Washington*, the Court may acknowledge the sincerity of plaintiffs' belief that it should engage in pro-life advocacy, but the prohibition on one form of that expression in a particular place is not a substantial burden on plaintiffs' religious exercise when plaintiffs have other means available for advocacy.

Even if the Court found that the Defacement Ordinance constitutes a substantial burden on plaintiffs' exercise of religion, the District satisfies its burden to show that the Ordinance furthers a compelling government interest with the least restrictive means, as discussed in Section I.A.1.c above.

> **6.  Plaintiffs Cannot Succeed on Their Claim Under the Free Exercise Clause Because the Defacement Ordinance Has Not Imposed a Substantial Burden on Plaintiffs' Religious Exercise and the Ordinance is Neutral and Generally Applicable.**

Plaintiffs contend that the District's application of the Defacement Ordinance violates the Free Exercise Clause because the District enforces the Ordinance against religiously-motivated defacement but not non-religious defacement. Pls.' Mem. at 27. That, too, is incorrect. The District has not violated plaintiffs' free exercise rights

37

because: (1) the Ordinance does not substantially burden plaintiffs' religious practice; and (2) the District's application of the Ordinance is neutral and generally applicable. As a result, plaintiffs cannot succeed on their free exercise claim. *See All. for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 179 (D.D.C. 2000) ("neutral laws of general applicability do not violate the Free Exercise Clause, even if the laws incidentally burden religion.").

First, plaintiffs must make a "threshold showing" that "a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice" before the Free Exercise clause is implicated. *Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C. Cir. 2002). In evaluating whether a law imposes a substantial burden on a plaintiff's religious exercise, courts must find that "[t]he litigant's beliefs [are] sincere and the practices at issue [are] of a religious nature," and that the law "burden[s] a central tenet or important practice of the litigant's religion." *Id.* For the reasons described above, *see* Section I.A.5, plaintiffs cannot show that the prohibition on defacing public sidewalks and streets substantially burdens their religious practice. This alone defeats their claim.

Second, even if the Court found that the Defacement Ordinance substantially burdened plaintiffs' religious exercise, plaintiffs' free exercise claim could not succeed because the District's application of the Ordinance is neutral and generally applicable. The First Amendment "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."

38

*Archdiocese of Wash.*, 281 F. Supp. 3d at 112 (quoting *Emp't Div. Dep't of Human Res. of Oreg. v. Smith*, 494 U.S. 872, 879 (1990), and citing *Lukumi Babalu*, 508 U.S. at 531-32). A law is neutral "if the object of a law is [not] to infringe upon or restrict practices because of their religious motivation." *Lukumi Babalu*, 508 U.S. at 533. And a law is generally applicable if it "cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 543.

Here, plaintiffs argue that the Defacement Ordinance is not neutrally applied because the enforcement "discriminates against the [plaintiffs'] religious exercise." Pls.' Mem. at 27. But, as discussed above, plaintiffs' claims of disparate enforcement are baseless. *See* Background. Plaintiffs have offered no evidence or allegation that MPD targeted or will target plaintiffs for enforcement of the Ordinance because of plaintiffs' religious conduct. *Cf. Lukumi Babalu*, 508 U.S. at 534 (finding that "suppression of the central element of the Santeria worship service was the object of the ordinances" when "the only conduct subject to ordinances ... is the religious exercise of Santeria church members."); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 167-68 (3d Cir. 2002) (finding that a city's ordinance that prohibited affixing materials to utility poles was not neutral when the city removed religious but not non-religious items). Thus, plaintiffs cannot show that the District has made enforcement decisions based on the religious nature of the message. The application of the Defacement Ordinance against plaintiffs was neutral.

Similarly, plaintiffs argue that the Defacement Ordinance is not generally applicable because the District's enforcement has been "underinclusive." Pls.' Mem.

at 26-27. But plaintiffs arrive at this conclusion by, once again, erroneously asserting that the District has failed to enforce the Defacement Ordinance against "the 'Defund the Police' mural [painters] or the myriad instances of speech and street art containing substantially similar messages." *Id.* at 27. Yet again, *see* Background, plaintiffs' assertions about discriminatory enforcement are incorrect, and the District's enforcement of the Ordinance is generally applicable.

In sum, because the application of the Defacement Ordinance does not impose a burden on plaintiffs' religious conduct and the Ordinance is neutral and generally applicable, there can be no violation of the Free Exercise Clause. *See Adair v. England*, 183 F. Supp. 2d 31, 53 (D.D.C. 2002) (finding that if the challenged law is both neutral and generally applicable, it "need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice"). But even if the Court found that the District did not satisfy those requirements—which would subject the Defacement Ordinance to strict scrutiny to determine whether it violates the Free Exercise Clause—the District has a compelling government interest in applying the Ordinance and does so using narrowly tailored means. *See* Section I.A.1.c above; *Lukumi Babalu*, 508 U.S. at 546 ("A law burdening religious practice that is not neutral or not of general application must ... be narrowly tailored in pursuit of [a compelling government interest].").

