UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FREDERICK DOUGLASS
FOUNDATION, INC., *et al.*,

    Plaintiffs,

        v.                                          Civil Action No. 20-3346 (JEB)

DISTRICT OF COLUMBIA,

    Defendant.

## MEMORANDUM OPINION

Large gatherings often spawn expression in a variety of forms, and last summer's protests sparked by the killing of George Floyd in Minneapolis were no exception. Tens of thousands of demonstrators flooded the streets of downtown Washington, chanting their messages for all to hear and brandishing signs adorned with pithy mantras. Some, however, took matters a step further and attempted to leave a more lasting imprint on their physical surroundings. Notwithstanding the District of Columbia's ban on defacing public property, see D.C. Code § 22–3312.01, they chalked and graffitied their messages on sidewalks and streets. Others painted the phrase "Defund the Police" in yellow block letters adjacent to a prominent, city-commissioned street mural reading, "Black Lives Matter."

This case is indeed about speech in the nation's capital, but with a different message. It arises from a lower-profile protest in sharply contrasting circumstances — including far fewer activists, a separate part of the city, and a different moment in time. On August 1, 2020, a few-dozen people held an anti-abortion demonstration outside a Planned Parenthood clinic in Northeast D.C. Their goal, piggybacking on the earlier protests, was to paint the words "Black

Pre-Born Lives Matter" in the same block-wide proportions that characterized the street murals two miles away outside the White House.  Although District police, consistent with the city's Defacement Ordinance, denied the sponsoring group permission to mark the street in any capacity over a week before the gathering, and although officers reiterated those warnings on the morning of the event, two individuals nonetheless attempted to scrawl their message in chalk on a sidewalk.  After ignoring renewed commands to cease defacing public property, they were promptly arrested.  The protest otherwise continued without further incident.

Two organizations and three individuals behind this assembly eventually brought this suit against the District, claiming that its enforcement of the Defacement Ordinance against them — but not against others voicing distinct messages earlier in the summer — contravened the First Amendment's prohibition of viewpoint discrimination, as well as several other constitutional and statutory provisions.  They subsequently moved for a preliminary injunction, requesting that the Court bar the District from enforcing the Ordinance against them when they once again attempt to coat their desired message on a public street during a forthcoming rally on March 27, 2021. Unfortunately for Plaintiffs, the Court can offer them no succor here, as they have not established a likelihood of success on any of their five claims.  It will accordingly deny their Motion.

## I.      Background

The Court begins with a brief overview of pertinent statutory provisions surrounding assemblies and protests in the District, then turns to the facts giving rise to this suit, and concludes with its procedural history.

A.  <u>First Amendment Assemblies in the District</u>

The District's First Amendment Rights and Police Standards Act of 2004 declares it the city's policy to permit "peaceful First Amendment assemblies on the streets, sidewalks, and other public ways."  D.C. Code § 5–331.03.  Such assemblies, however, are "subject to reasonable restrictions designed to protect public safety, persons, and property, and to accommodate the interest of persons not participating in the assemblies to use the streets, sidewalks, and other public ways."  <u>Id.</u>  Groups are generally required to provide notice to and seek approval from the District prior to holding a First Amendment assembly so that the city can allocate police protection and otherwise assist participants.  <u>Id.</u> § 5–331.05(b)–(c); <u>but see</u> <u>id.</u> § 5–331.05(d) (listing exceptions).  The Metropolitan Police Department may also enforce "reasonable time, place, and manner restrictions" on an assembly, either prior to the event through approval of a plan, or during the event (regardless of whether it has been approved).  <u>Id.</u> § 5–331.04(b); <u>see also</u> <u>id.</u> § 5–331.04(b)(2) (listing additional criteria for restrictions enforced during assembly for which plan has been approved).

One restriction applicable during assemblies, and of particular relevance here, is the city's Anti-Intimidation and Defacing of Public or Private Property Criminal Penalty Act of 1982 — otherwise known as the Defacement Ordinance.  It provides, in part, as follows:

> It shall be unlawful for any person or persons willfully and wantonly . . . to write, mark, draw, or paint, without the consent of the owner or proprietor thereof, or, in the case of public property, of the person having charge, custody, or control thereof, any word, sign, or figure upon: Any property, public or private, building, statue, monument, office, public passenger vehicle, mass transit equipment or facility, dwelling or structure of any kind . . . .

D.C. Code § 22–3312.01.  "Property" is defined to include streets and sidewalks.  <u>Id.</u> § 22–3312.05(9).  The District enforces the Ordinance against defacement of public and private

property when it becomes aware of violations and is able to identify suspects.  See ECF No. 13-2 (Declaration of Guillermo Rivera), ¶ 4.

B.  Factual Background

As Plaintiffs' claims rely in substantial part on the District's allegedly favored treatment of property defacement that occurred during select protests predating their own, the Court will begin there, before eventually shifting to the critical August assembly.  Given the thin nature of the present evidentiary record, the Court draws some of the operative facts from the parties' briefing.

On June 5, 2020, in the heat of the demonstrations that took the District — and cities across the nation — by storm, Mayor Muriel Bowser commissioned a mural on a two-block stretch of 16th Street immediately north of the White House.  See ECF No. 13-1 (Def. Opp.) at 5. Artists from a program within the District's Department of Public Works painted the words "Black Lives Matter" on the street in bolded yellow letters.  Id.  The design, which also featured the D.C. flag (three stars over two bars), remains in place to this day.

Less than 24 hours later — on a Saturday that witnessed thousands fill the city's downtown blocks — protesters unaffiliated with the District left their own mark on 16th Street. With paint supplies in tow, they blotted out the stars at the top of the D.C. flag emblazoned next to the "Black Lives Matter" mural and added a new message — "Defund the Police" — of far smaller but nonetheless considerable size.  See ECF No. 1 (Compl.), ¶ 36.  The effect of the amendment was that the mural appeared to state, "Black Lives Matter = Defund the Police." Def. Opp. at 6.  No permit was issued for the event at which the painting occurred, and MPD had no warning or advance notice of the protesters' plans.  See Rivera Decl., ¶ 6.  The following day, city employees restored the stars on top of what was originally the D.C. flag, thus eliminating the

appearance of an equals sign.  See Def. Opp. at 6.  The District did not remove the activists'

"Defund the Police" mural for approximately two months.  Id.; ECF No. 8 (Pl. Mot.) at 5.

Protesters created additional graffiti art and affixed further messages, though of a

considerably less intrusive sort, on construction scaffolding outside the U.S. Chamber of

Commerce building a block away from the murals, as well as on the adjacent public street.  See

Pl. Mot. at 6–8; Compl., ¶¶ 43, 48.  The Chamber consented to the presence of the former

designs on its own property, even permitting activists to produce more.  See Def. Opp. at 21.

According to Plaintiffs, the District "did not enforce [the Defacement Ordinance] against any

protestor of police brutality or use it to silence their speech in anyway [sic]."  Pl. Mot. at 8.

While Defendant does not specifically dispute that contention with respect to the aforementioned

incidents, it indicates that the city made 22 arrests for violations of the Ordinance in the latter

half of 2020, including six "in connection with the Black Lives Matter protests."  Def. Opp. at 5;

see also Rivera Decl., ¶ 5; ECF No. 18 (Def. Reply) at 12, 17 n.4.

It is here that the Frederick Douglass Foundation and Students for Life of America —

Plaintiffs in this action — enter the story.  FDF is a self-described "national education and public

policy organization . . . that advocates free-market and limited-government ideas."  Compl., ¶ 16.

SFLA, for its part, "is the nation's largest youth pro-life organization" and "exists to recruit,

train, and mobilize pro-life students to abolish abortion."  Id., ¶¶ 26–27.  Together, the two

groups planned a joint rally outside Planned Parenthood's Carol Whitehill Moses Center in

Northeast D.C. — i.e., an entirely different quadrant of the city from the BLM protests.  See

Compl., ¶¶ 51–52.  In heavily freighted language, they describe their goal as "bring[ing]

attention to the fact that the abortion industry kills numerous preborn African-American children

every year."  ECF No. 8-1 (Declaration of Angela "Tina" Whittington), ¶ 4; see also Compl.,

¶ 22 ("FDF . . . stands for and with Black America, including the most vulnerable among this population: those black babies still in the womb.").

The groups intended for this particular event — scheduled for August 1, 2020 — to extend beyond mere chanting and signage.  Specifically, they sought to paint on the city street outside the Planned Parenthood facility, in a style and manner mimicking the murals emblazoned just north of the White House, the phrase "Black Pre-Born Lives Matter."  Whittington Decl., ¶ 4.  The District learned of Plaintiffs' aims well in advance of the rally date via their assembly-permit application, which requested permission to paint — notwithstanding the Defacement Ordinance — their envisioned mural during the forthcoming event.  See Rivera Decl., ¶ 7.  Although MPD approved the request to assemble, informing the groups that they could "possess bullhorns, music stand[s] and signs" and hold an event of their desired size (up to 49 people) at their preferred time and place, it nonetheless expressly denied permission to paint or otherwise mark the street.  See ECF No. 13-3 (Assembly Plan Approval) at ECF p. 2 ("Marking or painting the street is not permitted.");  see also Rivera Decl., ¶ 8.  It also directed that all assembly participants "must comply with all the conditions of this assembly approval plan and applicable regulations and instructions issued by [MPD]."  Assembly Plan Approval at ECF p. 2.  (Notwithstanding the permit's express proscription of painting — which Plaintiffs never acknowledge in their materials before this Court — an SFLA official maintains that an unidentified MPD officer at an unknown time in advance of the rally gave her "verbal permission" to paint the group's message during the event.  See Whittington Decl., ¶ 6.)

