**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE FREDERICK DOUGLASS
FOUNDATION, INC.
801 G Street, NW
Washington, D.C. 20001;

STUDENTS FOR LIFE OF AMERICA
1000 Winchester St. Suite 301
Fredericksburg, VA 22401;

WILLIAM CLEVELAND
2121 Jamison Ave. Unit 501E
Alexandria, VA 22314;

ROBERT L. GURLEY, JR.
14311 Deloice Crescent
Newport News, Virginia 23602; and

ANGELA TINA WHITTINGTON
2278 Bluebird Lane
Locust Grove, VA 22408

                                            *Plaintiffs*,

v.

DISTRICT OF COLUMBIA,
Karl A. Racine, Attorney General
400 6th Street, NW
Washington, D.C.  20001

Muriel Bowser, Mayor, District of Columbia
1350 Pennsylvania Ave., NW
Washington, D.C.  20004

                                            *Defendant.*

Case No.:  1:20-cv-03346

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

Plaintiffs, The Frederick Douglass Foundation, Inc., Students for Life of America, William

Cleveland, Robert L. Gurley, Jr., and Angela Tina Whittington allege as follows:

## INTRODUCTION

1.      This case is an as-applied federal civil rights action brought pursuant to 42 U.S.C. § 1983 challenging the constitutionality of the District's application of District of Columbia Code § 22-3312.01 to Plaintiffs.

2.      On August 1, 2020, Frederick Douglass Foundation and Students for Life of America held a joint rally to declare that "Black Pre-Born Lives Matter," against the backdrop of significant protest activity in the District of Columbia following the high-profile deaths of African Americans when being confronted and/or arrested by law enforcement officers. In June 2020, D.C. Mayor Muriel Bowser had commissioned a mural declaring "Black Lives Matter" in permanent yellow paint, the length of an entire city block, extending the width of the street. Shortly after the mural was painted, another mural reading "Defund the Police," done in nearly identical style, was also painted along the same public street by Black Lives Matter D.C. In response to these murals, Plaintiffs sought to paint a similar mural outside of the Planned Parenthood Carole Whitehill Moses Center in D.C. The mural was to read "Black Pre-Born Lives Matter," to recognize the fact that Planned Parenthood and the abortion industry kill tens of thousands of unborn African-American children in the womb each year.

3.      After receiving a permit for the assembly and verbal confirmation from a police officer that the Plaintiffs would be able to paint, the Plaintiffs gathered at approximately 6:00 A.M. on August 1, ready to paint their message. Instead, they were confronted by myriad police cars and law-enforcement officers. Plaintiffs were informed that, if they used paint or even washable sidewalk chalk on either the street or the public sidewalk, they would be arrested and taken to jail under the District's law prohibiting the defacement of public property. Despite this warning, two

students decided to chalk the message on the public sidewalk, and were immediately arrested, unable to even finish writing the short message.

4.     The Plaintiffs were prohibited from communicating their message, even though other messages are now permanently emblazoned along the streets of the District in a nearly identical format. The only difference between the Plaintiffs' desired mural and the other permitted—and permanent—murals is the content of the message.

5.     The District of Columbia, like many American jurisdictions, prohibits the defacement of public property. District of Columbia Code § 22-3312.01 (the "Defacement Ordinance"). While such laws are intended to prohibit criminal activity, they may not be used as a tool to silence disfavored speech. But this is precisely what the District and the Defendants have done.

The District of Columbia permitted these messages:[1]





---

[1] Photographs from: Wright, Robin, The Secret Project That Led to Black Lives Matter Murals Coast to Coast, THE NEW YORKER (June 9, 2020), https://www.newyorker.com/news/news-desk/the-secret-project-that-led-to-black-lives-matter-murals-coast-to-coast (last accessed Oct. 20, 2020); Photograph from: Carlson, Margaret, *Why 'defund the police' is deadly for democrats*, NEW YORK DAILY NEWS (June 8, 2020), https://www.nydailynews.com/opinion/ny-oped-why-defund-the-police-is-deadly-20200608-zeq554ejubfrlazrw2ysqzkoei-story.html (last accessed Oct. 20, 2020).

But it deemed this message criminal activity:



6.      While the Plaintiffs support the ability of all individuals and organizations to peacefully express their beliefs, the District of Columbia is prohibited from favoring one message over another. It is axiomatic that the government cannot choose which messages succeed and which are censored in our diverse society. As the Supreme Court has emphatically held, "the people lose when the government is the one deciding which ideas should prevail." *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2375 (2018).

7.      In contrast to the conspicuous message "Black Lives Matter = Defund the Police," members of the Plaintiff organizations were arrested for merely chalking a small message, comprising not even half the width of the public sidewalk, with washable sidewalk chalk. The Plaintiffs were completely unable to communicate their message that "Black Pre-Born Lives Matter" in a manner identical to the "Black Lives Matter" and "Defund the Police" murals painted in permanent yellow paint on the public streets of the District. Given that two students were

arrested, Plaintiffs credibly feared that they would be arrested for peacefully expressing their views. The District's enforcement of the Defacement Ordinance against Plaintiffs chills the exercise of Plaintiffs' First Amendment freedoms. The Defendants' actions are blatant viewpoint discrimination, which the United States Constitution does not tolerate.