B.  <u>**Plaintiffs Will Not Suffer Irreparable Harm Absent Relief Because They Have Not Suffered an Injury.**</u>

The D.C. Circuit has held that "failure to demonstrate irreparable harm is 'grounds for refusing to issue a preliminary injunction, even if the other three factors

entering the [preliminary injunction] calculus merit such relief.'" *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (observing that there is "a high standard for irreparable injury")). "[P]roving irreparable injury is a considerable burden, requiring proof that the movant's injury is certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (internal citations and quotation marks omitted). If a party fails to make a sufficient showing of irreparable injury, a court may deny a motion for preliminary relief without considering the other factors. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

Here, plaintiffs have not made a sufficient showing of an injury to satisfy the irreparable harm prong. Though plaintiffs note that the "loss of constitutional freedoms, for even minimal periods of time" is sufficient to show irreparable harm, *see* Pls.' Mem. at 28 (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)), mere "possibility" of a constitutional harm is not sufficient to satisfy a plaintiff's burden of showing that irreparable harm would occur absent a preliminary injunction, *Winter*, 555 U.S. at 21. Indeed, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22 (emphasis added); *see Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("[T]he deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be

likely."). Plaintiffs have not met this burden. As discussed above, plaintiffs have not shown they are likely to succeed on their claims under the First Amendment, Fifth Amendment or RFRA. Thus, plaintiffs fail to identify any irreparable harm that results from the application of the Defacement Ordinance or the absence of their requested relief.

### C.   The Balance of the Equities and the Public Interest Weigh in Favor of the District.

Even if a movant demonstrates a likelihood of success and irreparable injury, the Court still must balance the equities between the parties and consider the public interest. *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020). Those two factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

Although plaintiffs argue they are suffering from the deprivation of their First Amendment rights by not being allowed to paint their message on a street or sidewalk, they do not have an unrestricted right to convey their message by defacing government property. It is well settled that "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron*, 452 U.S. at 647. Plaintiffs' interest in relief is minimal, given that they are already permitted to communicate their views in public places and the Defacement Ordinance only prevents one form of the communication. *See* Section I.A.1.d above.

The District, on the other hand, has a substantial interest in maintaining the aesthetic appearance of the public sidewalks and roads. And as explained above, the Supreme Court has found that "municipalities have a weighty, essentially esthetic

interest in proscribing intrusive and unpleasant formats for expression." *Taxpayers for Vincent*, 466 U.S. at 895. Indeed, the D.C. Circuit specifically found that the government had a substantial interest in "controlling the esthetic appearance" of its streets. *Mahoney*, 642 F.3d at 1118; *see* Section I.A.1.c.

Moreover, "[t]he government's interest in enforcing the [D]efacement [Ordinance] ... should not be judged solely by reference to the demonstration at hand nor by reference to the harm caused (or not caused) by a single letter written by a single demonstrator." *Mahoney*, 662 F. Supp. 2d 74 at 91 (internal quotation marks and citations omitted). "Instead, courts must look to what would happen if *every* individual to which a restriction applies were freed of its limitations, and defendants were compelled to grant each and every request to chalk the promenade." *Id.* (internal quotation marks and citations omitted).

That untenable result would be the unrestrained proliferation of graffiti over all public spaces in the District. If the District were required to grant all requests to paint the streets and sidewalks, District officials would have to "brace themselves for an influx of clutter." *Summum*, 555 U.S. at 479; *cf. Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 49 n.9 (1983) (noting that is "untenable" to permit "any citizen's group or community organization with a message for school personnel" to access the school's mailboxes because it would "invite schools to close their mail systems to all but school personnel"). The District has a critical interest in managing the use of public space, especially when that space is located in the street and needs to communicate traffic safety messages to the public, as well as First Amendment

assemblies. *See McCullen v. Coakley*, 573 U.S. 464, 486 (2014) ("We have, moreover, previously recognized the legitimacy of the government's interests in ensuring public safety and order [and] promoting the free flow of traffic on streets and sidewalks ...") (internal quotation marks and citation omitted); *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941) ("Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses."). Even if plaintiffs can ultimately prevail, the balance of equities and public interest weigh against granting plaintiffs' motion for preliminary injunctive relief.

## II.   The District Is Entitled to Dismissal on All Claims.

For the reasons discussed above, plaintiffs' claims are meritless, and they are not entitled to any relief. Plaintiffs not only fail to satisfy the standard for obtaining a preliminary injunction, they also fail to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). Even if the Court accepts as true plaintiffs' factual allegations, plaintiffs have not plead sufficient facts to "allow[] the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). Here, as discussed above, plaintiffs fail to provide any plausible allegations that could support their claims under the Free Speech Clause, Due Process Clause, Assembly Clause, RFRA or Free Exercise Clause. Thus, plaintiffs fail to state a claim for relief, and the District is entitled to dismissal on all claims in the Complaint.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion for preliminary injunction and grant the District's cross-motion to dismiss plaintiffs' Complaint with prejudice.

Dated:  January 29, 2021.        Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Chief, Equity Section

*/s/ Gavin N. Palmer*
GAVIN N. PALMER [1619264]
PAMELA A. DISNEY [1601225]
Assistant Attorneys General
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
(202) 805-7440
gavin.palmer@dc.gov

*Counsel for Defendant*