On the morning of the assembly, FDF and SFLA members arrived outside the Planned Parenthood at the crack of dawn, some as early as 5:00 a.m.  Id., ¶ 8; ECF No. 8-2 (Declaration of Robert "J.R." Gurley, Jr.), ¶ 5.  Approximately 32 D.C. police officers were soon on the scene

pursuant to standard operating procedures for permitted First Amendment events.  See ECF No. 13-4 (Declaration of Carlos Mejia), ¶ 4.  When some protesters expressed their desire to paint the city street, MPD informed them — in keeping with the terms of the event permit — that they could not do so because such behavior would constitute defacement of property.  Id., ¶ 5; Whittington Decl., ¶ 8.  Officers responded in the same manner upon demonstrators' subsequent request to chalk the sidewalk.  See Mejia Decl., ¶ 5; Whittington Decl., ¶ 8.  Despite those admonitions, shortly before 7:30 a.m., two individuals began inscribing messages on the sidewalk in chalk.  See Mejia Decl., ¶ 6.  When they continued to do so following renewed warnings that failure to cease would lead to arrest, officers made good on their promises, taking the two participants into custody.  Id., ¶¶ 6–7.  The protest continued on, with demonstrators chanting and displaying their "Black Pre-Born Lives Matter" message on posters.  See Def. Opp. at 9.  The two arrestees, having been released in relatively short order, promptly rejoined the gathering.  Id.; Mejia Decl., ¶ 7.

FDF and SFLA intend to hold a renewed rally on March 27, 2021, at which they will — once again — attempt to coat the street with their painted slogan.  See Whittington Decl., ¶ 9. The groups desire that their design be "as large and as prominent as the 'Black Lives Matter' and 'Defund the Police' murals."  Id.

C.  Procedural History

Hoping for clearance to paint during their 2021 event, FDF and SFLA — along with three individual officers and members — filed this suit against the city on November 18, 2020. Their Complaint, which asserts five claims, contends most prominently that the District has enforced the Defacement Ordinance in a content- and viewpoint-discriminatory manner, thus running afoul of the First Amendment.  See Compl., ¶¶ 71–90.  It also alleges violations of the

Fifth Amendment's equal-protection guarantee, their expressive-association rights, the Religious

Freedom Restoration Act, and the Free Exercise Clause. Id., ¶¶ 91–140.

Precisely one month later, Plaintiffs filed this Motion for Preliminary Injunction, which

incorporates each of the Complaint's five challenges. See Pl. Mot. An attachment states their

desired relief: an order enjoining the District from enforcing the Ordinance against them at their

March 27 rally and beyond, thereby enabling them to paint or chalk their messages of choice on

city streets and sidewalks. See ECF No. 8-4 (Proposed Order) at 1–2. Plaintiffs requested a

ruling from this Court prior to that date. See Pl. Mot. at 3. Concurrent with the filing of its

Opposition, the District moved to dismiss the Complaint for failure to state a claim. See Def.

Opp.; ECF No. 14-1 (Def. Mot.). Given the aforementioned time constraints, the present

Opinion resolves only Plaintiffs' Motion.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter

v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary

injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to

suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in

his favor, and [4] that an injunction is in the public interest." Sherley v. Sebelius, 644 F.3d 388,

392 (D.C. Cir. 2011) (alterations in original) (quoting Winter, 555 U.S. at 20). "The moving

party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the

requested relief is warranted." Hospitality Staffing Solutions, LLC v. Reyes, 736 F. Supp. 2d

192, 197 (D.D.C. 2010) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290,

297 (D.C. Cir. 2006)).

Historically, these factors have "been evaluated on a 'sliding scale.'" Davis v. Pension

Ben. Guar. Corp., 571 F.3d 1288, 1291 (D.C. Cir. 2009) (quoting Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)).  In other words, if the movant makes an "unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  Id. at 1291–92.  This Circuit has hinted, though not held, that Winter — which overturned the Ninth Circuit's "possibility of irreparable harm" standard — establishes that "likelihood of irreparable harm" and "likelihood of success" are "'independent, free-standing requirement[s].'"  Sherley, 644 F.3d at 392–93 (quoting Davis, 571 F.3d at 1296 (Kavanaugh, J., concurring)); see League of Women Voters v. Newby, 838 F.3d 1, 7 (D.C. Cir. 2016) (declining to address whether "sliding scale" approach is valid after Winter).  At any rate, courts in our Circuit have squarely held that a failure to demonstrate a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion.  See Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric., 573 F.3d 815, 832 (D.C. Cir. 2009).

## III.   Analysis

Plaintiffs contend that the District's enforcement of the Defacement Ordinance against them offends four separate constitutional provisions, along with RFRA.  In this season of March Madness, we are often reminded that basketball players (like litigants) miss 100% of the shots they do not take; that does not mean, however, that simply piling on claims can transform a weaker suit into something more fruitful.  Such is the case here, as Plaintiffs do not find the rim — or establish a likelihood of success — on any of their five shots.

The Court takes each of Plaintiffs' claims in turn.  As their free-speech challenge is the most involved, the Court will devote most of its time there, before moving on to their equal-protection, expressive-association, RFRA, and free-exercise claims.

A.  <u>Freedom of Speech</u>

The First Amendment prohibits government entities from "abridging the freedom of speech."  Plaintiffs argue that the District ran afoul of this guarantee by invoking the Defacement Ordinance to curtail their endeavor to paint and chalk a public street with their message. Plaintiffs, it should be noted, do not mount a facial challenge to the Ordinance; in other words, they do not contend that it is unconstitutional in all, or even most, applications.  Rather, they purport to bring an as-applied claim, arguing only that it is unconstitutional as the District has applied it to them in light of their own particular circumstances and the city's enforcement history.  <u>See</u> Pl. Mot. at 15; Compl., ¶¶ 1, 87; <u>see also</u> <u>Edwards v. District of Columbia</u>, 755 F.3d 996, 1001 (D.C. Cir. 2014) (explaining that to prevail on as-applied free-speech challenge, plaintiff must show statute is unconstitutional as applied to her particular expressive activity).

The Court begins with a detour into whether the First Amendment even provides the proper legal framework for resolving Plaintiffs' claim before concluding that, assuming it does, they have not established a likelihood of success.

1.  *Suitability of First Amendment Framework*

The threshold question to which the Court refers is one that the parties never adequately develop and on which it harbors doubts — specifically, whether Plaintiffs' claim is properly analyzed under the First Amendment at all.  The gravamen of their challenge is that the District has enforced the Ordinance in a content- and viewpoint-discriminatory manner, silencing "speech it disagrees with" while "not enforcing [it] against speech it prefers."  Compl., ¶¶ 78, 86. In a brief bid to turn Plaintiffs away at the gates, Defendant posits that this type of claim is actually one for selective prosecution appropriately considered under the Equal Protection Clause, rather than the First Amendment.  <u>See</u> Def. Opp. at 19 & n.3; <u>see also, e.g.</u>, <u>Henderson v.</u>

Kennedy, 253 F.3d 12, 17–18 (D.C. Cir. 2001) (analyzing claim as "one of selective enforcement" under Equal Protection Clause where plaintiffs alleged that government "has not applied its regulations equally").

Although the District cites but a sole district-court decision when making its case, the Court's own review suggests that the city may be on to something.  The D.C. Circuit has explained that selective-enforcement claims are properly analyzed under the Equal Protection Clause, not the First Amendment, even if a plaintiff alleges that the selective enforcement occurred because the government sought to prevent the exercise of her free-speech rights. Sanjour v. EPA, 56 F.3d 85, 92 n.9 (D.C. Cir. 1995).  Any such motivation, while no doubt relevant to the analysis, "does not transform an equal protection 'selective enforcement' claim into a First Amendment 'as-applied' challenge." Id. ("The critical inquiry in such cases is thus not whether legislation is constitutional 'as applied' to a particular set of facts, but rather whether the government may constitutionally 'apply' the same rule to some individuals but not to others similarly situated.").  Indeed, as the Ninth Circuit reasoned in circumstances similar to those present here, a claim that a law has been enforced in a viewpoint-discriminatory manner is "usually not categorized . . . as an 'as-applied' First Amendment challenge," but rather as a "selective enforcement equal protection claim[]." Hoye v. City of Oakland, 653 F.3d 835, 855 (9th Cir. 2011).

Other courts in this district have proceeded similarly.  In United States v. Barnes, 481 F. Supp. 3d 15 (D.D.C. 2020), for instance, several defendants charged with violating a statute criminalizing expressive behavior on the Supreme Court plaza argued that it was unconstitutional as applied to their conduct. Id. at 21.  Although they contended that the government's selective application of the statute belied assertions of its viewpoint neutrality, the court remarked that this

11

tack was "[m]ore akin to a claim that [they] are the victims of impermissible selective

prosecution," and that "[v]iewpoint-discriminatory enforcement practices do not transform

otherwise viewpoint-neutral laws." Id. at 24. Similarly, in BEG Investments, LLC v. Alberti, 85

F. Supp. 3d 13 (D.D.C. 2015), a business argued that the government had exercised its liquor-

license enforcement discretion in content-discriminatory fashion, thus burdening its ability to

play certain kinds of music and infringing its First Amendment rights. Id. at 35. Although the

business did not classify its claim as one of selective enforcement, the court nonetheless

considered it under the Equal Protection rubric. Id. at 35–36, 37–38.