**JURISDICTION AND VENUE**

8.      This action arises under the United States Constitution and 42 U.S.C. §1983, and this Court therefore has jurisdiction over the federal claims by operation of 28 U.S.C. §§ 1331 and 1343. This Court has authority to grant the requested injunctive relief under 28 U.S.C. § 1343; the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202; and costs and attorneys' fees under 42 U.S.C. § 1988(b).

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and all acts described in this Complaint occurred in this district.

**PARTIES**

**Plaintiffs**

10.      Plaintiff The Frederick Douglass Foundation, Inc. ("FDF") is a not-for-profit corporation duly incorporated under the laws of North Carolina, with its principal place of business at 801 G Street NW, Washington, D.C. 20001.

11.      Plaintiff Students for Life of America ("SFLA") is a not-for-profit corporation duly incorporated under the laws of the District of Columbia, with its principal place of business at 1000 Winchester St. Suite 301, Fredericksburg, VA 22401.

12.      Plaintiff William Cleveland is a resident of Alexandria, Virginia.

13.      Plaintiff Robert L. "J.R." Gurley, Jr. is a resident of Newport News, Virginia.

6

14.     Plaintiff Angela Tina "Tina" Whittington is a resident of Locust Grove, Virginia.

**Defendants**

15.     Defendant District of Columbia is a municipal corporation existing under the laws of the Constitution of United States and is a corporate entity capable of suing and being sued.

## FACTUAL BACKGROUND

**The Frederick Douglass Foundation, Inc.**

16.     The Frederick Douglass Foundation is a national education and public policy organization with local chapters across the United States that advocates free-market and limited-government ideas as solutions to the hardest problems facing our nation.

17.     Members of the Frederick Douglass Foundation believe: We live in a land of liberty where natural rights of individuals precede and supersede the power of the state. We are a constitutional republic in which government power is limited and employed for the purpose of providing legitimate public goods rather than for the benefit of insiders and narrow interest groups. We believe in the free market in which persons, individually or collectively, have the natural right to sell goods and services to willing buyers, and in which the individual pursuit of economic opportunity benefits all. We are a free society where citizens solve social problems not only through government but also by working together in families, neighborhoods, churches, charities, and other private, voluntary organizations.

18.     FDF provides tools for improving the economic status of the individuals, families, and businesses within the targeted communities, thus, enhancing the quality of life.

19.     FDF acts as a liaison between black, faith-based organizations and conservative candidates, parties, and elected officials.

20.     FDF seeks to educate the public about the social, cultural, spiritual, and civic rights needs of our nation.

21.     FDF trains political workers, volunteers, and candidates as leaders in the political arena.

22.     FDF, with their state affiliates across the country, stands for and with Black America, including the most vulnerable among this population: those black babies still in the womb. As a public policy and educational organization, FDF is a collection of pro-active individuals committed to developing innovative and new approaches to today's problems, including the systemic racism of Planned Parenthood and its founder.

23.     Plaintiff Robert L. "J.R." Gurley, Jr. is the President of the Virginia chapter of FDF. Mr. Gurley also serves as the young adult pastor of The World Outreach Worship Center in Newport News, Virginia.

24.     Plaintiff William "Bill" Cleveland is a volunteer with FDF. Mr. Cleveland served with the United States Capitol Police for 15 years and is a former City Councilman and Vice Mayor for the City of Alexandria.

25.     Plaintiffs J.R. Gurley and Bill Cleveland have a sincere religious belief that all human beings, from the moment of conception, are created in the image of God, and therefore believe that abortion is a grave sin. Their pro-life convictions stem from their deeply held religious beliefs.

**Students for Life of America**

26.     Students for Life of America is the nation's largest youth pro-life organization. SFLA is dedicated to training and equipping college, high school, middle, medical, and law school students.

27.     SFLA exists to recruit, train, and mobilize pro-life students to abolish abortion.

28.     SFLA works to equip students across America to defend the unborn and help young mothers on their campuses. Since launching full-time in 2006, SFLA has helped to establish and build over 1,250 student pro-life organizations and train more than 100,000 students nationwide.

29.     Students for Life exists to recruit, train, and mobilize students and young adults to abolish abortion. The Students for Life groups SFLA supports and mentors on campuses are the key to achieving SFLA's goal of abolishing abortion. These pro-life student leaders across America work to change the hearts and minds of their peers, to save lives, and to recruit more young people to join their movement. In addition, these leaders work to support pregnant and parenting mothers.

30.     SFLA launches and supports Students for Life groups in colleges, high schools, middle schools, law schools, and medical schools throughout the nation to educate other young people about the violence of abortion, create new pro-life individuals, and transform campuses into places that support pregnant and parenting students.

31.     Plaintiff Tina Whittington is the Executive Vice President of SFLA.

32.     Plaintiff Tina Whittington has a sincere religious belief that all human beings, from the moment of conception, are created in the image of God, and therefore believes that abortion is a grave sin. Her pro-life convictions directly stem from her deeply held religious beliefs.