　　　　Plaintiffs decline to acknowledge this caselaw or even the District's contention that their

allegations of a discriminatory enforcement pattern are more properly considered under an equal-

protection framework. The most they do is briefly insist, in a different section of their Reply,

that they have not brought a selective-enforcement claim. See ECF No. 17 (Pl. Reply) at 16.

Their own submissions, however, counsel otherwise; both their Complaint and briefing suggest

that the thrust of their First Amendment claim is that the District has selectively enforced the

Defacement Ordinance against them based on the content and/or viewpoint of their speech. See

Compl., ¶ 78 ("The District's enforcement of the Defacement Ordinance to censor the message

of Plaintiffs is impermissibly content and viewpoint based. The application of the Defacement

Ordinance to Plaintiffs therefore unconstitutionally discriminates against Plaintiffs' speech based

on its content and Plaintiffs' viewpoint."); id., ¶ 86 ("The District has a policy and practice of

enforcing the Defacement Ordinance against speech it disagrees with and not enforcing against

speech it prefers."); Pl. Reply at 3 ("Here, the District applied the Defacement Ordinance in a

content and viewpoint discriminatory manner when it allowed speech it approves but enforced

the Ordinance against [Plaintiffs'] speech."); id. at 6 (arguing that "the District is forbidden from

engaging in discriminatory <u>enforcement</u> of the Defacement Ordinance").  Plaintiffs' own

materials thus intimate that their true claim is one protesting the District's selective enforcement

of the Ordinance more properly analyzed under the Equal Protection Clause.

The Court nonetheless sees ample reason to refrain from terminating the First

Amendment analysis before it even gets started.  Notwithstanding its previously mentioned

guidance, the D.C. Circuit does not appear to have conclusively weighed in on which doctrinal

framework governs claims of the precise sort raised here.  Other circuits, meanwhile, have

expressly entertained First Amendment as-applied challenges based on the government's alleged

selective or discriminatory enforcement of a statute.  See, e.g., Brown v. City of Pittsburgh, 586

F.3d 263, 292–93 (3d Cir. 2009); McGuire v. Reilly, 386 F.3d 45, 61–62 (1st Cir. 2004).  In

addition, as will soon become clear, the doctrinal differences between an equal-protection and

First Amendment as-applied approach are at times "semantic rather than substantive," Hoye, 653

F.3d at 855, and the parties here principally ground their arguments in free-speech caselaw.  The

Court will therefore "assum[e]" that the First Amendment supports an as-applied challenge to a

neutral law where a plaintiff alleges discriminatory enforcement based on content and/or

viewpoint.  Barnes, 481 F. Supp. 3d at 24; see also Def. Opp. at 19.  Such assumption does not

change the outcome here, however, for as the Court will explain, Plaintiffs are not likely to

succeed in their quest to establish the requisite content or viewpoint discrimination at any rate.

(It will later conclude that Plaintiffs' separate equal-protection claim also fails.  See infra at 32–

35.)

2.  *Merits*

With that protracted prelude in the books, the Court turns to resolving Plaintiffs' claim,

taking them at their word and treating it as a proper as-applied challenge under the First

Amendment.  See Compl., ¶ 87; Pl. Reply at 3.  In so doing, the Court draws substantial

guidance from the D.C. Circuit's decision in Mahoney v. Doe, 642 F.3d 1112 (D.C. Cir. 2011),

which concerned a set of circumstances similar in many respects to those presented here.  In

Mahoney, a group of individuals sought permission to hold an anti-abortion demonstration that

involved chalking a public street in front of the White House.  Id. at 1114.  While granting them

approval to conduct their assembly, the D.C. police denied their request to chalk the street and

eventually stopped one person from doing so, invoking the very same Defacement Ordinance at

issue here.  Id. at 1115 (citing D.C. Code § 22–3312.01).  Unhappy with that outcome, the

protesters brought suit against the city, mounting, inter alia, a First Amendment challenge to the

constitutionality of the Ordinance as applied to their efforts to chalk the street.  Id.  On appeal,

the Court of Appeals unanimously affirmed the district court's conclusion that application of the

Ordinance to the plaintiffs' desired activity — i.e., chalking the public street — did not violate

their First Amendment rights.  Id. at 1119; see also id. at 1122 (Kavanaugh, J., concurring) ("No

one has a First Amendment right to deface government property.").

    Mahoney thus provides the framework for the Court's analysis of the distinct as-applied

challenge to the Ordinance that Plaintiffs bring here.  As in that case, the Court will proceed in

three broad steps: "first, determining whether the First Amendment protects the speech at issue,

then identifying the nature of the forum, and finally assessing whether the District's justifications

for restricting [Plaintiffs'] speech 'satisfy the requisite standard.'"  Id. at 1116 (quoting Cornelius

v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985)).  As will soon become

evident, however, this precedent does not get the Court all the way home, for Plaintiffs'

argument here carries a different thrust.  Instead of simply claiming a general right to paint or

chalk a public street, a position foreclosed by <u>Mahoney</u>, they contend that such right flows in these particular circumstances from the city's permitting <u>others</u> to paint their own messages.

The first two steps can be resolved in short order, and the parties do not belabor them. First, although the Defacement Ordinance does not regulate speech, it indisputably criminalizes certain forms of conduct that are "clearly expressive," such as "painting, drawing, or writing." <u>Id.</u> at 1116 (citing D.C. Code § 22–3312.01). Neither party disputes that Plaintiffs' desired activity — the creation of a message via painting — qualifies as an expressive act that implicates the First Amendment.

The second step follows nearly as readily. For the uninitiated reader, "the extent of scrutiny given to a regulation of speech — in effect, how [a court] examine[s] the directness with which it promotes the government's goals and the degree to which it burdens speech — depends on whether the regulation applies in a <u>public</u> or <u>nonpublic</u> forum." <u>Boardley v. U.S. Dep't of Interior</u>, 615 F.3d 508, 514 (D.C. Cir. 2010). The former "are those places which by long tradition or by government fiat have been devoted to assembly and debate." <u>Cornelius</u>, 473 U.S. at 802 (quoting <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 46 (1983)). The latter, by contrast, consist of "[p]ublic property which is not by tradition or designation a forum for public communication." <u>Boardley</u>, 615 F.3d at 514 (alteration in original) (quoting <u>Perry</u>, 460 U.S. at 46).

"[P]ublic places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be public forums." <u>United States v. Grace</u>, 461 U.S. 171, 177 (1983) (internal quotation marks and citations omitted); <u>see also</u> <u>Perry</u>, 460 U.S. at 45 (explaining that streets — which "have immemorially been held in trust for the use of the public" and "have been used for purposes of assembly, communicating

thoughts between citizens, and discussing public questions" — are "quintessential" example of public forums) (citation omitted).  As the District does not seriously argue otherwise, the Court will treat the street on which Plaintiffs sought to paint their desired message as a public forum. See Mahoney, 642 F.3d at 1117 (reaching same result).

This determination does not hand Plaintiffs a victory, though, since regulation of speech in a public forum is still permitted.  As for whether the District's justifications for its restriction here pass constitutional muster, the Court turns to the critical third step of the analysis.  In a fitting — or, perhaps more precisely, painful — development, this third step yields yet another three-part inquiry.  Specifically, the government may impose "time, place, and manner" restrictions on speech in a public forum so long as such restrictions: 1) "are justified without reference to the content of the regulated speech"; 2) "are narrowly tailored to serve a significant governmental interest"; and 3) "leave open ample alternative channels for communication of the information."  Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)); see also Mahoney, 642 F.3d at 1117.  As is so often the case, this test is more easily recited than applied.  The present occasion is no exception, as the parties vigorously debate all three prongs.  Although Mahoney once again lights the Court's path as it resolves the various disputes, Plaintiffs come armed with several complicating wrenches to the analysis — particularly on the first prong, to which the Court now looks.

### a.   Content and Viewpoint Neutrality

In Mahoney, the D.C. Circuit held that the Defacement Ordinance "is indisputably content neutral," as it bans expressive conduct "without reference to the message the speaker wishes to convey."  642 F.3d at 1118.  In other words, the restriction at issue — application of

the Ordinance to prevent individuals from chalking or painting a public street — was "justified without reference to the content of the regulated speech," thereby easily satisfying the first prong of the analysis.  Ward, 491 U.S. at 791 (quoting Cmty. for Creative Non-Violence, 468 U.S. at 293).

Plaintiffs do not quarrel with this binding holding, at least in the abstract.  Instead, perhaps in recognition of its force, they inject a new argument into the fold that they claim makes the instant case a far cry from Mahoney — to wit, that the Ordinance is unconstitutional as applied to them because the District has enforced it in a content- and viewpoint-discriminatory manner.  In other words, the city permits people to chalk messages relating to, e.g., Black Lives Matter because its leaders endorse such positions, but it prohibits the expression of anti-abortion slogans because they are inconsistent with officials' views.  See Pl. Reply at 2 (attempting to distinguish Mahoney as "premised on the fact that Defendant enforced the Defacement Ordinance in a content and viewpoint neutral manner"); id. at 8 (arguing that District's application of Ordinance "is not a regulation of time, place, or manner," but rather "an impermissible regulation of content and viewpoint").  As this is the issue on which the parties principally butt heads, it is also the one to which the Court will devote the most attention.