9

**The District's Defacement Ordinance**

33.     The District of Columbia prohibits the defacement of public property, upon pain

of criminal penalties. District of Columbia Code § 22-3312.01 provides:

> It shall be unlawful for any person or persons willfully and wantonly
> to disfigure, cut, chip, or cover, rub with, or otherwise place filth or
> excrement of any kind; to write, mark, or print obscene or indecent
> figures representing obscene or objects upon; to write, mark, draw,
> or paint, without the consent of the owner or proprietor thereof, or,
> in the case of public property, of the person having charge, custody,
> or control thereof, any word, sign, or figure upon:
>
> (1) Any property, public or private, building, statue, monument,
> office, public passenger vehicle, mass transit equipment or facility,
> dwelling or structure of any kind including those in the course of
> erection; or
>
> (2) The doors, windows, steps, railing, fencing, balconies,
> balustrades, stairs, porches, halls, walls, sides of any enclosure
> thereof, or any movable property.

**Protests in the District**

34.     Following the death of George Floyd while being arrested by a Minneapolis police

officer, the District of Columbia experienced significant protest activity. As a result of Floyd's

death and multiple media reports of African-American individuals killed by law enforcement

officers, protests began in May 2020 and continued throughout the summer.

35.     During the course of these protests, Mayor Bowser commissioned a mural, extending along 16th Street, NW, in letters extending laterally across the entire width of the street, displaying the words "Black Lives Matter."[2]



36.     One day after the "Black Lives Matter" mural was unveiled, protestors with Black Lives Matter D.C. painted the words "Defund the Police" in response to Mayor Bowser's message.[3] The protestors also modified the painting of the D.C. flag next to the "Black Lives

---

[2] Nirappil, Fenit, et al, *'Black Lives Matter': In giant yellow letters, D.C. Mayor sends message to Trump*, THE WASHINGTON POST (June 5, 2020), https://perma.cc/XJ3P-Q9FT (last accessed Oct. 7, 2020). The mural comprises two blocks of 16th Street, NW, between K and H streets, directly north of the White House. *Id.* Photograph from: Fox, Ben, *DC paints huge Black Lives Matter mural near White House*, THE ASSOCIATED PRESS (June 5, 2020), https://apnews.com/article/80d971be4f01869553a247b8d62ccb7b (last accessed Oct. 20, 2020).
[3] Tan, Rebecca, et al., *Protestors paint 'Defund the police" right next to D.C.'s 'Black Lives Matter' mural*, THE WASHINGTON POST (June 7, 2020), https://perma.cc/BU4S-ZF7F (last accessed Oct. 21, 2020).

Matter" mural so that the message contained an "equals" sign. The message then read "Black Lives

Matter = Defund the Police."[4]



37.     Shortly after the "= Defund the Police" message was painted, the District repainted

the stars above the "equals" sign, to signify the D.C. flag. The "Defund the Police" message

remained.

38.     Officers with the MPD were present during the painting of the "Defund the Police"

mural, but refused to enforce the Defacement Ordinance against those creating the mural because

of the District's agreement with the message. MPD did not fail to enforce the Defacement

Ordinance due to a concern for officer safety or due to being outnumbered by protestors.

---

[4] Tan, Rebecca, et al., *Protestors paint 'Defund the police" right next to D.C.'s 'Black Lives Matter' mural*, THE WASHINGTON POST (June 7, 2020),  https://perma.cc/BU4S-ZF7F (last accessed Oct. 21, 2020).

39.     The District removed the "Defund the Police" mural in mid-August due to "previously planned road work at 16th Street and H Street NW."[5] The mural was therefore permitted to remain on the street for over two months, and was only removed due to planned road construction.

40.     A permit from the District Department of Transportation was neither sought nor granted for the "Defund the Police" mural.

41.     A permit from the Metropolitan Police Department (MPD) was neither sought nor granted for the "Defund the Police" mural.

42.     Despite the fact that the "Defund the Police" mural clearly violates the District Defacement Ordinance, no punishment resulted from such unlawful activity. No one was cited and no arrests were made for violating the Ordinance.

43.     The "Black Lives Matter" and "Defund the Police" murals are visible from Google satellite view:[6]

_____

[5] Blitz, Matt, *City Says 'Defund The Police' Message At BLM Plaza Was Erased Due To Road Work*, DCIST (Aug. 17, 2020) https://dcist.com/story/20/08/17/dc-defund-police-black-lives-matter-plaza-mural/ (last accessed Oct. 21, 2020). Photograph from: Twitter, @dougmillsnyt, https://twitter.com/dougmillsnyt/status/1269629320336728065 (last accessed Oct. 21, 2020).
[6] View of the streets surrounding the White House, image accessed on Oct. 14, 2020, https://perma.cc/N3J4-ZR5J?type=image.



44.     Also during the protests, construction scaffolding located on the southern side of

the U.S. Chamber of Commerce headquarters had become a "gallery wall for a wide array of

protest art."[7] Such "protest art" violated the D.C. Defacement Ordinance because it was placed

without prior permission of the property owner. The protest art was permitted to remain until

---

[7] Blitz, Matt, *Protest Artists Come Out On A Rainy Sunday To 'Reclaim' H Street Art Tunnel Near BLM Plaza*, DCɪsᴛ (Aug. 16, 2020) https://dcist.com/story/20/08/16/protest-artists-come-out-on-a-rainy-sunday-to-reclaim-h-street-art-tunnel-near-blm-plaza/ (last accessed Oct. 21, 2020).

August 2020, when the U.S. Chamber of Commerce removed the "mosaic of signs comprised of words, photography, and painted murals" in order to preserve the work.[8]

45.     Neither permission from the Chamber nor permits from the District Department of Transportation were sought or granted for the protest art created on the construction scaffolding at the U.S. Chamber of Commerce headquarters prior to the creation of the art.