As a preliminary aside, the Court notes that Plaintiffs largely use the terms "content" and "viewpoint" discrimination interchangeably, never distinguishing between the two.  See, e.g., id. at 3–4 (arguing that "the District applied the Defacement Ordinance in a content and viewpoint discriminatory manner" and that "[u]neven application based on the content and views of the murals, graffiti, and assorted street art is the hallmark of content discrimination").  That is fairly unsurprising, as the distinction between content and viewpoint discrimination is often "not a precise one." Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 831 (1995);

see also id. at 829 (deeming viewpoint discrimination "an egregious form of content discrimination").  To be sure, the two doctrines are analytically distinct: while content discrimination "occurs when the government chooses the subjects that may be discussed," viewpoint discrimination "occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject."  Giebel v. Sylvester, 244 F.3d 1182, 1188 (9th Cir. 2001) (cleaned up); see also Matal v. Tam, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring in part and concurring in the judgment) ("[T]he test for viewpoint discrimination is whether — within the relevant subject category — the government has singled out a subset of messages for disfavor based on the views expressed."); Reed v. Town of Gilbert, 576 U.S. 155, 168–69 (2015) (similar).  In this case, though, the differences are largely academic, as both forms of discrimination are proscribed in public forums, and Plaintiffs seem to argue that the District's enforcement of the Ordinance was based on impermissible considerations of content (e.g., abortion-related messages) as well as viewpoint (e.g., anti-abortion messages).  See Rosenberger, 515 U.S. at 828–29; Pleasant Grove City v. Summum, 555 U.S. 460, 469 (2009). The Court, moreover, need not excessively probe, for Plaintiffs are unlikely to succeed on their claim however it is framed.

Assuming, once again, that allegations of selective or discriminatory enforcement of a particular law based on content or viewpoint fall within the scope of an as-applied challenge under the First Amendment, the Court turns to setting out the legal standard for considering them.  In order to prevail, Plaintiffs must establish "a pattern of unlawful favoritism," Thomas v. Chicago Park Dist., 534 U.S. 316, 325 (2002), by showing that they were "prevented from speaking while someone espousing another viewpoint was permitted to do so."  McCullen v. Coakley, 573 U.S. 464, 485 n.4 (2014); see also Phelps-Roper v. Ricketts, 867 F.3d 883, 897

(8th Cir. 2017); McGuire, 386 F.3d at 64.  When premised on various discrete "incidents of enforcement" (or non-enforcement), moreover, that pattern must "evinc[e] a governmental policy or custom of intentional discrimination on the basis of viewpoint or content."  Brown, 586 F.3d at 294; see also McGuire, 386 F.3d at 63.  It thus follows, as one court in this district has explained, that simply "[p]ointing to a handful of instances of allegedly inconsistent enforcement is not enough to justify declaring [a] statute unconstitutional as applied to conduct the parties do not dispute falls under its purview."  Barnes, 481 F. Supp. 3d at 25.  For in such circumstances, there is neither a "pattern" of enforcement activity based on content or viewpoint, nor a showing of government "intent[]" underlying the disparate application.  Brown, 586 F.3d at 294.

Plaintiffs have established neither of these necessary elements in the present case. Although their Complaint purports to identify a "policy and practice" of the District's discriminatory enforcement of the Defacement Ordinance, see Compl., ¶ 86, the evidence — all of which dates from the summer 2020 protests downtown — amounts to nothing of the sort.  The Court will examine Plaintiffs' identified examples seriatim.  With regard to each, they assert that the District declined to enforce the Ordinance against certain street painting and graffiti on account of its "approv[ing]" of the subject matter and viewpoint at issue.  See Pl. Reply at 3. (Although the Court could, alternatively, conduct the below analysis outside the instant time, place, and manner framework under the separate label of an as-applied challenge premised upon selective enforcement, it elects to do so here in light of the parties' briefing in this action, as well as the Mahoney district court's similar treatment of allegations that the District had enforced the Ordinance in viewpoint-discriminatory fashion.  See Mahoney v. District of Columbia, 662 F. Supp. 2d 74, 88–89 (D.D.C. 2009), aff'd sub nom. Mahoney v. Doe, 642 F.3d 1112 (D.C. Cir. 2011).)

Start with the "Black Lives Matter" street mural created by the D.C. government.  The Court can easily brush this example aside, for Plaintiffs concede that the display is <u>government</u> speech.  <u>See</u> Pl. Reply at 8.  It is well established that the First Amendment "restricts government regulation of private speech; it does not regulate government speech."  <u>Summum</u>, 555 U.S. at 467; <u>see also</u> <u>Matal</u>, 137 S. Ct. at 1757 (explaining that government need not maintain viewpoint neutrality when speaking); <u>Walker v. Texas Div., Sons of Confederate Veterans, Inc.</u>, 576 U.S. 200, 207 (2015) (same with regard to content).  The mural, moreover, cannot be an example of the city's not enforcing the Defacement Ordinance because there was no defacement, as the design was painted by District employees with the District's permission.  It thus has no bearing on Plaintiffs' claim.

They next point to scattered graffiti art on scaffolding outside the Chamber of Commerce, as well as similar designs on the adjacent public street, all of which protesters created allegedly free of consequence.  <u>See</u> Compl., ¶¶ 43, 48; Pl. Mot. at 6–8; Pl. Reply at 4.  While this set of examples actually gets off the ground, it does not advance the argument that the District has actively declined to enforce the Ordinance against speech the city assertedly favors.  Plaintiffs offer precious little about the precise circumstances in which protesters created the designs at issue and any role law enforcement might have played in enabling such activity.  It does not follow from the mere fact that select individuals managed to mark up this property with words and images supporting their cause, that the District refrained from enforcing the Ordinance "because of" its favoring the subjects discussed and messages espoused.  <u>Brown</u>, 586 F.3d at 293 (emphasis removed).  It is noteworthy, moreover, that many of the drawings to which Plaintiffs point appear to have come after the Chamber explicitly consented to their presence on its own

private property.  See Def. Opp. at 21; see also D.C. Code § 22–3312.01 (making it unlawful to mark private property "without the consent of the owner").

Even assuming, however, that MPD or other officials were on the scene, observed individuals applying graffiti to public (as opposed to private) property, and declined to intervene — facts Plaintiffs neither allege nor establish — it hardly seems likely that the content or viewpoint of the messages at issue drove their restraint.  It seems far more plausible, rather, that law enforcement opted against enforcing the Ordinance in light of the foreseeable risks of intervention in the moment — e.g., inflaming what may well have already been a tense, fervent, and chaotic protest scene.  "Law enforcement are permitted to 'exercise enforcement authority' with some degree of discretion based on 'unique circumstances,'" and the exercise of such discretion does not inevitably constitute "evidence of viewpoint discrimination."  Barnes, 481 F. Supp. 3d at 24–25 (quoting Hodge v. Talkin, 799 F.3d 1145, 1162 (D.C. Cir. 2015)).  At least at present, Plaintiffs have not offered any information supporting a conclusion to the contrary.

The Court, finally, turns to the "Defund the Police" mural, which happens to be the only one of Plaintiffs' examples that holds any real heft.  As a reminder, private protesters painted this smaller image adjacent to the city's "Black Lives Matter" mural shortly after the latter was created in June 2020.  See Pl. Mot. at 4–5.  They did so not as part of a permitted event, and the District had no warning of the protesters' plans to paint.  See Rivera Decl., ¶ 6.  The city removed the "Defund the Police" mural approximately two months after its creation.  See Pl. Mot. at 5.

The Court begins by registering its doubts surrounding Defendant's attempt to deem this design government speech and thereby lump it in with the "Black Lives Matter" mural.  See Def. Opp. at 20.  Although the District correctly notes that government selection of artwork to display

on public property is a context in which courts have applied the government-speech doctrine, in all of its cited authority, the government selected or approved the art in question *ex ante*. Those choices, in turn, commenced the public display. See, e.g., Summum, 555 U.S. at 472–73 (holding that city's decision to select certain monuments from among pool of submissions for ultimate display in public park constituted government speech). Here, by contrast, private parties painted the "Defund the Police" mural on public property independent of any prior government knowledge, choice, or approval, only to have it remain in place until the District finally elected to remove it. See Def. Opp. at 6.

The distinction matters. "If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." Matal, 137 S. Ct. at 1758. This is because the government would simply say that it endorsed any speech it agreed with but did not endorse any offering the opposing view. It could then punish the latter without being accused of viewpoint discrimination. This case, accordingly, represents a fine example of the "great caution" courts must take "before extending" government-speech precedents in order to avoid the potential for "dangerous misuse." Id. While D.C. Mayor Bowser remarked upon the artwork's creation that it was "not a part of the [city's 'Black Lives Matter'] mural," Pl. Reply at 10 (citation omitted), the District now appears to have effectively reversed course, mounting a belated bid to take ownership of the message and insulate it from First Amendment scrutiny via the government-speech doctrine. In the absence of more affirmative and contemporaneous pronouncements or actions from the District than currently present in the record, as well as additional argument as to public perception of the design at issue, the Court is loath to sanction a *post hoc* litigating

position that, if replicated and extended, might provide government a public-forum playbook for censoring disfavored and preserving preferred messages.

The Court, at any rate, need not resolve this question at the present juncture. For even assuming that the government-speech doctrine does not apply, the record leaves the Court unconvinced that any initial non-enforcement of the Defacement Ordinance against the "Defund the Police" mural, when considered alongside its subsequent enforcement against Plaintiffs, constitutes evidence of content or viewpoint discrimination. On the contrary, given distinct differences between the circumstances surrounding the mural's creation and the incident involving Plaintiffs nearly two months later, it seems far more likely that the District's contrasting response turned on factors other than the content or viewpoint of the speech at issue.