46.     Permits from the Metropolitan Police Department were neither sought nor granted for the protest art created on the construction scaffolding at the U.S. Chamber of Commerce headquarters prior to the creation of the art.

47.     Despite the fact that the protest art clearly violates the District Defacement Ordinance because it was placed on private property without prior permission from the property owner, no punishment resulted from such unlawful activity. No one was cited and no arrests were made for violating the Ordinance.

48.     After the "Defund the Police" message and the artwork near the U.S. Chamber of Commerce were removed, protestors organized an event entitled "Reclaim DC" for August 16, 2020, where individuals were called to "reclaim[] the H Street Art Tunnel at BLM Plaza" and "[c]ome create art in all forms." The Palm Collective, Instagram, https://www.instagram.com/p/CD7uEo_BYWK/.

49.     In the months following the outbreak of protests, the public sidewalks and streets of the District were marked with graffiti, street art, and street chalking. On the evening of August

---

[8] U.S. Chamber of Commerce, *U.S. Chamber to Preserve Historic Black Lives Matter Artwork in Partnership with Washington D.C.-based Institutions* (Aug. 10, 2020), https://www.uschamber.com/press-release/us-chamber-preserve-historic-black-lives-matter-artwork-partnership-washington-dc (last accessed Oct. 21, 2020).

16, several pieces of graffiti were observed at 17th Street, NW and H Street, NW, near the U.S.

Chamber of Commerce Building:





50.     No permits were obtained for any of the graffiti, painting, chalking, or street art as photographed in ¶ 45.

51.     Permission from the owners of the private properties photographed in ¶ 45 was not obtained prior to the placement of the graffiti, painting, chalking, and street art.

52.     No arrests were made and no one was cited for the graffiti, painting, chalking, or street as photographed in ¶ 45, despite the fact that such destruction of public property clearly

violates the District Defacement Ordinance. MPD was present when the graffiti, painting, chalking, and street art photographed in ¶ 45 was placed and observed the violations of the Defacement Ordinance.

53.     MPD did not enforce the Defacement Ordinance against the instances of graffiti, painting, chalking, and street art photographed in ¶ 45 due to the District's agreement with the messages expressed by the protest art. MPD did not fail to enforce the Defacement Ordinance due to a concern for officer safety or due to being outnumbered by protestors.

54.     District arrest data indicates that there were 22 arrests for violations of the Defacement Ordinance between May 30, 2020 and December 31, 2020. None of these arrests were for speech or expression with which the City agrees.

**Students for Life of America and Frederick Douglass Foundation August 1, 2020 Event**

55.     FDF and SFLA planned and executed an event on August 1, 2020. The purpose of the event was for SFLA and FDF to come together to declare that "Black Pre-Born Lives Matter," in response to the period of unrest in the District and across the country following high-profile deaths of African-American individuals in several U.S. jurisdictions during various confrontations with police.

56.     As part of the event, SFLA and FDF intended to paint "Black Pre-Born Lives Matter" on the street near the Planned Parenthood Carole Whitehill Moses Center, located at 1225 4th St NE, Washington, DC 20002. The location was to signify the Plaintiffs' belief in the sanctity of pre-born life, and to bring attention to the fact that the abortion industry kills numerous pre-born African-American children every year. The mural was intended to resemble the "Black Lives Matter" and "Defund the Police" murals permitted by the City.

57.     By way of example, SFLA and FDF—in a separate event—were permitted to paint "Black Pre-Born Lives Matter" on a street in downtown Baltimore:



58.     Plaintiff Tina Whittington applied for a permit for assembly with the Metropolitan Police Department for the event. The application is attached as Exhibit A. The application indicates that there would be use of "bullhorns, [a] music stand, and signs with paint supplies."  The MPD approved the permit for assembly. The application was approved, providing permission for the assembly on August 1, 2020 from 6:00 A.M. until approximately 12:00 P.M.

59.     In a separate conversation regarding the permit, an officer with MPD gave Ms. Whittington verbal permission to paint the "Black Pre-Born Lives Matter" mural on 4th Street, NE. The officer informed Ms. Whittington that the attendees would be permitted to paint the mural in the street as long as tempera paint was used. The officer further stated that, because the Mayor had allowed painting on other streets, that the Mayor had "opened Pandora's Box" and therefore the police officer would not be able to stop the attendees from painting their similar "Black Pre-Born Lives Matter" mural on the public street.

60.     Separately, FDF and SFLA sent a letter to the office of Mayor Bowser, requesting permission to paint the mural: "SFLA and FDF request permission to paint Black Pre-Born Lives Matter on the 1200 block of 4th Street NE at 6 o'clock in the morning on August 1, 2020, to celebrate the beautiful children with endless potential who are the future of their community and deserve the opportunity to make their mark in the world." Letter to Mayor Bowser, attached as Exhibit B. Police Chief Newsham and the Metropolitan Police Department were also copied on the letter.

61.     Additionally, the letter informed Mayor Bowser that "First Amendment Assemblies are regulated by D.C. Code § 5-331.01 *et seq*. The Code requires people who wish to assemble to apply to the Chief of the Metropolitan Police Department through a designated form. SFLA has timely applied for a permit. If denied, SFLA will appeal to your office. You are required by law to make a decision expeditiously, prior to the date of the event and explain your decision in writing. D.C. Code § 5-331.06(d)(2)." Ex. B.