Consider the District's advance knowledge of the relevant activities. It is undisputed that MPD was not aware of plans to create the "Defund the Police" mural ahead of time, and the assembly at which the painting occurred was not a permitted event with a clearly defined scope. See Rivera Decl., ¶ 6; Def. Opp. at 20. Not so when it came to Plaintiffs' gathering on August 1, 2020. SFLA sought approval for the assembly nearly two weeks in advance. See ECF No. 1-1 (Assembly Application) at ECF p. 2. As part of that submission, it requested permission to paint the words "Black Pre-Born Lives Matter" on the public street holding the protest. See Rivera Decl., ¶ 7. Although MPD approved the assembly, it expressly denied the request to paint or mark the street. Id., ¶ 8; see also Assembly Plan Approval at ECF p. 2 ("Marking or painting the street is not permitted."). While the "Defund the Police" painting thus may well have caught ill-prepared officials by surprise at an unregistered event, their forbidding Plaintiffs from acting similarly is readily explained by the well-in-advance nature of their explicit request for permission to violate the law.

Further differences unrelated to the content and viewpoint of the messages at issue emerge upon considering the particular circumstances of the two events.  As with the aforementioned graffiti, the parties offer little detail regarding the actual creation of the "Defund the Police" mural; Plaintiffs never even allege the bare minimum of police observing the painting and declining to act.  Even assuming they had provided evidence to that effect, however, it seems reasonable to conclude (once again) that the decision not to enforce the Ordinance was a legitimate exercise of law-enforcement discretion driven not by the message being painted, but rather by public-safety imperatives in unique circumstances.  See Barnes, 481 F. Supp. 3d at 24–25.  Thousands upon thousands of impassioned Americans poured into the tight streets in front of the White House in early June, many of whom came to protest law enforcement of the very type that would have been tasked with curtailing the painting.  While enforcing the Ordinance may have led to a cleaner street, it all too easily could have transformed a then-peaceful gathering into something far less sedate, with considerable risk to the safety of both civilians and dramatically outnumbered law-enforcement personnel.

Now consider the wholly dissimilar setting at Plaintiffs' own assembly.  To do so, fast forward nearly two months, shift the clock from the cover of night to 7:30 in the morning, and move roughly two miles northeast.  Toss out a once-in-a-generation protest packing the streets in the heart of our city and replace it with a far less chaotic gathering outside a Planned Parenthood for which at most 49 people were expected to show.  See Assembly Application at ECF p. 2. Add in the 32 MPD officers who were present pursuant to standard operating procedures for permitted events.  See Mejia Decl., ¶ 4.  And now — in this comparably tranquil scene where a reinforced police unit had advance notice of a small number of protesters' desire to paint and chalk the street — consider MPD's decision to enforce the Ordinance and rebuff the protesters'

attempts to defy it.  It is difficult to conclude, and Plaintiffs offer essentially no evidence suggesting, that the content or viewpoint of the speech at issue on June 6 and August 1 — as opposed to the starkly differing contextual and circumstantial factors entirely <u>unrelated</u> to content and viewpoint — account for the disparate enforcement responses.  Disparate impact alone, of course, is not enough to render a speech restriction content- or viewpoint-based.  <u>Ward</u>, 491 U.S. at 791; <u>Pahls v. Thomas</u>, 718 F.3d 1210, 1235–36 (10th Cir. 2013); <u>cf.</u> <u>White House Vigil for ERA Comm. v. Clark</u>, 746 F.2d 1518, 1527 (D.C. Cir. 1984) ("The government has offered cogent explanations for the handful of instances in which the regulations were applied unevenly; we conclude that those aberrations were the product of happenstance and unavoidable circumstances rather than of improper motives.").

This brings the Court all the way back to <u>Mahoney</u>, which — in yet another parallel to this case — itself featured allegations of content and viewpoint discrimination surrounding the District's enforcement of the Defacement Ordinance.  Specifically, the plaintiffs pointed to the city's history of allowing other chalking events to go forward, Ordinance notwithstanding, while clamping down on their own bid to do the same.  The district court, however, rejected this discriminatory-enforcement argument where the evidence reflected only "dissimilar incidents" of past chalking "on public property in other parts of the District."  <u>Mahoney</u>, 662 F. Supp. 2d at 88.  The D.C. Circuit did not disturb this conclusion, even when the plaintiffs pressed the issue on appeal.  <u>See</u> Brief for Appellants at 30–31, 35, <u>Mahoney v. Doe</u>, 642 F.3d 1112 (D.C. Cir. 2011) (No. 09-7131), 2010 WL 3564779; <u>Mahoney</u>, 642 F.3d at 1115.  While not controlling, therefore, the district-court's decision in <u>Mahoney</u> at the very least reinforces the Court's determination here.

To be sure, the District left the protesters' "Defund the Police" mural in place for roughly two months (even as it restored the adjacent D.C. flag in its own mural) before finally removing it in order to complete pre-planned roadwork.  See Def. Opp. at 6.  Even assuming, though, that this inertia constitutes evidence of the District's declining to enforce the Defacement Ordinance — an uncertain proposition, given that the statute prohibits the disfiguring and marking of private and public property, but does not require the government to clean anything up, see D.C. Code § 22–3312.01 — Plaintiffs remain obligated to establish a "pattern" of non-enforcement activity "evincing a governmental policy or custom of intentional discrimination on the basis of viewpoint or content."  Brown, 586 F.3d at 294; see also Thomas, 534 U.S. at 325.  This isolated occurrence would not clear the bar.  Even "a handful of instances of allegedly inconsistent enforcement," after all, "is not enough to justify declaring the statute unconstitutional as applied to conduct the parties do not dispute falls under its purview."  Barnes, 481 F. Supp. 3d at 25; cf. Hodge, 799 F.3d at 1162 (explaining that police's selective non-enforcement "in certain situations" of statute restricting expressive activity on grounds of Supreme Court "did not somehow transform the plaza" from nonpublic forum to "public forum for all time").

The outcome here might have been different upon a record containing additional and more compelling evidence of the District's enforcing (or not) the Ordinance when dealing with disfavored (or favored) speech in materially similar circumstances.  The Court will not hypothesize as to the form such evidence could take at this juncture.  Suffice it to say that not nearly enough is present here to enable the Court to reach Plaintiffs' desired conclusion.

On the current record, accordingly, the Court finds that the District's application of the Ordinance to Plaintiffs was "justified without reference to the content [or viewpoint] of the regulated speech."  Ward, 491 U.S. at 791 (quoting Cmty. for Creative Non-Violence, 468 U.S.

at 293).

> b.  Government Interest and Tailoring

Resolution of the second prong of the time, place, and manner test, thankfully, requires

far less exertion than the first.  As a reminder, application of the Ordinance to Plaintiffs' desired

expression must be "narrowly tailored to serve a significant governmental interest."  Ward, 491

U.S. at 791 (quoting Cmty. for Creative Non-Violence, 468 U.S. at 293).  The District readily

checks this box.

Starting with the governmental interest at hand, it is well established that "the

government has a substantial interest in the preservation and enhancement of the human

environment" and that "aesthetics are a proper focus of governmental regulation."  White House

Vigil, 746 F.2d at 1528.  Courts have repeatedly held that "municipalities have a weighty,

essentially esthetic interest in proscribing intrusive and unpleasant formats for expression."

Members of City Council of City of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 806 (1984);

see also, e.g., Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507–08 (1981) (plurality

opinion) (determining that city had substantial aesthetic interest in avoiding visual clutter).

Reasoning from these principles, the D.C. Circuit in Mahoney determined that the District had a

significant governmental interest in controlling the aesthetic appearance of city streets.  See 642

F.3d at 1118.  That conclusion controls here.

Fishing for a way around this holding, Plaintiffs gesture once more at the District's

alleged non-enforcement of the Ordinance throughout summer 2020.  By declining to apply the

statute on the aforementioned occasions, they argue, Defendant forfeited the ability to claim a

significant governmental interest in the aesthetic appearance of public property.  See Pl. Mot. at

16–17.  As described above, however, the isolated examples to which Plaintiffs point occurred

not because of the District's lack of commitment to enforcing the Ordinance, but rather because of unique underlying circumstances (to wit, a chaotic and unprecedented protest).  At any rate, Plaintiffs' latest tack is once again foreclosed by Mahoney.  That case, as a reminder, involved litigants who asserted that the District had not previously enforced the Ordinance against a number of comparable chalking displays on city streets.  See 642 F.3d at 1115.  The mere existence of such prior approvals and instances of non-enforcement did not prevent the Court of Appeals (and the district court) from holding as it did.

Rather than grapple with the force of Mahoney, Plaintiffs invoke Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993), a free-exercise case finding inadequate evidence of a "compelling" (as opposed to significant) governmental interest where the ordinances at issue "restrict[ed] only conduct protected by the First Amendment and fail[ed] to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort."  Id. at 546–47.  Lukumi, however, does Plaintiffs no favors.  The Defacement Ordinance does not "restrict[] only conduct protected by the First Amendment," id., but rather proscribes "the conduct of defacing, defiling, or disfiguring property by various means — some of which are clearly expressive," but others of which "are primarily destructive."  Mahoney, 642 F.3d at 1116; see also id. ("[E]nforcement of the Defacement Statute will not always implicate the First Amendment.").  In any event, even assuming that the case's strict-scrutiny principles apply to claims asserting discriminatory application of a facially neutral statute (Plaintiffs never so demonstrate), and even assuming that the District has enforced the Ordinance in the alleged selective manner (as previously explained, it has not), any such (non)-enforcement has not left "appreciable damage to [the city's] supposedly vital interest unprohibited."  Lukumi, 508 U.S. at 547 (citation omitted).  On the contrary, the District "enforced the Ordinance 22 times in the last

six months of 2020 alone, including 6 times in connection with the Black Lives Matter protest,"
ECF No. 18 (Def. Reply) at 12, and it continues to enlist public assistance in identifying suspects
for Ordinance violations.  See Rivera Decl., ¶ 5.