62.     Finally, the letter noted that Mayor Bowser "must allow SFLA and FDF to paint its 'Black Pre-born Lives Matter' message. Your original decision to paint 'Black Lives Matter' on the street is government speech. However, your decision to allow protestors to paint 'Defund the Police' opened the streets up as a public forum. You are not permitted to discriminate on the basis of viewpoint in making determinations relating to public assemblies in public fora." Ex. B.

63.     FDF and SFLA did not receive a response to the letter to Mayor Bowser's office.

64.     Mayor Bowser supports Planned Parenthood and it's "pro-choice" agenda.[9]

65.     Because the MPD had approved the permit for assembly and given verbal confirmation that attendees of the event would be permitted to paint "Black Pre-Born Lives Matter" in tempera paint in the street, FDF and SFLA held the rally and gathering, commencing at approximately 6:00 A.M. on August 1, 2020. Plaintiffs planned on painting the mural in temporary paint that would only remain on the street until it was washed away by rainfall or water. When the students and other Plaintiff volunteers and staff members arrived at Planned Parenthood, approximately six police cars and several police officers awaited them. The police officers informed the attendees that they could neither paint nor chalk a message on the street or sidewalk, and if they did so, they would be arrested.

66.     Mayor Bowser and/or District officials ordered the Metropolitan Police Department to be present at the FDF and SFLA event in order to stop the painting and chalking.

67.     Plaintiff J.R. Gurley traveled with four other individuals to the District for the rally. He arrived at approximately 6:30 A.M. He brought clothes for painting, and incurred

---

[9] *See* 2017 *Annual Report*, Planned Parenthood of Metropolitan Washington, DC at 14, https://www.plannedparenthood.org/uploads/filer_public/7f/a7/7fa72f2a-bab4-4680-a552-46478259b3ff/2017annualreport_final.pdf (last accessed Apr. 15, 2021) (listing Mayor Bowser as a "champion[] of choice" in attendance at Planned Parenthood's 2017 "Pink Ball"); *At Signing of Women's Health Care Bill, Mayor Bowser Announces Open Enrollment Extension*, Executive Office of the Mayor (Jan. 31, 2018), https://mayor.dc.gov/release/signing-women%E2%80%99s-health-care-bill-mayor-bowser-announces-open-enrollment-extension (last accessed Apr. 15, 2021) (Mayor Bowser hosted a bill signing at the D.C. Planned Parenthood facility); Perry Stein, *D.C.'s only Planned Parenthood facility is open and ready to see patients*, WASHINGTON POST (Sept. 27, 2016), https://www.washingtonpost.com/local/dcs-only-planned-parenthood-facility-is-open-and-ready-to-see-patients/2016/09/27/6d89326c-84cb-11e6-92c2-14b64f3d453f_story.html (last accessed Apr. 15, 2021) (Mayor Bowser attended the D.C. Planned Parenthood's opening gala and benefit).

expenses for gas and hotel. When the group arrived, they were told by a Metropolitan Police Officer that if they chalked or painted the sidewalk, they would be taken to jail.

68.     Plaintiff Bill Cleveland arrived at the rally at approximately 10 A.M., and was prepared to assist with the painting of the "Black Pre-Born Lives Matter" mural.

69.     Plaintiff Tina Whittington arrived at approximately 5 A.M., and brought painting supplies purchased by SFLA for the planned mural, as well as signs, a podium sign, and other event materials.

70.     Two students affiliated with SFLA, Erica Caporaletti and Warner DePriest, attempted to draw "Black Pre-Born Lives Matter" in chalk on the sidewalk, and were immediately arrested. There was substantial media coverage of the event, including several instances of video of the chalking and the subsequent arrests.[10]

71.     Plaintiffs held a similar event on March 27, 2021, where they requested a permit from the District to paint (in temporary paint) or chalk "Black Pre-Born Lives Matter" on the public street outside of the Planned Parenthood Carole Whitehill Moses Center. On March 23, 2021, District officials issued a permit to Plaintiffs allowing an assembly consisting of 25 people and allowed one bullhorn and one music stand. The permit (attached as Exhibit C) states "You are not authorized or permitted to paint or mark the street and to paint or mark the sidewalk."

72.     The Plaintiffs were all prohibited from effectively communicating their desired message when the District informed them that they would be subject to the Defacement Ordinance

---

[10] *See e.g.*, Dr. Berry, Susan, *WATCH: D.C. Police Arrest Two Students Chalking 'Black Preborn Lives Matter' in Front of Planned Parenthood*, BREITBART NEWS, https://perma.cc/27KS-NJUE (last accessed Oct. 9, 2020).

if they used temporary paint or chalk to display their message on the public sidewalk or public street.

73.     Plaintiffs' message reached fewer people than similar messages—including the "Defund the Police" and "Black Lives Matter" murals, among others—because Plaintiffs were prohibited from painting or chalking their message on the public street or sidewalk.

74.     District officials targeted the Plaintiffs' religious and pro-life beliefs. The District effectively denied Plaintiffs of the government benefit of chalking and street painting due to the Plaintiffs' religious and pro-life beliefs.

75.     District officials acted under color of state law when enforcing the Defacement Ordinance against the Plaintiffs.