At bottom, on Plaintiffs' view, several asserted instances in which a municipality declines
to enforce its prohibition on street marking — regardless of the particular circumstances giving
rise to such non-enforcement — would seemingly divest it of the ability to ever claim an interest
in regulating visual clutter.  In this case, that would mean that anyone could chalk any street in
any part of the District with any message at any time.  That simply cannot be right.

With a substantial governmental aesthetic interest thus established, the Court next asks
whether the restriction of Plaintiffs' desired expression is "narrowly tailored to serve" that
interest.  Ward, 491 U.S. at 791 (quoting Cmty. for Creative Non-Violence, 468 U.S. at 293).
Mahoney again counsels in the affirmative.  As the Court of Appeals explained, "It is the
tangible medium — chalking — that creates the very problem the Defacement Statute seeks to
remedy."  642 F.3d at 1118; see also Taxpayers for Vincent, 466 U.S. at 810 ("[T]he substantive
evil — visual blight — is not merely a possible by-product of the activity, but is created by the
medium of expression itself.").  Application of the Ordinance against Plaintiffs thus "responds
precisely to the substantive problem which legitimately concerns" the District, "curtail[ing] no
more speech than is necessary to accomplish its purpose."  Taxpayers for Vincent, 466 U.S. at
810; see also Mahoney, 642 F.3d at 1119 ("The government can proscribe even temporary
blight.").

Plaintiffs rejoin that Defendant flunks the tailoring requirement because its non-
enforcement of the Ordinance "against some speech demonstrate[s] that street murals, sidewalk
messages, and a governmental interest in clean and open streets can co-exist."  Pl. Mot. at 18.

Putting aside the fact that this line seems more of a backdoor bid to undermine the government's (already established) aesthetic interest, it likewise misses the point when it comes to tailoring. The reasonableness of a time, place, and manner restriction "should not be measured by the disorder that would result from granting an exemption solely to" a single litigant, or even a few. Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 652 (1981); see also Cmty. for Creative Non-Violence, 468 U.S. at 296–97. Courts, rather, "must look to what would happen if every individual to which a restriction applies were freed of its limitations." Mahoney v. U.S. Marshals Serv., 454 F. Supp. 2d 21, 35 (D.D.C. 2006). If any number of groups could affix their desired messages and imagery to city streets on a whim, the consequences would be self-evident: clutter, "widespread disorder," and, to say the least, a "much larger threat" to the District's ability to "further[] its important concern" in managing the city's aesthetics. Heffron, 452 U.S. at 653–54. Plaintiffs, unsurprisingly, never grapple with that world when asserting that their proposed designs could "co-exist" with open streets. See Pl. Mot. at 18. Application of the Ordinance in this case, accordingly, is narrowly tailored to serve the substantial governmental interest at hand.

### c.  Alternative Channels of Communication

The Court finally arrives at the third prong of the inquiry: whether the restriction "leave[s] open ample alternative channels for communication of the information." Ward, 491 U.S. at 791 (quoting Cmty. for Creative Non-Violence, 468 U.S. at 293). As it plainly does, the Court need not spend much time here.

The District's enforcement of the Defacement Ordinance has not prevented Plaintiffs from expressing their desired message at their desired time and place. Consider their assembly on August 1, 2020, which the District expressly approved. See Assembly Plan Approval at ECF

p. 2.  Although MPD barred them from inscribing "Black Pre-Born Lives Matter" on the street and sidewalk, the protesters carried signs reciting the very same message and chanted it in unison over the course of the morning.  See Def. Opp. at 9; Assembly Plan Approval at ECF p. 2 (permitting protesters "to possess bullhorns, music stand[s] and signs").  The protest continued even after police arrested the two attendees who defied warnings to cease their chalking, one of whom was clearly not chilled or intimidated, since he returned later and spoke through a bullhorn while standing next to a "Black Pre-Born Lives Matter" poster.  See Def. Opp. at 9.  It is thus clear that "ample alternative channels of communication existed" for Plaintiffs' message, Mahoney, 642 F.3d at 1119, and there is no indication that demonstrators will be prevented from engaging in any of these forms of expression (save the painting or chalking) at their forthcoming March 27 event.

All Plaintiffs muster in response is the flat assertion that they retain no alternative channel "because Defendant has completely banned [them] from engaging in their desired protected speech, which is painting the words 'Black Pre-Born Lives Matter' on the public street."  Pl. Reply at 13.  The D.C. Circuit, however, has rejected this precise argument, instructing that "the scope of [a plaintiff's] request cannot define the available 'channels of communication.'"  Mahoney, 642 F.3d at 1119 (explaining, e.g., that "[i]f [plaintiff] exclusively asked to post signs on light posts, he could not do so under Taxpayers for Vincent, 466 U.S. at 810").  Because Plaintiffs remain "free to engage in a rich variety of expressive activities" and retain "a multitude of possibilities for meaningful protest," White House Vigil, 746 F.2d at 1528, it matters not that the District curbed but a single form of such potential expression.  See Mahoney, 642 F.3d at 1119 (alternative channels of communication available where plaintiff "was free to announce any 'verbal' message he chose" and "depict visual messages on signs,

banners, and leaflets"); Heffron, 452 U.S. at 655 (alternative channels of communication available where plaintiffs could continue to assemble and "orally propagate their views"); ISKCON of Potomac, Inc. v. Kennedy, 61 F.3d 949, 958 (D.C. Cir. 1995).

* * *

"[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron, 452 U.S. at 647. Because the District's application of the Defacement Ordinance to Plaintiffs was and is a valid restriction on speech, they are not likely to succeed on the merits of their free-speech claim.

   B. Equal Protection

Plaintiffs' second cause of action takes them from the First Amendment over to the Fifth's and Fourteenth's guarantee of equal protection. Although the relevant constitutional provision is different, their argument is largely the same: that the Ordinance is unconstitutional as applied to them because the District failed to enforce it against "similarly situated individuals" espousing "speech it prefers." Compl., ¶¶ 100–02. As might be expected, this stratagem of Amendment-hopping does not improve their odds: their equal-protection challenge is unlikely to succeed for essentially the same reasons as their free-speech claim.

Under the Fourteenth Amendment's Equal Protection Clause, as applicable to the District through the Fifth Amendment, similarly situated persons must be treated alike. Women Prisoners of D.C. Dep't of Corr. v. District of Columbia, 93 F.3d 910, 924 (D.C. Cir. 1996). "Dissimilar treatment of dissimilarly situated persons," on the other hand, "does not violate equal protection." Id. (cleaned up) (citation omitted). "The threshold inquiry in evaluating an equal protection claim is, therefore, to determine whether a person is similarly situated to those persons who allegedly received favorable treatment." Id. (internal quotation marks and citation omitted).

Plaintiffs' equal-protection argument essentially reduces to the following: they are "similarly situated" to the many other "activists, protestors, and street artists who painted messages on the streets of D.C." during summer 2020 because they too are "private citizens who desire to communicate their chosen message" by inscribing it on public streets. See Pl. Reply at 14–15. When the District declined to enforce the Ordinance against certain protesters while nonetheless applying it against them simply because of the viewpoint of the speech at issue, Plaintiffs contend, the city treated similarly situated entities differently in violation of the equal-protection guarantee. See Pl. Mot. at 20–21.

"If this argument sounds familiar, it should." Wagner v. FEC, 793 F.3d 1, 32 (D.C. Cir. 2015). It is essentially the same theory, albeit then "clothed in the garb of a First Amendment claim," id., that the Court rejected when it found stark contextual and circumstantial differences between Plaintiffs' curtailed painting bid and the other incidents of non-enforcement to which they point. See supra at 20–26. The Court need not revisit all those distinctions here, which collectively make it difficult to conclude that Plaintiffs have carried their burden to "show[] that they are 'similarly situated'" to the other unidentified protesters against whom the Ordinance was not enforced. Henderson, 253 F.3d at 18. In other words, the mere fact that Plaintiffs sought to mark public property with "nearly identical words" as those latter individuals, see Pl. Mot. at 21, is not enough. See Mahoney, 662 F. Supp. 2d at 97 (determining that plaintiffs were not similarly situated to other groups permitted to chalk public streets).

Even if Plaintiffs could establish dissimilar treatment of similarly situated entities, however, their claim would still fail. That is because litigants bringing equal-protection challenges based on the government's allegedly selective or discriminatory enforcement of its laws — as Plaintiffs do here — must also show that the relevant "differential treatment was

based on impermissible considerations such as . . . intent to inhibit or punish the exercise of

constitutional rights."  Wandering Dago, Inc. v. Destito, 879 F.3d 20, 40 (2d Cir. 2018); see also

Branch Ministries v. Rossotti, 211 F.3d 137, 144 (D.C. Cir. 2000) (requiring plaintiff to show

that enforcement was "improperly motivated").  As the Court explained at length when resolving

their free-speech claim, Plaintiffs have not demonstrated that enforcement of the Ordinance "was

improperly motivated by the [District's] desire to discriminate against the viewpoint" or content

of their speech.  BEG Investments, 85 F. Supp. 3d at 38; see also Hoye, 653 F.3d at 854–55

(explaining that differences between First Amendment as-applied challenge based on selective

enforcement and selective-enforcement equal-protection claim can be "semantic rather than

substantive" because plaintiff must always show that government's "content-discriminatory

enforcement of an ordinance is the result of an intentional policy or practice").  Numerous

circumstances unrelated to the content of the speech at issue distinguish the city's action against

Plaintiffs from the other instances of non-enforcement they identify.  "Even if there [were] lapses

in enforcement," moreover, "there [is] no indication that these were attributable to impermissible

discrimination."  Henderson, 253 F.3d at 18 (rejecting equal-protection claim on this basis).