76.     The District has a policy and practice of enforcing the Defacement Ordinance against speech expressing views it disagrees with and not enforcing the Ordinance against speech expressing views it prefers.

77.     The District instituted a policy and practice of enforcing the Defacement Ordinance against the speech and expression of Plaintiffs but not the substantially similar expression of others similarly situated.

78.     As a policymaker, Mayor Muriel Bowser and/or District officials directed the District to enforce the Defacement Ordinance against Plaintiffs but not other speakers, so that enforcement became a policy and practice of the District.

79.     The District adopted a policy and practice of enforcing the Defacement Ordinance against speech with which it disagrees when it knowingly failed to enforce the Defacement Ordinance against speech and expression of views the District prefers.

80.     The District showed a deliberate indifference to the risk that the enforcement of the Defacement Ordinance would result in violations to Plaintiffs' constitutional rights.

81.     The District's unconstitutional enforcement of the Defacement Ordinance against Plaintiffs' speech has resulted in irreparable injury to Plaintiffs.

82.     No adequate remedy against the Defendants' application of the Defacement Ordinance to Plaintiffs is available at law.

**FIRST CLAIM FOR RELIEF**
**Violation of the Free Speech Clause of the First Amendment**
**to the United States Constitution**

83.     Plaintiffs reallege all matters set forth in paragraphs 1–82 and incorporate them herein.

84.     The Free Speech Clause applies to the District of Columbia.

85.     The public ways and sidewalks where Plaintiffs and others attempted to communicate their message are traditional public fora. Traditional public fora such as streets and sidewalks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152 (1969) (internal citations omitted).

86.     Plaintiffs' speech and expressive activity is protected by the First Amendment. "Commenting on matters of public concern" such as abortion "are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks; a prototypical example of a traditional public forum." *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 377 (1997).

87.     The First Amendment emphatically prohibits the government from discriminating against ideas based on the content or viewpoint of protected speech. The government, "including a municipal government vested with state authority, has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (cleaned up).

88.     Content-based laws, including the application of otherwise constitutional laws in a content-based manner, "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163 (cleaned up).

89.     Laws that discriminate on the basis of viewpoint are presumed unconstitutional.

90.     Plaintiffs and others were impermissibly prohibited from communicating their message when Defendants prohibited Plaintiffs from painting or chalking their message on the public streets and sidewalks, but permitted similar messages by others to be painted or chalked on the public streets and sidewalks. The District's enforcement of the Defacement Ordinance to censor the message of Plaintiffs is impermissibly content and viewpoint based. The application of the Defacement Ordinance to Plaintiffs therefore unconstitutionally discriminates against Plaintiffs' speech based on its content and Plaintiffs' viewpoint.

91.     By prohibiting Plaintiffs from communicating their message in their desired way, the Defendants' actions also constitute an impermissible prior restraint.

92.     There are no guidelines governing the unbridled discretion of District officials and prohibiting them from discriminating against viewpoints when enforcing the Defacement Ordinance.

93.     The application of the Defacement Ordinance to Plaintiffs serves no legitimate, or compelling, government interest, and Defendants lack any evidence or sufficient evidence to demonstrate the existence of such an interest.

94.     The application of the Defacement Ordinance to Plaintiffs is not narrowly tailored to further any government interest, and is not the least restrictive means of achieving any alleged government interest.

95.     The application of the Defacement Ordinance to Plaintiffs suppresses substantially more speech than is necessary to further any alleged government interest.

96.     Plaintiffs do not have any, much less ample, alternative channels to communicate their desired message.

97.     District officials acted under color of state law when enforcing the Defacement Ordinance against the Plaintiffs.

98.     The District has a policy and practice of enforcing the Defacement Ordinance against speech it disagrees with and not enforcing against speech it prefers.

99.     The Defacement Ordinance is unconstitutional as applied to Plaintiffs' speech under any applicable standard of scrutiny.

100.    Accordingly, Defendant's enforcement of the Defacement Ordinance against Plaintiffs violates the First Amendment of the United States Constitution.

101.    Therefore, Defendants' enforcement of the Defacement Ordinance against Plaintiffs' speech unconstitutionally infringes on Plaintiffs' rights, thereby entitling Plaintiffs to the belief requested below under 42 U.S.C. § 1983.

102.     WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

**SECOND CLAIM FOR RELIEF**
**Violation of the Fifth Amendment to the United States Constitution**
**Due Process**

103.     Plaintiffs reallege all matters set forth in paragraphs 1–82 and incorporate them herein.

104.     The Due Process Clause of the Fifth Amendment requires that the government treat all similarly situated organizations and individuals equally.

105.     The Fifth Amendment to the United States Constitution—which applies to the District of Columbia—prohibits the government from depriving Plaintiffs of life, liberty, or property without due process of law. The protection of liberty within the Fifth Amendment prohibits denying any person the equal protection of law. *United States v. Windsor*, 570 U.S. 744, 774 (2013). The Fifth Amendment's guarantee of equal protection requires that the government treat all similarly situated individuals and organizations equally.

106.     By applying the Defacement Ordinance to Plaintiffs, but not to other individuals or organizations similarly situated, the Defendants have impermissibly subjected Plaintiffs to unequal treatment from similarly situated individuals and organizations.