Simply swapping Amendments does nothing to change the underlying analysis.  Hoye, 653 F.3d

at 855.

        All Plaintiffs say in response — other than recycling free-speech arguments the Court has

already discarded — is that they have not pled a selective-enforcement claim, such that the above

discriminatory-intent inquiry is misplaced.  See Pl. Reply at 16.  As previously discussed,

though, regardless of the technical fashion in which they caption their pleadings, their own

description of their equal-protection challenge betrays its true nature.  See, e.g., Compl., ¶ 94

("By applying the Defacement Ordinance to Plaintiffs, but not to other individuals or

organizations similarly situated, the Defendants have impermissibly subjected Plaintiffs to unequal treatment from similarly situated individuals and organizations."); id., ¶ 98 (alleging "discriminatory application of the Defacement Ordinance to Plaintiffs"); id., ¶ 100 ("The District has a policy and practice of enforcing the Defacement Ordinance against speech it disagrees with and not enforcing against speech it prefers.").  As if further confirmation were necessary, the D.C. Circuit has explained — in an equal-protection case similar to this one — that a challenge to the government's enforcement of its regulations against the plaintiffs but not other allegedly similarly situated entities was, "in essence, one of selective enforcement" requiring a showing of "impermissible discrimination."  Henderson, 253 F.3d at 17–18.  Just as the plaintiffs in Henderson asserted the government "ha[d] not applied its regulations equally," id. at 17, so too here do Plaintiffs maintain that the District has unevenly enforced the Ordinance "against some messages, but not other similar messages" based on the type of speech at issue.  See Compl., ¶ 101.

Plaintiffs, accordingly, are unlikely to succeed on the merits of their equal-protection claim.

C.  Freedom of Association

Returning to the First Amendment, Plaintiffs next assert that the District's enforcement of the Ordinance to prevent their defacing public property violated their "right to associate on the basis of their shared beliefs."  Compl., ¶ 110.  In other words, as their briefing clarifies, by "prevent[ing] [them] from gathering to temporarily paint their message" on city streets, the District infringed their "expressive association" rights.  See Pl. Reply at 16–17.  Plaintiffs, however, have not explained how such rights are implicated at all in this case.

The Supreme Court "has recognized a right to associate for the purpose of engaging in

those activities protected by the First Amendment." Roberts v. U.S. Jaycees, 468 U.S. 609, 618
(1984).  Such activities, it seems naturally understood, "could not be vigorously protected from
interference by the State unless a correlative freedom to engage in group effort toward those ends
were not also guaranteed." Id. at 622.  Although government action may "infringe upon this
freedom" in a range of factual settings, the Court has specifically found expressive-associational
rights implicated by policies that, among other things, "impose penalties or withhold benefits
from individuals because of their membership in a disfavored group," "require disclosure of the
fact of membership in a group seeking anonymity," or "interfere with the internal organization or
affairs of [a] group." Id. at 622–23 (citations omitted).

 Mere recital of these categories suggests the $64,000 question: how does Plaintiffs' claim
fit within them?  Their cursory briefing never explains.  It is no doubt true that "[e]ffective
advocacy of both public and private points of view, particularly controversial ones, is undeniably
enhanced by group association." Pl. Reply at 16 (quoting NAACP v. Alabama ex rel. Patterson,
357 U.S. 449, 460 (1958)).  It is left entirely unsaid, however, how the District's enforcement of
the Ordinance at all interfered with Plaintiffs' ability to engage in such "group association" for
the purpose of expressing their views, id. — even though that is the precise activity their claimed
right protects.

 None of the three cases Plaintiffs cite (without offering any real accompanying
discussion) involves circumstances remotely comparable to those present here.  Two feature state
requirements found to burden individuals' ability to join or remain in groups of their choosing.
In Kusper v. Pontikes, 414 U.S. 51 (1973), for instance, a statute effectively "'lock[ed]'" voters
into their "pre-existing party affiliation[s] for a substantial period of time," thus "substantially
restrict[ing]" their "freedom to change" affiliations and accordingly burdening their ability to

"associate" with their desired group.  Id. at 57–58.  Similarly, in NAACP, the Supreme Court determined that a state regulation compelling disclosure of a private organization's membership list "may induce members to withdraw from the [organization] and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations."  357 U.S. at 462–63.  Plaintiffs, of course, do not identify such risks here; they never argue that enforcement of the Ordinance discourages or restricts group membership, as necessary to implicate the "freedom to engage in association for the advancement of beliefs."  Id. at 460.  The third case, Jaycees, is even further afield.  There, the Court considered a statute requiring an all-male organization to admit women, a mandate that implicated freedom of association by "intru[ding] into the internal structure or affairs of [the] association" and "forc[ing] [it] to accept members it does not desire," potentially altering its very nature.  See 468 U.S. at 623.  The District's preventing Plaintiffs from painting a public street has no such bearing on internal organizational affairs.

At bottom, Plaintiffs are not likely to succeed on the merits of their claim for the basic reason that they never coherently link the protested enforcement to their expressive-association rights.  Even at the most basic level, it remains unclear how such rights are implicated by a restriction on speech that in no fashion "impairs their ability to associate with each other or any other group."  Def. Reply at 19–20.  It seems difficult to maintain, as Plaintiffs would, that where individual speech is permissibly barred, group speech cannot be without violating association rights.  Indeed, as Defendant points out, Plaintiffs' conception of expressive association would seemingly prevent government "from regulating any expressive conduct by any group of individuals unless it satisfied strict scrutiny."  Id. at 21; see Pl. Mot. at 21–22; Pl. Reply at 17.  That, of course, is not the law.

D.  <u>RFRA</u>

Shifting gears, the three individual Plaintiffs next pin their hopes on RFRA.  Specifically,

they maintain that the "District's enforcement of the Defacement Ordinance against [them]

substantially burdens their religious exercise" as manifested in their pro-life advocacy and is "not

narrowly tailored to any compelling government interest."  Compl., ¶¶ 115–16, 119.  The Court

does not reach the latter analysis, however, for it finds that Plaintiffs have flunked their initial

obligation to establish a substantial burden on their religious exercise.

RFRA provides that the "Government shall not substantially burden a person's exercise

of religion" unless "it demonstrates that application of the burden . . . (1) is in furtherance of a

compelling governmental interest; and (2) is the least restrictive means of furthering that

compelling governmental interest."  42 U.S.C. § 2000bb–1; <u>see also</u> <u>id.</u> § 2000bb–2(2)

(clarifying that RFRA applies to District of Columbia).  A person who brings a challenge under

RFRA bears the initial burden of proving that (1) the Government's policy or action implicates

her religious exercise, (2) the relevant religious exercise is grounded in a sincerely held religious

belief, and (3) the policy or action substantially burdens that exercise.  <u>See</u> <u>Holt v. Hobbs</u>, 574

U.S. 352, 360–61 (2015) (discussing burdens in Religious Land Use and Institutionalized

Persons Act action); <u>id.</u> at 357–58 (citation omitted) (explaining RLUIPA is governed by same

standard as set forth in RFRA).

The D.C. Circuit has considered RFRA claims similar to that presented here on several

occasions.  Indeed, <u>Mahoney</u> rejected an essentially identical one.  Even though the plaintiffs

there insisted that their abortion-related chalking efforts were "religiously motivated," the Court

of Appeals concluded that the District's enforcement of the Ordinance did not substantially

burden their religious exercise.  <u>See</u> 642 F.3d at 1120.  As the unanimous panel explained, such

38

enforcement neither "force[d] [them] to engage in conduct that their religion forbids" nor

"prevent[ed] them from engaging in conduct their religion requires," chiefly because it

"prohibit[ed] only 'one of a multitude of means' of conveying" their chosen religious message.

Id. at 1121 (quoting Henderson, 253 F.3d at 17).  The Circuit recently reaffirmed this reasoning

in a case in which a public-transit authority refused to accept a religiously oriented advertisement

for display in its advertising space.  See Archdiocese of Wash. v. Wash. Metro. Area Transit

Auth., 897 F.3d 314, 320 (D.C. Cir. 2018).  Although the plaintiff organization argued that

advertising offered a "unique and powerful format" for its religiously motivated faith-spreading

campaign, the Court of Appeals explained that it never "alleged that its religion requires

displaying advertisements on" WMATA property (or even advertising at all), and that it "has

many other ways to pursue its evangelization efforts."  Id. at 333.  "Sincere religious beliefs," the

Circuit concluded, "are not impermissibly burdened by restrictions on evangelizing . . . where a

'multitude of means' remains for the same evangelization."  Id. (pointing to newspapers, social

media, and city bus shelters); see also Henderson, 253 F.3d at 16–17 (similar).