107.     The application of the Defacement Ordinance to Plaintiffs serves no legitimate, important, or compelling government interest, and Defendants lack any evidence or sufficient evidence to demonstrate the existence of such an interest.

108.     The application of the Defacement Ordinance to Plaintiffs was not the least restrictive means of achieving any alleged government interest.

27

109.    The application of the Defacement Ordinance to Plaintiffs is not narrowly tailored to any interest.

110.    The discriminatory application of the Defacement Ordinance to Plaintiffs, but not others similarly situated, is not rationally related to any government interest.

111.    District officials acted under color of state law when enforcing the Defacement Ordinance against the Plaintiffs.

112.    The District has a policy and practice of enforcing the Defacement Ordinance against speech it disagrees with and not enforcing against speech it prefers.

113.    By enforcing the Defacement Ordinance against some messages, but not other similar messages, the Defendants have impermissibly subjected Plaintiffs to unequal treatment a compared to similarly situated individuals and organizations.

114.    The Defacement Ordinance, as applied to Plaintiffs, accordingly violates the Due Process Clause of the Fifth Amendment.

115.    The Due Process Clause of the Fifth Amendment requires that the government refrain from engaging in the selective enforcement of its laws.

116.    The Plaintiffs intended to engage in their protected constitutional rights when they gathered for the August 1, 2020 event to declare that "Black Pre-Born Lives Matter."

117.    The District selectively enforced the Defacement Ordinance against Plaintiffs due to the content and viewpoint of Plaintiffs' speech and expression.

118.    The District's enforcement of the Defacement Ordinance against Plaintiffs was improperly motivated by the desire to prevent Plaintiffs' exercise of their constitutional rights.

119.    The District singled out Plaintiffs for enforcement of the Defacement Ordinance but declined to enforce the Defacement Ordinance against substantially similar conduct and similarly situated actors.

120.    D.C. Mayor Muriel Bowser and/or District officials instructed the Metropolitan Police Department to be present at Plaintiff's August 1, 2020 event and to enforce the Defacement Ordinance against Plaintiffs.

121.    The District had a discriminatory purpose and intent when it enforced the Defacement Ordinance against Plaintiffs but not others similarly situated.

122.    The District intended to discriminate against Plaintiffs when it enforced the Defacement Ordinance against Plaintiffs' speech and expression.

123.    The effect of the District's enforcement of the Defacement Ordinance was discriminatory against Plaintiffs' exercise of their constitutional rights.

124.    The application of the Defacement Ordinance to Plaintiffs is not narrowly tailored to further any government interest, and is not the least restrictive means of achieving any alleged government interest.

125.    Accordingly, the Defacement Ordinance, as applied to Plaintiffs, violates the Fifth Amendment to the United States Constitution.

126.    WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

### THIRD CLAIM FOR RELIEF
**Violation of the First Amendment to the United States Constitution**
**Free Association**

127.    Plaintiffs reallege all matters set forth in paragraphs 1–82 and incorporate them herein.

128.    The First Amendment to the United States Constitution protects the right to freedom of association.

129.    Plaintiffs hold views respecting the dignity and sanctity of human life, including opposition to abortion in all forms, and they associate with others for the purpose of more effectively expressing that viewpoint. In response to the ongoing protests following the high-profile deaths of African-Americans when interacting with law enforcement, Plaintiffs desired to come together to promote their message that "Black Pre-Born Lives Matter," and associate with others who share those ideals.

130.    The application of the Defacement Ordinance to Plaintiffs chills, deters, and restricts Plaintiffs from participating in activities organized around their shared beliefs.

131.    The application of the Defacement Ordinance to Plaintiffs serves no legitimate, or compelling, government interest, and Defendants lack any evidence or sufficient evidence to demonstrate the existence of such an interest.

132.    The application of the Defacement Ordinance to Plaintiffs is not narrowly tailored to further any government interest, and is not the least restrictive means of achieving any alleged government interest.

133.     The District's application of the Defacement Ordinance to Plaintiffs' speech—and not the speech of others—impermissibly infringes on Plaintiffs' right to associate on the basis of their shared beliefs.

134.     The Defacement Ordinance, as applied to Plaintiffs, is therefore unconstitutional under the First Amendment to the United States Constitution.

135.     WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Religious Freedom Restoration Act**
**42 U.S.C. § 2000bb**
**on behalf of Plaintiffs Gurley, Cleveland, and Whittington**

136.     Plaintiffs reallege all matters set forth in paragraphs 1–82 and incorporate them herein.

137.     Plaintiffs Gurley, Cleveland, and Whittington share sincerely held religious beliefs that all life, from the moment of conception, is precious, and believe that abortion is a grave sin. The individual Plaintiffs therefore engage in pro-life advocacy and witness as part of their religious beliefs, including organizing and participating in the August 1, 2020 rally.

138.     When Plaintiffs engage in pro-life advocacy, they exercise their religious beliefs within the meaning of the Religious Freedom Restoration Act.

139.     The District's enforcement of the Defacement Ordinance against the individual Plaintiffs substantially burdens their religious exercise.

140.     The District's enforcement of the Defacement Ordinance against the individual Plaintiffs chills their religious exercise.

141.    The enforcement of the Defacement Ordinance subjects the individual Plaintiffs to criminal penalties.

142.    The enforcement of the Defacement Ordinance against the individual Plaintiffs furthers no compelling governmental interest and is not narrowly tailored to any compelling government interest.