These principles squarely foreclose Plaintiffs' RFRA claim.  By their own account, their

"pro-life advocacy is an exercise of their . . . religious belief that all human beings, including

unborn children, are made in the image of God, and that all such life is worthy of protection from

conception until natural death."  Pl. Mot. at 24–25; see also, e.g., Whittington Decl., ¶ 10 ("I

believe that abortion is a grave sin.  My pro-life convictions directly stem from these deeply held

religious beliefs.").  The Court does not question the sincerity of these beliefs.  Their mere

"existence," however, and "even the sincere desire to act in accordance with [them]," is "not

enough to sustain a [RFRA] claim."  Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,

281 F. Supp. 3d 88, 114 (D.D.C. 2017), aff'd, 897 F.3d 314, 320 (D.C. Cir. 2018); see also

Mahoney, 642 F.3d at 1120–21 (holding that fact that pro-life advocacy is "religiously motivated" is insufficient to establish substantial burden on religious exercise).  Here, Plaintiffs never allege that their sincerely held religious beliefs include engaging in pro-life advocacy "through the specific medium" of painting or chalking a public street.  Mahoney, 662 F. Supp. 2d at 96–97; see also Archdiocese of Wash., 897 F.3d at 333.  The District's enforcement of the Ordinance notwithstanding, they retain a "multitude of means" — such as the very bullhorns, signs, and chants they deployed at their August 2020 protest — to engage in the "same evangelization," Archdiocese of Wash., 897 F.3d at 333, thereby communicating their desired message and engaging in "pro-life advocacy" in accordance with their religious beliefs.  See Whittington Decl., ¶ 10; see also Mahoney, 642 F.3d at 1121 (noting that although plaintiffs could not chalk, they could still spread religious message through picketing); Henderson, 253 F.3d at 16–17 (similar).

At no point do Plaintiffs discuss any of these cases.  Nor do they acknowledge the binding principles for which they stand, despite Defendant's recounting them at length.  See Def. Opp. at 35–37.  Instead, they simply maintain that they have suffered a substantial burden because application of the Ordinance places "substantial pressure on [them] to modify [their] behavior and to violate [their] beliefs."  Pl. Reply at 17–18 (quoting Thomas v. Review Bd., 450 U.S. 707, 718 (1981)).  Although Plaintiffs correctly state the law, it renders them no assistance here.  For, as the Court has already demonstrated, they are under no pressure whatsoever to "violate [their] beliefs."  Id.  The District's enforcement, after all, "only require[s] that they modify their nonreligious choice of expressive medium" for their pro-life advocacy.  Mahoney, 662 F. Supp. 2d at 97.  The very caselaw they ignore confirms that such imposition is entirely proper under RFRA.

Because Plaintiffs have not established that the District has or will substantially burden their religious exercise, their RFRA claim finds no likelihood of success.

E.  Free Exercise

Reaching the end of the road at last, the Court turns to Plaintiffs' fifth and final claim — namely, that the District has violated the Free Exercise Clause of the First Amendment. The thrust of their challenge is that the city has enforced the Ordinance against religiously oriented activity but has refrained from doing so against secular analogues. See Pl. Mot. at 27. Once again, however, largely for reasons the reader has already seen, this closing effort meets the same fate as its precursors'.

The D.C. Circuit has instructed that not all constraints on religiously motivated conduct give rise to a First Amendment claim. Instead, the Free Exercise Clause is implicated only "when a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice." Levitan v. Ashcroft, 281 F.3d 1313, 1320 (D.C. Cir. 2002); see also Branch Ministries, 211 F.3d at 142 ("To sustain its claim under either the [Free Exercise Clause] or [RFRA], [a plaintiff] must first establish that its free exercise right has been substantially burdened."); but see Brandon v. Kinter, 938 F.3d 21, 32 & n.7 (2d Cir. 2019) (applying substantial-burden requirement but questioning whether it survives Employment Division, Department of Human Resources v. Smith, 494 U.S. 872 (1990)). A component of this threshold showing requires that the challenged rule "burden a central tenet or important practice of the litigant's religion." Levitan, 281 F.3d at 1320. The Court questions whether Plaintiffs can surmount this initial hurdle, as they never allege that the specific activity affected by the District's enforcement of the Ordinance — i.e., their painting a public street, as distinct from other means of engaging in their religiously motivated pro-life advocacy — comprises a "central

tenet" or "important practice" of their religion.  Id.; see supra at 40; Archdiocese of Wash., 281 F. Supp. 3d at 113 (rejecting free-exercise claim in part because no substantial burden on religious belief or practice where plaintiff could spread religious message in numerous other fashions).

In any event, even assuming Plaintiffs could get their free-exercise claim through the doorway, see Kaemmerling v. Lappin, 553 F.3d 669, 677 (D.C. Cir. 2008) (so assuming), they still could not establish a likelihood of success on its merits.  The right of free exercise protected by the First Amendment "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."  Smith, 494 U.S. at 879 (internal quotation marks and citation omitted).  Plaintiffs do not gainsay that the Ordinance is both neutral and generally applicable on its face.  Instead, in what appears to be yet another effort to repurpose their failed selective-enforcement claim, they maintain that the statute flunks both requirements as the District has applied it to them.  See Compl., ¶¶ 129–31.

Plaintiffs first argue that the Ordinance has "not been applied in a generally applicable manner" because the District enforced it against them while declining to do so against analogous secular messages.  See Pl. Mot. at 27.  It is true that government "cannot in a selective manner impose burdens only on conduct motivated by religious belief" or "fail to prohibit nonreligious conduct that endangers [the government's] interests in a similar or greater degree than" the prohibited religious conduct does.  Lukumi, 508 U.S. at 543.  As the Court has already explained, however, the District here has done nothing of the sort.  Assuming these broad principles govern free-exercise challenges based on alleged discriminatory enforcement of a facially valid law — a proposition Plaintiffs never establish — the present record does not

support the conclusion that the city has selectively applied the Ordinance against "religiously motivated defacement" while letting similarly situated "nonreligious defacement . . . go unchallenged."  <u>Mahoney</u>, 662 F. Supp. 2d at 95 (rejecting free-exercise claim).  Plaintiffs must show more than a mere handful of instances of non-enforcement in circumstances dissimilar to their own in order to establish that the city has "target[ed] religious . . . speech to an extreme degree."  <u>Am. Family Ass'n, Inc. v. FCC</u>, 365 F.3d 1156, 1171 (D.C. Cir. 2004).  It is clear, moreover, that "religion alone" does not "bear the burden of the [Ordinance]," <u>Lukumi</u>, 508 U.S. at 544; on the contrary, the District has enforced the facially neutral law dozens of times throughout 2020, including against secular messages.  <u>See</u> Def. Reply at 12, 17 n.4; Rivera Decl., ¶¶ 4–5; <u>see also</u> <u>Am. Family Ass'n</u>, 365 F.3d at 1171 (rejecting free-exercise challenge where "[i]t is just not true . . . that the burdens of the [challenged regulatory scheme] fall on religious organizations 'but almost no others'") (quoting <u>Lukumi</u>, 508 U.S. at 536).

It readily follows that the District's application of the Ordinance against Plaintiffs was neutral.  A law flunks this independent (albeit "interrelated") requirement if its "object . . . is to infringe upon or restrict practices because of their religious motivation."  <u>Lukumi</u>, 508 U.S. at 531, 533.  Contrary to Plaintiffs' conclusory contention, <u>see</u> Pl. Mot. at 27, the record contains no evidence suggesting that the District enforced the Ordinance against them "because [their conduct was] undertaken for religious reasons."  <u>Lukumi</u>, 508 U.S. at 532; <u>see also</u> <u>Archdiocese of Wash.</u>, 897 F.3d at 332.  Similarly, the Court has already rejected on multiple occasions (including just now) the factual predicate behind their claim that "[t]he Ordinance is not enforced in a neutral way because the District applies it to . . . [Plaintiffs'] message, but not similar messages that do not have a pro-life viewpoint."  Pl. Reply at 19.  This recycled assertion merits

no further attention here.  Plaintiffs, accordingly, are not likely to succeed on the merits of their free-exercise claim.

* * *

As Plaintiffs have not established a likelihood of success on any of their claims, the Court need not address the remaining preliminary-injunction factors.  See Ark. Dairy Co-op, 573 F.3d at 832; Adams v. District of Columbia, 285 F. Supp. 3d 381, 397 (D.D.C. 2018).  It cannot bring this Opinion to a close, however, without briefly remarking on the possible incompatibility between their requested injunctive relief and the public interest (one of the four preliminary-injunction criteria).

Were the Court to enjoin the District from enforcing the Ordinance against Plaintiffs' street-marking campaign, the city would necessarily have one more street mural on its hands. Perhaps that alone would not be excessively invasive, notwithstanding the large size intended for the design.  See Whittington Decl., ¶ 9 ("We intend for our 'Black Pre-Born Lives Matter' mural to be as large and as prominent as the 'Black Lives Matter' and 'Defund the Police' murals."). The Court, however, cannot entertain Plaintiffs' request in a vacuum, for granting them their desired relief would presumably be just the beginning.  No doubt there are countless more hopeful sketchers — and would-be litigants — waiting in the wings with their own ideas for street art, in their own location, espousing their own desired messages.

Consider a world — as the Court must — in which every individual subject to the Ordinance were suddenly "freed of its limitations," and the District was "compelled to grant each and every request" to paint a given design on city streets.  Mahoney, 662 F. Supp. 2d at 91 (citation omitted).  Roads would be closed and traffic diverted to accommodate new creations. Citizens would be confronted with "an influx of clutter," Summum, 555 U.S. at 479 (citation

omitted), substantially changing the city's appearance.  Formerly well-ordered streets and sidewalks would become anything but.

No one wants a city awash in paint.  Given the Court's merits decision today, it need not consider how such public interest might inform any hypothetical exercise of its equitable discretion.  For now, at least, it simply intends to sound warning chimes for both parties: one alerting Plaintiffs to the uphill battle they face should they desire to continue pursuing their presently requested relief, and another reminding the District of the distinctly unpleasant results that a successfully established pattern of content-discriminatory Ordinance enforcement might yield.

## IV.    Conclusion

For the aforementioned reasons, the Court will deny Plaintiffs' Motion for a Preliminary Injunction.  A separate Order so stating will issue this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: March 26, 2021