143.    The enforcement of the Defacement Ordinance against the individual Plaintiffs is not the least restrictive means of furthering the Defendant's interests.

144.    Accordingly, the application of the Defacement Ordinance to the individual Plaintiffs violates the Religious Freedom Restoration Act.

145.    WHEREFORE, the individual Plaintiffs respectfully request that the Court grant the relief set forth in the prayer for relief.

**FIFTH CLAIM FOR RELIEF**
**Violation of the First Amendment to the United States Constitution**
**Free Exercise of Religion**
**on behalf of Plaintiffs Gurley, Cleveland, and Whittington**

146.    Plaintiffs reallege all matters set forth in paragraphs 1–82 and incorporate them herein.

147.    Plaintiffs Gurley, Cleveland, and Whittington share sincerely held religious beliefs that all life, from the moment of conception, is precious, and believe that abortion is a grave sin. The individual Plaintiffs therefore engage in pro-life advocacy and witness as part of their religious beliefs, including organizing and participating in the August 1, 2020 rally.

148.    When Plaintiffs engage in pro-life advocacy, they exercise their religious beliefs within the meaning of the Free Exercise Clause.

149.     The District's enforcement of the Defacement Ordinance against the individual Plaintiffs substantially burdens the individual Plaintiffs' religious exercise.

150.     The District's enforcement of the Defacement Ordinance against the individual Plaintiffs chills their religious exercise.

151.     The enforcement of the Defacement Ordinance subjects the individual Plaintiffs to criminal penalties.

152.     The Defacement Ordinance is neither neutral nor generally applicable as applied to the individual Plaintiffs.

153.     The Defacement Ordinance is not neutral as applied to the individual Plaintiffs because it was applied to silence pro-life religious beliefs when Defendant would not allow Plaintiffs to paint or chalk "Black Pre-Born Lives Matter" on the street or sidewalk, but permitted other messages, done in an identical manner in permanent paint, to be created without punishment.

154.     The Defacement Ordinance is likewise not generally applicable as applied to the individual Plaintiffs, because Defendant applied the Defacement Ordinance to religious pro-life speech but did not apply it to other substantially similar non-religious messages.

155.     The Free Exercise Clause prohibits the government from disapproving of or showing hostility toward a particular religion or religion in general.

156.     The Defacement Ordinance is neither neutral nor generally applicable as applied because the District treated comparable secular activity more favorably than religious exercise.

157.     The enforcement of the Defacement Ordinance against the individual Plaintiffs furthers no compelling governmental interest and is not narrowly tailored to any compelling government interest.

158.    The enforcement of the Defacement Ordinance against the individual Plaintiffs is not the least restrictive means of furthering the Defendant's interests.

159.    The Defacement Ordinance, as applied to the individual Plaintiffs, violates the Free Exercise Clause of the First Amendment of the United States Constitution.

160.    The enforcement of the Defacement Ordinance against the individual Plaintiffs also violates the individual Plaintiffs' "hybrid" rights under the Free Exercise Clause in conjunction with their rights to Free Speech and Free Association guaranteed by the First Amendment and Equal Protection guaranteed by the Fifth Amendment.

161.    The First Amendment's Free Exercise Clause requires the government to satisfy strict scrutiny before it may burden an individual's exercise of religion in conjunction with its First and Fifth Amendment rights.

162.    Defendant cannot show a compelling interest for enforcing the Defacement Ordinance against the individual Plaintiffs, nor can it demonstrate that the application of the Defacement Ordinance pursues its goals in a means least restrictive of the individual Plaintiffs' rights.

163.    Accordingly, the Defacement Ordinance, as applied to the individual Plaintiffs, violates the individual Plaintiffs' hybrid Free Exercise rights guaranteed by the First Amendment.

164.    WHEREFORE, the individual Plaintiffs respectfully request that the Court grant the relief set forth in the prayer for relief.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment against Defendants and grant

Plaintiffs the following relief:

(A)     Declare the Defacement Ordinance unconstitutional as applied to the Plaintiffs because its application violates the rights of Plaintiffs to the freedom of speech and association and of due process, which are guaranteed to Plaintiffs under the United States Constitution.

(B)     Grant to Plaintiffs preliminary and permanent injunctive relief against the Defacement Ordinance as applied to Plaintiffs and the exercise of their constitutional rights;

(C)     Grant to Plaintiffs an award of actual and nominal damages;

(D)     Grant to Plaintiff an award for their costs of litigation, including reasonable attorneys' fees and costs, as authorized by 42 U.S.C. § 1988;

(E)     Grant such other and further relief as the Court deems appropriate.

Plaintiffs demand a jury for all issues so triable.

Respectfully submitted this 16th day of April, 2021.

By:  *s/ Elissa M. Graves*

Kristen K. Waggoner (DC Bar #242069)
Kevin H. Theriot (AZ Bar #030446)
Elissa M. Graves (DC Bar #1029052)
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile:  (480) 444-0025
Email: kwaggoner@adflegal.org
          ktheriot@adflegal.org
          egraves@adflegal.org

David A. Cortman (DC Bar #478748)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE

Suite D-1100
Lawrenceville, GA 30040
Telephone: (770) 339-0774
Email:  dcortman@adflegal.org

*Attorneys for Plaintiffs*