UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE FREDERICK DOUGLASS FOUNDATION, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> Defendant. | Civil Action No. 20-3346 (JEB) |

DEFENDANT'S MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

INTRODUCTION

Plaintiffs[1] seek to enjoin the District of Columbia (the District) from enforcing the Anti-Intimidation and Defacing of Public or Private Property Criminal Penalty Act of 1982 (the Defacement Ordinance or Ordinance) to allow the painting or chalking of a "Black Pre-Born Lives Matter" mural on a public street or sidewalk. Plaintiffs' Amended Complaint should be dismissed because plaintiffs do not have the right to deface public property and fail to state a claim for relief under any theory.

First, plaintiffs fail to state a selective enforcement claim under the Free Speech Clause because that claim is not properly raised under the First Amendment, and even if the Court were to consider this claim under a First Amendment

---

[1]    Plaintiffs are The Frederick Douglass Foundation, Inc.; Students for Life of America; William Cleveland; Robert L. Gurley, Jr.; and Angela Tina Whittington.

framework, it still fails because plaintiffs do not have a First Amendment right to deface public property and the District's enforcement of the Defacement Ordinance satisfies constitutional scrutiny. Second, plaintiffs fail to state a claim under the equal protection component of the Due Process Clause because they cannot show that the District treated plaintiffs differently from any persons or organizations that are similarly situated, that it intentionally discriminated against plaintiffs or that it did so in accordance with an official policy or custom. Third, plaintiffs fail to state a freedom of association claim because the application of the Defacement Ordinance does not implicate plaintiffs' association or membership in a group. And finally, plaintiffs fail to state a claim under the Religious Freedom Restoration Act (RFRA) or Free Exercise Clause because the Ordinance does not impose a substantial burden on plaintiffs' religious exercise and is neutral and generally applicable. Because plaintiffs fail to state a claim for relief under any of their five theories, the Court should grant the District's motion to dismiss the Amended Complaint.

## BACKGROUND

I.  <u>Laws and Policies Governing First Amendment Assemblies in the District</u>

The District's First Amendment Rights and Police Standards Act of 2004 states that "[i]t is the declared public policy of the District of Columbia that persons and groups have a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways." D.C. Law 15-352, § 102 (Apr. 13, 2005) (codified at D.C. Code § 5-331.03). However, the right to participate in First Amendment assemblies is "subject to reasonable restrictions designed to

protect public safety, persons, and property, and to accommodate the interest of persons not participating in the assemblies to use the streets, sidewalks, and other public ways." *Id.* Prior notice to the District or approval for an assembly plan is generally required for First Amendment assemblies on streets, sidewalks and public ways. *See* D.C. Code § 5-331.05(a). The purpose of this process is "to avoid situations where more than one group seeks to use the same space at the same time" as well as "to provide the Metropolitan Police Department (MPD) and other District agencies the ability to provide appropriate police protection, traffic control, and other support for participants and other individuals." *Id.* § 5-331.05(b).

Under MPD's Standard Operating Procedure for First Amendment Assemblies (SOP), MPD "provides trained personnel to respond to the scene of First Amendment assemblies in our city in order to preserve peace while protecting the constitutional and statutory rights of people to assemble peacefully and exercise free speech." MPD SOP 16-01, *Handling First Amendment Assemblies and Mass Demonstrations* at 3 (Dec. 13, 2016), *available at* https://go.mpdconline.com/GO/SOP_16_01.pdf. At planned First Amendment assemblies that MPD "is aware of in advance, either through the submission of a permit request or other means that allow for the advance planning of resources and response procedures," the Chief of Police is required to "designate command officials to serve as area or incident commanders at various sites to manage events." *Id.* at 4. The SOP further states that "[i]n order to perform its mission of protecting the rights of demonstrators, counter-demonstrators, and non-demonstrators alike, it is the policy of the MPD to engage in advance planning to

3

facilitate demonstrations where the Department is provided advance notification through the permit application process or learns of a planned First Amendment assembly." *Id.*

One of the laws that the District enforces in connection with First Amendment assemblies is the Defacement Ordinance. Under the Defacement Ordinance, it is unlawful for any person to "write, mark, draw, or paint" on public or private property "without the consent of the owner or proprietor thereof." D.C. Code § 22-3312.01. MPD makes an effort to identify violations of the Ordinance, including by sending out notices to the public seeking assistance identifying people suspected of defacing public and private property. *See, e.g.*, Metropolitan Police Department, Suspects Sought in a Defacing Private/Public Property Offense:  5400 Block of 5th Street, Northwest (Nov. 9, 2020), https://mpdc.dc.gov/release/suspects-sought-defacing-privatepublic-property-offense-5400-block-5th-street-northwest. MPD did this on several occasions around the time of the Black Lives Matter protests in the summer of 2020. *See, e.g.*, Metropolitan Police Department, Persons and Vehicles of Interest: May to September 2020 at 5, 167, 239, https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/POIs%20and%20Vehicles%20of%20Interest_1062020_Reduced.pdf (photographs of persons of interest for crimes of defacing property). Between May 30 and December 31, 2020, MPD made 22 arrests for violations of the Defacement Ordinance, including 6 arrests in connection with the Black Lives Matter protests. *See* Metropolitan Police Department, Unrest-Related   Arrest   Data   as   of   January   17,   2021,

https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/Unrest-Related%20Arrest%20Data%20as%20of%20January%2017%202021_0.pdf   (listing six defacement arrests related to civil unrest between May 30, 2020, and the end of 2020).

## II.   The "Black Lives Matter" and "Defund the Police" Murals

On June 5, 2020, at Mayor Muriel Bowser's direction, artists commissioned by the D.C. Department of Public Works (DPW) painted "Black Lives Matter" on a two-block stretch of 16th Street. *See* Black Lives Matter, MuralsDC, and the Making of History, MuralsDC, *available at* https://muralsdcproject.com/black-lives-matter-muralsdc-the-making-of-history/. The artists from MuralsDC, a program within DPW, painted the mural in large yellow letters. *Id.* City officials have stated that the mural was commissioned to honor the protestors advocating for changes to law enforcement practices in the wake of George Floyd's death, and who were the victims of aggression by federal law enforcement on June 1, 2020. Fenit Nirappil, et al., *'Black Lives Matter': in Giant Yellow Letters, D.C. Mayor Sends Message to Trump*, Wash. Post. (June 5, 2020), *available at* https://www.washingtonpost.com/local/dc-politics/bowser-black-lives-matter-street/2020/06/05/eb44ff4a-a733-11ea-bb20-ebf09 21f3bbd_story.html.

After the District commissioned the Black Lives Matter mural, activists painted over the three stars that appear at the top of the District's flag at the edge of the mural and added the words "Defund the Police" in the same color paint and typeface as "Black Lives Matter." *See* Rachel Sadon, *et al.*, *Activists Painted Defund*

5

*the Police Next to the New Black Lives Matter Mural*, NPR (June 8, 2020), *available at* https://www.npr.org/local/305/2020/06/08/872234932/activists-painted-defund-the-police-next-to-the-new-black-lives-matter-mural. The effect was that the mural appeared to state "Black Lives Matter = Defund the Police." *Id.* The Defund the Police mural was not made as part of an event permitted by the MPD, and the individuals who painted the mural did not seek MPD's permission to paint the mural. Am. Compl. [26] ¶ 41.

The next day, District employees restored the paint on the original mural and repainted the three stars on the image of the flag. *See* Sadon, *et al.*, above. District employees subsequently removed the Defund the Police mural in the process of completing pre-planned roadwork. *See* Matt Blitz, *City Says 'Defund the Police' Message At BLM Plaza Was Erased Due to Road Work*, DCIST (Aug. 17, 2020), *available at* https://dcist.com/story/20/08/17/dc-defund-police-black-lives-matter-plaza-mural/.

### III.   Plaintiffs' August 1, 2020 "Black Pre-Born Lives Matter" Protest

On the morning of August 1, 2020, plaintiffs Students for Life of America and the Frederick Douglass Foundation held a joint protest outside of Planned Parenthood's Carole Whitehill Moses Center on 4th Street, N.E. in Washington, D.C. as a part of their "campaign to highlight the impact of abortion on Black communities." Margaret Barthel, *Anti-Abortion Groups Sue D.C. After Not Being Allowed To Paint Slogan On City Street,* WAMU 88.5 (Nov. 19, 2020), *available at* https://www.npr.org/local/305/2020/11/19/936651995/anti-abortion-groups-sue-d-c-

after-not-being-allowed-to-paint-slogan-on-city-street; Emily Davies, *Two protesters arrested while chalking 'Black Pre-Born Lives Matter' on sidewalk*, Wash. Post (Aug. 1, 2020 7:23 p.m.), *available at* https://www.washingtonpost.com/local/two-protesters-arrested-for-chalking-black-pre-born-lives-matter-onsidewalk/2020/08/01/6d966d90-d41f-11ea-9038-af089b63ac21_story.html. Plaintiffs had previously sought and received a permit for the gathering; however, the permit did not grant plaintiffs approval to paint or otherwise mark the street. *Frederick Douglass Found., Inc. v. District of Columbia*, Civil Action No. 20-03346, 2021 WL 1166841, at *3 (D.D.C. Mar. 26, 2021). The permit stated that the organizers could "possess bullhorns, music stand[s] and signs" but added that "[m]arking or painting the street is not permitted." *Id.*; *see* [14-3]. In addition, the permit stated that all participants in the assembly "must comply with all the conditions of this assembly approval plan and applicable regulations and instructions issued by the Metropolitan Police Department." *Frederick Douglass Found., Inc.*, 2021 WL 1166841, at *3.

Consistent with MPD's SOP for First Amendment assemblies, approximately 32 MPD officers arrived outside Planned Parenthood early on the morning of August 1, 2020. *Id.* Some of the attendees wanted to paint or chalk their message, but the officers present told them that doing so was not permitted because it would violate the District's prohibition against defacing public property. Am. Compl. ¶ 3.

Despite MPD's prior warnings during the assembly, two participants proceeded to write the words "Black Pre-Born Lives Matter" in chalk on the sidewalk. In an exchange captured on video, an MPD officer gave the two participants warnings

that they would be arrested for defacement of property if they continued to chalk the sidewalk, and then, after the participants began writing their message, issued an order for their arrest. *See* Mary Margaret Olohan, *DC Police Reveal Why They Arrested Teens Writing Pro-Life Messages In Chalk*, Daily Caller (Aug. 1, 2020, 1:07 p.m.), *available at* https://dailycaller.com/2020/08/01/dc-police-pro-life-students-arrest-chalk/. In the video, the arrestees and other members of the assembly can be heard informing the MPD officers present that they had written protest messages outside of Planned Parenthood before as an effort to persuade women not to get abortions, and that they had not been arrested on those prior occasions. *Id.* Immediately after the arrest, a Students for Life organizer stated in front of the MPD officers that the event would continue with protesters holding posters stating "Black Pre-Born Lives Matter" instead of writing their message in chalk *Id.*; *see* Jordan Lancaster, *Pro-Life Students Arrested for Writing 'Black Preborn Lives Matter' On Sidewalk Outside Of DC Planned Parenthood*, Daily Caller (Aug. 1, 2020, 12:03 p.m.), *available at* https://dailycaller.com/2020/08/01/pro-life-students-arrested-black-preborn-lives-matter-dc-planned-parenthood/ ("We are moving on with our event today, that is not going to stop us … . If anything, this just added some fuel to our fire." (quoting Students for Life eastern regional director Michele Hendrickson)).

The two participants who were arrested were held by MPD for about an hour and then they returned to the assembly, which "continued long after the early-morning arrests." *See* Davies, above. After the arrests, the participants gathered at Frederick Douglass Court for a prayer and then marched back to Planned Parenthood

holding posters that spelled out the words "Black Pre-Born Lives Matter." *Id.* During a press conference that plaintiffs held as a part of the assembly, one of the two participants who had been arrested spoke to attendees through a bullhorn while standing adjacent to a Black Pre-Born Lives Matter poster. *Id.*

IV.   **Plaintiffs' March 27, 2021 "Black Pre-Born Lives Matter" Protest**

On March 27, 2021, plaintiffs held an event similar to their August 1, 2020 rally. Am. Compl. ¶ 71. Prior to the event, plaintiffs again requested a permit from the District to paint or chalk "Black Pre-Born Lives Matter" on the street outside of the Planned Parenthood Carole Whitehill Moses Center. *Id.* MPD permitted plaintiffs to hold the assembly of 25 people with 1 bullhorn and 1 music stand, but the permit again warned plaintiffs that they "are not authorized or permitted to paint or mark the street and to paint or mark the sidewalk." *Id.*

V.   **Plaintiffs' Allegations**

Plaintiffs filed their Complaint on November 18, 2020, raising an as-applied challenge to the District's enforcement of the Defacement Ordinance in their efforts to paint or chalk a "Black Pre-Born Lives Matter" message on a District street or sidewalk. Compl. [1] ¶¶ 1-3, 66. Plaintiffs alleged violations of the Free Speech Clause, Due Process Clause, freedom of expressive association, RFRA and the Free Exercise Clause. *Id.* ¶¶ 71-140. In their prayer for relief, plaintiffs requested that the Court declare that the Defacement Ordinance is unconstitutional as applied to them, issue preliminary and permanent injunctive relief enjoining the District from

enforcing the Ordinance against them, and award actual and nominal damages, costs and attorney's fees. *Id.* at 31.

On December 18, 2020, plaintiffs filed a motion for preliminary injunction, which the Court denied on March 26, 2021. *See* Pls.' Mot for Prelim. Inj. [8]; *Frederick Douglass Found., Inc.*, 2021 WL 1166841. The Court found that plaintiffs failed to "establish[] a likelihood of success on any of their five claims," *Frederick Douglass Found., Inc.*, 2021 WL 1166841, at *1, and warned plaintiffs of the "uphill battle they face should they desire to continue pursuing the presently requested relief," *id.* at *21. Plaintiffs moved to file an Amended Complaint on April 16, 2021 [24], which the Court granted on March 19, 2021, *see* Apr. 19, 2021 Minute Order. Plaintiffs' Amended Complaint raises the same five claims brought in the Complaint while clarifying that, despite their prior assertions to the contrary, *see, e.g.*, Pls.' Reply in Supp. of Mot. for Prelim. Inj. [17] at 16, their equal protection claim relies on a theory of selective enforcement, Am. Compl. ¶ 115.

## LEGAL STANDARD

A case must be dismissed when a party fails to set forth "a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although well-pleaded factual allegations must be taken as true, a plaintiff must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*,

550 U.S. at 555; *see Jackson v. District of Columbia*, 826 F. Supp. 2d 109, 120 (D.D.C. 2011). Courts need not accept as true conclusory "assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 679, and "need not … accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint," *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (alterations adopted) (internal quotation marks omitted).

In evaluating a motion under Rule 12(b)(6), the Court "may consider … the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Laughlin v. Holder*, 923 F.Supp.2d 204, 209 (D.D.C. 2013).

## ARGUMENT

I.   **Plaintiffs Fail To State a Free Speech Clause Because Their Claim Is Not Properly Raised Under the First Amendment, and Even If It Were, the Claim Fails as a Matter of Law.**

   A.   **Plaintiffs' Challenge to the District's Application of the Defacement Ordinance Is Not Properly Raised as a First Amendment Claim.**

As a threshold matter, plaintiffs are not likely to succeed on the merits of their viewpoint discrimination claim because it is not properly raised under the First Amendment. Plaintiffs do not raise a facial challenge to the constitutionality of the Defacement Ordinance but instead bring an as-applied challenge to the District's enforcement of the Ordinance against them in their efforts to write a message on a District street. Their theory is that the District violated the Free Speech Clause by enforcing the Ordinance against them to prevent them from painting or chalking a

11

"Black Pre-Born Lives Matter" mural when it did not enforce the Ordinance against certain other street artists—conduct that plaintiffs claim "unconstitutionally discriminates against Plaintiffs' speech" based on its content and viewpoint. Am. Compl. ¶ 90. Despite their reliance on the Free Speech Clause, plaintiffs' claim is "in essence, one of selective enforcement." *Frederick Douglass Found., Inc.*, 2021 WL 1166841, at *16 (quoting *Henderson v. Kennedy*, 253 F.3d 12, 17-18 (D.C. Cir. 2001)).

Moreover, as this Court previously suggested, "selective-enforcement claims are properly analyzed under the Equal Protection Clause, not the First Amendment, even if a plaintiff alleges that the selective enforcement occurred because the government sought to prevent the exercise of her free-speech rights." *Id.* at *5; *see Sanjour v. EPA*, 56 F.3d 85, 92 n.9 (D.C. Cir. 1995) ("'Selective enforcement' is not, of course, a First Amendment cause of action; rather, as the Second Circuit has aptly observed, it lies in 'a murky corner of equal protection law.'" (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980))). When a plaintiff alleges that a law has been selectively enforced against her based on the content or viewpoint of her speech—as plaintiffs do here—that "does not transform an equal protection 'selective enforcement' claim into a First Amendment 'as-applied' challenge." *Frederick Douglass Found.*, 2021 WL 1166841, at *5 (quoting *Sanjour*, 56 F.3d at 92 n.9). Accordingly, the Court should not consider plaintiffs' Free Speech Clause claim based on allegations of viewpoint-discriminatory enforcement because "their true claim is

one protesting the District's selective enforcement of the Ordinance more properly analyzed under the Equal Protection Clause."[2] *Id.* at *6.

### B. Even If Plaintiffs' As-Applied Challenge Were Properly Raised Under the First Amendment, It Still Fails Because Plaintiffs Do Not Have a Right To Deface Public Property and the District's Application of the Ordinance to Plaintiffs Withstands Constitutional Scrutiny.

Even if plaintiffs' as-applied challenge to the Defacement Ordinance were cognizable under the Free Speech Clause, plaintiffs still are not likely to succeed on the merits of that claim. Although, as plaintiffs point out, public streets and sidewalks are traditional public forums, Am. Compl. ¶¶ 85-86, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired," *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). Speech on streets and sidewalks remain "[s]ubject to the traditional time, place, and manner restrictions," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 578 (1980), including restrictions on defacement of public property, *see Mahoney v. Doe*, 642 F.3d 1112, 1122 (D.C. Cir. 2011) (Kavanaugh, J. concurring) ("No one has a First Amendment right to deface government property.").

*Mahoney v. Doe* is on point. There, the plaintiff had given MPD and the Department of the Interior advance notice that he intended to carry out a chalk art demonstration outside the White House as a protest to then-President Obama's position on abortion. *Id.* at 1114-15. MPD granted the plaintiff a permit for the

---

[2]    For the reasons described below, *see* Section II, plaintiffs also fail to state a claim of selective enforcement under the equal protection component of the Due Process Clause.

demonstration but the permit did not include permission for chalking, and MPD warned the plaintiff that chalking the sidewalk in front of the White House would violate the Defacement Ordinance. *Id.* at 1115. The plaintiff ignored this warning and, two days later, began chalking outside the White House and was stopped by MPD officers. *Id.* Like the plaintiffs in this case, the plaintiff in *Mahoney* subsequently raised an as-applied challenge to the District's enforcement of the Defacement Ordinance in his efforts to communicate his views against abortion. *Id.* at 1115-16. The plaintiff claimed that he should be permitted to chalk the street or sidewalk because the District had previously allowed similar chalking events such as a youth chalk art contest and a "Chalk for Peace" event. *Id.* at 1115.

As the D.C. Circuit stated in *Mahoney*, "[t]he District's ability to restrict expressive conduct in a traditional public forum is limited to the enforcement of time, place, and manner regulations, provided the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Id.* at 1117 (quoting *United States v. Grace*, 461 U.S. 171, 177 (1983)). Although the court found that the street was a public forum, it concluded that "[e]ven under the standard that applies to speech restrictions in a traditional public forum" the chalking ban withstood constitutional scrutiny as applied to the plaintiff. *Id.* at 1118. The court explained that the Defacement Ordinance is "indisputably content neutral" because "[i]t prohibits certain conduct (i.e. disfiguring, cutting, chipping, defacing or defiling), including certain expressive conduct (i.e. writing, marking, drawing, or painting), without reference to the

14

message the speaker wishes to convey," and there is no evidence that the District passed the Ordinance as a way of silencing any particular viewpoints or messages with which it disagrees. *Id.* The court also found that "the District's interest in controlling the esthetic appearance of the street in front of the White House is substantial," and the District has a "weighty" interest in "proscribing intrusive and unpleasant formats for expression." *Id.* (quoting *Members of the City Council of the City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 806 (1984)). Further, the court determined that the Defacement Ordinance was "sufficiently tailored to serve the District's esthetic interest" because "[i]t is the tangible medium—chalking—that creates the very problem the Defacement Statute seeks to remedy." *Id.* And even if "the defacement at issue is temporary" the District's enforcement is still narrowly tailored because "[t]he government can proscribe even temporary blight." *Id.* at 1119. Finally, the court concluded that the plaintiff had alternative channels of communication available because, like plaintiffs here, *see* Background above, the plaintiff in *Mahoney* was granted a permit that allowed him to use signs and banners to convey his message, which were ample alternative avenues of communication. *Id.* As the court concluded, the plaintiff "was free to announce any 'verbal' message he chose," and he could also "depict visual messages on signs, banners, and leaflets." *Id.*

As discussed below, here, just like in *Mahoney*, the District's enforcement of the Defacement Ordinance is constitutional as applied to plaintiffs because it is content-neutral, it is "substantially justified by the District's esthetic interest in combatting the very problem [plaintiffs'] proposed [mural] entails—the defacement

15

of public property," and the District allowed plaintiffs to protest without curtailing plaintiffs' other means of expression. *Id.*

> 1. **As in *Mahoney*, the District's Enforcement of the Ordinance Is Content- and Viewpoint-Neutral.**
>
> > a. **The District's Unique Enforcement Decisions in Unanalogous Circumstances Are Not Evidence of Content- or Viewpoint-Based Discrimination.**

The District's application of the Defacement Ordinance to plaintiffs was content- and viewpoint-neutral. Contrary to plaintiffs' conclusory assertion, Am. Compl. ¶ 90, the District did not enforce the Ordinance against plaintiffs because of the content or viewpoint of their speech; rather, just like in *Mahoney*, the District enforced the Ordinance against plaintiffs because they broke the law. Although plaintiffs argue that the District "permitted similar messages by others" by failing to enforce the Defacement Ordinance in several discrete instances, *id.*, the instances of allegedly inconsistent enforcement that plaintiffs cite arise from "sharply contrasting circumstances," *Frederick Douglass Found.*, 2021 WL 1166841, at *1. And even if plaintiffs *could* show that the District's enforcement practices had been inconsistent, "[p]ointing to a handful of instances of allegedly inconsistent enforcement is not enough to justify declaring [a] statute unconstitutional as applied to conduct the parties do not dispute falls under its purview." *United States v. Barnes*, Criminal Action No. 18-mj-54, 2020 WL 4933600, at *5 (D.D.C. Aug. 24, 2020).

Plaintiffs first point to the Black Lives Matter mural, which as they concede, was commissioned by the Mayor. Am. Compl. ¶ 35. Because that mural was painted at the direction of the Mayor by artists participating in a District government

program, *see* Background above, it qualifies as government speech. Plaintiffs are not similarly situated to the government because the government is not a private citizen, and the Free Speech Clause does not apply to government speech. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."). What is more, the Black Lives Matter mural does not even implicate the Defacement Ordinance because it was painted with the District's express permission. Thus, there was thus "no defacement" for the District to prevent. *Frederick Douglass Found., Inc.*, 2021 WL 1166841, at *9.

Plaintiffs also point to the Defund the Police mural, which plaintiffs allege the District "permitted." Am. Compl. ¶ 5. But that mural also qualifies as government speech. Although this Court previously expressed doubts about whether the Defund the Police mural qualified as government speech given that it was painted by "private protesters" and not commissioned by the District, *Frederick Douglass Found., Inc.*, 2021 WL 1166841, at *10, it is well-established that the government's display of artwork on public property qualifies as government speech even when it is privately contributed, *see Summum*, 555 U.S. at 472 (holding that privately donated monuments displayed in a public park are government speech even though they "were not designed or built by the City and were donated in completed form by private entities"). The privately contributed Defund the Police mural is no different. In fact, another federal court recently held that a similar "Black Lives Matter" mural painted by protesters on a street in New York qualified as government speech. *See Women*

17

*for Am. First v. De Blasio*, Civil Action No. 20-05746, 2021 WL 634695, at *8 (S.D.N.Y. Feb. 18, 2021). The court there reached this conclusion even though "[t]he artists painted this mural without the government's knowledge, consent or participation" because the government's "acceptance and preservation" of the mural for purposes of sharing the message therein was itself government speech. *Id.* at *1, *8. Indeed, as the Supreme Court held in *Summum*, a forum analysis is particularly "out of place" in the context of privately donated monuments on public property because if monuments on public property were treated as private speech instead of government speech the government would "have little choice but to refuse all such donations." *Summum*, 555 U.S. at 480.

Even if the Defund the Police mural were not government speech, plaintiffs have not shown that the District refused to enforce the Ordinance against the mural's artists "because of the District's agreement with the message." Am. Compl. ¶ 38. For starters, the Defund the Police mural was painted as part of a once in a generation mass protest "that witnessed thousands fill the city's downtown blocks," *Frederick Douglass Found.*, 2021 WL 1166841, at *2—a vastly different context from plaintiffs' August 1 protest, which was much smaller in scale and took place in "a separate part of the city" at "a different moment in time," *id.* at *1. Additionally, the artists behind the Defund the Police mural did not seek or receive a permit to paint the mural, Am. Compl. ¶¶ 40-41, and plaintiffs do not allege that MPD had any advance notice that these unidentified artists planned to paint the street. That was not the case with the chalk art display at plaintiffs' event: Plaintiffs informed the District about their

plans to mark the street ahead of time, and the event participants attempted to chalk their message (in violation of the Defacement Ordinance), despite multiple warnings that they would be arrested for it. *See* Background; Am. Compl. ¶ 3. In short, "[w]hile the 'Defund the Police' painting … may well have caught ill prepared officials by surprise at an unregistered event, their forbidding Plaintiffs from acting similarly is readily explained by the well-in-advance nature of their explicit request for permission to violate the law." *Frederick Douglass Found.*, 2021 WL 1166841, at *11.

Plaintiffs also point to protest art that appeared on construction scaffolding attached the Chamber of Commerce's headquarters and on the adjacent street that they claim was "permitted to remain." Am. Compl. ¶¶ 44, 49. Much of this artwork was on private property, and the owner—the Chamber—consented to its presence and even worked with activists to have it replaced after it was removed. *See Frederick Douglass Found.*, 2021 WL 1166841, at *3 ("The Chamber consented to the presence of the former designs on its own property, even permitting activists to produce more."); U.S. Chamber of Commerce, U.S. Chamber to Preserve Historic Black Lives Matter Artwork in Partnership with Washington D.C.-based Institutions (Aug. 10, 2020), *available at* https://www.uschamber.com/press-release/us-chamber-preserve-historic-black-lives-matter-artwork-partnership-washington-dc. Plaintiffs make no allegations to the contrary. That means the artwork did not even implicate the Defacement Ordinance, which only makes it unlawful to "write, mark, draw, or paint" on private property "without the consent of the owner." D.C. Code § 22-3312.01. Although plaintiffs allege that some of the artwork adjacent to the Chambers

headquarters was on public property, they concede that none of the artists sought or received a permit for this artwork, Am. Compl. ¶ 50, and they do not allege that MPD had advance notice of the artists' plans to paint any of this artwork.

Even if the District should have enforced the Defacement Ordinance in any of the instances plaintiffs reference, that does not mean that the District committed viewpoint discrimination by enforcing it against plaintiffs when, as plaintiffs appear to admit, their conduct plainly violated the Ordinance. As the D.C. Circuit opined in *Hodge v. Talkin*, 799 F.3d 1145, 1162 (D.C. Cir. 2015), where the plaintiff challenged a statute banning demonstrations on the Supreme Court plaza, "it is of no moment that the Supreme Court Police in certain situations might opt to allow" demonstrations as an exercise of discretion "in unique circumstances." Failure to enforce the statute in those circumstances "did not somehow transform the plaza into a public forum for all time." *Id.* Similarly, here, plaintiffs do not have a blank check to break the law simply because the Defacement Ordinance was not enforced in "a handful of instances," *Barnes*, 2020 WL 4933600, at *5, including the "unique circumstances" when "[t]ens of thousands of demonstrators flooded the streets of downtown Washington," *Frederick Douglass Found.*, 2021 WL 1166841, at *1, *11. Imperfect enforcement of the Ordinance cannot create a constitutional license for anyone to deface public property.

This conclusion is further supported by *Mahoney*, where the D.C. Circuit held that application of Defacement Ordinance to the plaintiff was constitutional even though the plaintiff alleged that the District "had previously approved similar

chalking events across the D.C. metropolitan area, including annual youth chalk art contests and a 'Chalk for Peace' event." 642 F.3d at 1115, 1119. Here, just like in *Mahoney*, plaintiffs are not entitled to violate the Defacement Ordinance just because others have painted public property in the past.[3] Plaintiffs fail to show how *Mahoney* is distinguishable, and the Circuit's decision in *Mahoney* is therefore controlling.

> **b.    Plaintiffs Fail To Establish the Requisite "Pattern" of Intentional   Content-   or   Viewpoint-Discriminatory Enforcement Through an Official Policy or Custom.**

Plaintiffs' viewpoint discrimination claim also fails for another reason:  They cannot show that the District's enforcement of the Ordinance against them was part of "a pattern of unlawful favoritism," *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 325 (2002), stemming from an official policy or custom of intentional discrimination, *see Hoye v. City of Oakland*, 653 F.3d 835, 855 (9th Cir. 2011) ("[A] plaintiff must show that a municipality's content-discriminatory enforcement of an ordinance is the result of an intentional policy or practice."). It is not enough to show "merely that the weight of [the government's] enforcement of the Ordinance has tended to fall more heavily on those who advocate one viewpoint (e.g., a pro-life view) than on those who advocate another." *Brown v. City of Pittsburgh*, 586 F.3d 263, 293 (3d Cir. 2009). Instead, plaintiffs must show both that there was a "pattern" of discriminatory enforcement *and* that this pattern was the product of "a governmental policy or custom of

---

[3]     As this Court previously acknowledged, it "cannot entertain Plaintiffs' request in a vacuum," and if the District had to accommodate plaintiffs' request to paint or chalk the street, it would also have to accommodate "countless more hopeful sketchers" who are "waiting in the wings." *Frederick Douglass Found.*, 2021 WL 1166841, at *20.

intentional discrimination on the basis of viewpoint or content.'"[4] *Frederick Douglass Found.*, 2021 WL 1166841, at *9 (quoting *Brown*, 586 F.3d at 294).

Here, plaintiffs merely assert that "[t]he District has a policy and practice of enforcing the Defacement Ordinance against speech expressing views it disagrees with and not enforcing the Ordinance against speech expressing views it prefers." Am. Compl. ¶ 76; *see also id.* ¶ 98 (similar). This is simply a conclusory, "formulaic recitation of the elements" of plaintiffs' claim, which is not enough to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Plaintiffs cannot establish that the District has a discriminatory enforcement policy by offering nothing more than legal conclusions. *See id.* ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). Moreover, as this Court previously found, "[i]t does not follow from the mere fact that select individuals managed to mark up [District streets] with words and images supporting their cause, that the District refrained from enforcing the Ordinance 'because of' its favoring the subjects discussed and messages espoused." *Frederick Douglass Found.*, 2021 WL 1166841, at *9 (quoting *Brown*, 586 F.3d at 293). At most, plaintiffs have identified mere isolated lapses of enforcement, which are "neither a 'pattern' of enforcement activity based on content or viewpoint, nor a showing of government 'intent[]' underlying the disparate application." *Id.* (quoting *Brown*, 586 F.3d at 294).

---

[4]    Plaintiffs would also have to show that such a policy or custom exists to establish *Monell* liability under 42 U.S.C. § 1983. *See* Section II.

Though plaintiffs argue that the police were present at plaintiffs' August 1 event because Mayor Bowser or another unnamed District official "ordered [them] to be present … in order to stop the painting and chalking," Am. Compl. ¶ 66; *see also id.* ¶ 120 (similar), these allegations are implausible and not entitled to the assumption of truth, *Iqbal*, 556 U.S. at 678. The more plausible explanation is that the police were merely present in accordance with MPD's SOP for First Amendment assemblies, which *requires* them to be present at First Amendment Assemblies like plaintiffs' event. *See* MPD SOP 16-01, Handling First Amendment Assemblies and Mass Demonstrations at 3-4 (Dec. 13, 2016), *available at* https://go.mpdconline.com/GO/SOP_16_01.pdf; *see also Frederick Douglass Found.*, 2021 WL 1166841, at *3 ("Approximately 32 D.C. police officers were soon on the scene *pursuant to standard operating procedures for permitted First Amendment events.*") (emphasis added). Thus, there was nothing discriminatory about MPD's presence at the event, or about MPD's enforcement of the Ordinance at the event, and there is no reason to believe that the police acted in accordance with some discriminatory "policy" by arresting the protesters at plaintiffs' event.

Additionally, as plaintiffs concede, the arrests at plaintiffs' event were not the only times the District has enforced the Defacement Ordinance: The District has made 22 arrests for violations of the Ordinance between May 30, 2020, and December 31, 2020. *See* Am. Compl. ¶ 54. That includes 6 arrests made in connection with the racial justice protests that began in late May. *See* Metropolitan Police Department,

Unrest-Related      Arrest      Data      as      of      January      17,      2021,

https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/Unrest-

Related%20Arrest%20Data%20as%20of%20January%2017%202021_0.pdf.[5]      This

directly undermines the notion that the District has a content- or viewpoint-

discriminatory enforcement policy. *See Frederick Douglass Found.*, 2021 WL

1166841, at *9 (finding that although plaintiffs "purport[ ] to identify a 'policy and

practice' of the District's discriminatory enforcement of the Defacement Ordinance,

the evidence—all of which dates from the summer 2020 protests downtown—amounts

to nothing of the sort") (citation omitted).

In reality, the District did not enforce the Ordinance against plaintiffs because

of the content or viewpoint of their speech; rather, just as it did against the plaintiff

in *Mahoney*, the District enforced the Ordinance against plaintiffs because they

informed the police that they intended to break the law. Hence, plaintiffs cannot

establish that the District's application of the Ordinance was anything but content

neutral, as it was applied "without reference to the content [or viewpoint] of the

---

[5]      At the motion to dismiss stage, the Court can take judicial notice of the publicly
available arrest data indicating that the District enforced the Defacement Ordinance
on numerous other occasions within the past year, including six times in connection
with the Black Lives Matter protests. And the Court may also take judicial notice of
the publicly available police reports for these arrests. *See In re Sci. Applications Int'l
Corp. Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 20 n.1 (D.D.C. 2014)
(Boasberg, J.) ("The police report is a public record subject to judicial notice."). None
of the police reports suggest in any way that the defacement at issue involved speech
with which the District disagreed or that the District targeted this speech because of
its content. *See* [18-1] Event # 20137726 Public Incident Report; [18-2] Event #
2008068 Public Incident Report; [18-3] Event # 20080606 Public Incident Report; [18-
4] Event # 20084777 Public Incident Report; [18-5] Event # 20098401 Public Incident
Report; [18-6] Event # 20156068 Public Incident Report.

regulated speech." *Id.* at *12 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (alteration in original)). Accordingly, plaintiffs' Free Speech Clause claim must fail. *See Mahoney*, 642 F.3d at 1122 (Kavanaugh, J., concurring) ("When, as here, the Government applies a restriction on defacement in a content-neutral and viewpoint-neutral fashion, there can be no serious First Amendment objection.").

2. **As in *Mahoney*, the District's Application of the Ordinance Is Narrowly Tailored To Promote the District's Interest in the Aesthetic Condition of Public Streets and Sidewalks.**

As it was in *Mahoney*, the District's application of the Defacement Ordinance against plaintiffs was narrowly tailored to further the District's interest in the aesthetic condition of the streets. *See Frederick Douglass Found.*, 2021 WL 1166841, at *12-*13. Instead of acknowledging this fact, plaintiffs merely state in conclusory fashion that "[t]he application of the Defacement Ordinance to Plaintiffs is not narrowly tailored to further any government interest, and is not the least restrictive means of achieving any alleged government interest." Am. Compl. ¶ 94. But plaintiffs fail to show how *Mahoney* is distinguishable.

Like the plaintiff in *Mahoney*, plaintiffs allege that there is no compelling interest in enforcing the Defacement Ordinance against their pro-life artwork if the District has not enforced the Ordinance against other artwork. *Id.* ¶ 93. However, as the Supreme Court has held, and the D.C. Circuit acknowledged in *Mahoney*, "municipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression." *Taxpayers for Vincent*, 466 U.S. at 806; *see Mahoney*, 642 F.3d at 1118. The Defacement Ordinance is narrowly tailored to

advancing that interest on its face. *Mahoney*, 642 F.3d at 1118-19. As it was in the virtually identical circumstances in *Mahoney*, the District's enforcement of the Ordinance burdens no more speech than necessary because "[i]t is the tangible medium"—in this case, painting or chalking—"that creates the very problem the Defacement Statute seeks to remedy." *id.* at 1118. And because "the substantive evil—visual blight—is not merely a possible by-product of the activity, but is created by the medium of expression itself" it is necessary to restrict this activity to accomplish the government's purpose. *Taxpayers for Vincent*, 466 U.S. at 810. It makes no difference that this prevents plaintiffs from utilizing one particular mode of speech because even a complete ban on one mode of speech can be narrowly tailored if it is necessary to advance the government's interest. *See Frisby v. Schultz*, 487 U.S. 474, 484, 487-88 (1988) (holding that city's "complete ban" on one "particular medium of expression"—picketing in residential neighborhoods—was narrowly tailored to government interest in protection of residential privacy).

Further, "[t]he government's interest in enforcing the [D]efacement [Ordinance] ... should not be judged solely by reference to the demonstration at hand nor by reference to the harm caused (or not caused) by a single letter written by a single demonstrator." *Mahoney v. District of Columbia*, 662 F. Supp. 2d 74, 91 (D.D.C. 2009) (internal quotation marks and citations omitted). "Instead, courts must look to what would happen if *every* individual to which a restriction applies were freed of its limitations, and defendants were compelled to grant each and every request [of a similar nature]." *Id.* (emphasis in original) (internal quotation marks and citations

omitted). No doubt, if the District were required to grant all requests to paint or chalk the streets and sidewalks, the result would be the unrestrained proliferation of graffiti over all public spaces in the District, and District officials would have to "brace themselves for an influx of clutter." *Summum*, 555 U.S. at 479.

As this Court previously stated, "on Plaintiffs' view, several asserted instances in which a municipality declines to enforce its prohibition on street marking — regardless of the particular circumstances giving rise to such non-enforcement — would seemingly divest it of the ability to ever claim an interest in regulating visual clutter." *Frederick Douglass Found.*, 2021 WL 1166841, at *13. "That simply cannot be right," *id.*, and plaintiffs' narrow-tailoring arguments therefore fail.

### 3.   As in *Mahoney*, the District's Application of the Ordinance Leaves Open Alternative Channels of Communication.

Finally, as in *Mahoney*, there are ample alternative channels of communication available to plaintiffs other than writing their message on government property. Plaintiffs state that "[t]he purpose of the event was for SFLA and FDF to come together to declare that 'Black Pre-Born Lives Matter.'" Am. Compl. ¶ 55. But plaintiffs could still "declare" that message without painting it or chalking it on a street or sidewalk. And, in fact, they did declare it. *See Frederick Douglass Found.*, 2021 WL 1166841, at *3 (stating that after two attendees at plaintiffs' protest were arrested "[t]he protest continued on, with demonstrators chanting and displaying their 'Black Pre-Born Lives Matter' message on posters"). Even though the Defacement Ordinance prevents them from writing the message on the street "there is no reason to believe that these same advantages cannot be obtained through other

means," *Taxpayers for Vincent*, 466 U.S. at 812, such as the other means plaintiffs used to communicate their message before and after the arrests.

Although plaintiffs specifically request that they be able to paint or chalk their message, "the scope of [the plaintiff's] request cannot define the available 'channels of communication.'" *Mahoney*, 642 F.3d at 1119. Even though plaintiffs' request was denied, like the plaintiff in *Mahoney*, plaintiffs still had ample alternative channels of communication because they received "approval to conduct an assembly," were "permitted to possess signs and banners" to communicate their message, and were "free to announce any 'verbal' message [they] chose." *Id.*

In spite of this, plaintiffs nevertheless claim that they "do not have any, much less ample, alternative channels to communicate their desired message." Am. Compl. ¶ 96. In essence, plaintiffs argue that they should be able to communicate their message by every possible means, a conclusion that the D.C. Circuit squarely rejected in *Mahoney* and *Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001). In *Henderson*, the plaintiffs challenged a National Park Service regulation that prevented certain commercial transactions on the National Mall, such as the sale of t-shirts. 253 F.3d at 14. The rationale for the regulation was that excessive commercialism on the Mall had "degraded aesthetic values" and converted the Mall into a "flea market." *Id.* (quoting National Capital Region Parks; Sales, 59 Fed. Reg. 25,855, 25,857 (May 18, 1994)). The plaintiffs challenged the regulation because they wanted to communicate their religious views "by all available means," *id.* at 15, but the D.C. Circuit upheld the regulation, finding that it restricted only "one of *a multitude* of means" for the

plaintiffs to express their views, *id.* at 17 (emphasis added). The court thus found the regulation to be a valid time, place and manner restriction that was content neutral, narrowly tailored to achieve the government's interest in preserving the aesthetic integrity of the Mall, and left open alternative channels of communication. *Id.* at 19.

As in *Mahoney* and *Henderson*, the fact that plaintiffs here cannot communicate their message through every possible means does not show that they lack alternative channels of communication.

## II.    Plaintiffs Fail To State an Equal Protection Claim Because the District Has Not Selectively Enforced the Defacement Ordinance.

Plaintiffs also argue that the District violated the equal protection component of the Due Process Clause by enforcing the Defacement Ordinance against them but not others who defaced public and private property. *See* Am. Compl. ¶ 106. As plaintiffs acknowledge in the Amended Complaint, their claim is one of selective enforcement. *See id.* ¶ 117 ("The District selectively enforced the Defacement Ordinance against Plaintiffs due to the content and viewpoint of Plaintiffs' speech and expression."). Admittedly, plaintiffs' arguments in support of their selective enforcement claim under the equal protection component of the Due Process Clause are "largely the same" as their arguments in support of its selective enforcement claim under the Free Speech Clause. *Frederick Douglass Found.*, 2021 WL 1166841, at *15. But much like plaintiffs' Free Speech Clause claim, plaintiffs' equal protection claim fails because their factual allegations cannot show that the District enforced the Ordinance against them without enforcing it against others who were similarly situated, that the District enforced the Ordinance with a discriminatory purpose, or

29

that it did so in accordance with an official policy or custom. *See Frederick Douglass Found.*, 2021 WL 1166841, at *15 (holding that plaintiffs' equal protection claim "is unlikely to succeed for essentially the same reasons as their free-speech claim"); *see also Hoye*, 653 F.3d at 855 (finding that differences between treating selective enforcement claim as one under the First Amendment or the Equal protection Clause are "semantic rather than substantive").

To begin, under the Equal Protection Clause of the Fourteenth Amendment—applicable to the District through the Fifth Amendment, *Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996)—a State cannot "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.14. It "requires States"—including the District—"to treat similarly situated persons alike." *Women Prisoners*, 93 F.3d at 924. To state an equal protection claim "a plaintiff must assert *facts* that support the allegation that the government intentionally treated [him or her] differently from others who were similarly situated." *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 34 (D.D.C. 2015) (emphasis in original) (citation omitted). The different treatment of dissimilarly situated people is permitted under the Equal Protection Clause. *See Women Prisoners*, 93 F.3d at 924 ("[D]issimilar treatment of dissimilarly situated persons does not violate equal protection.") (quoting *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994)).

Additionally, when plaintiffs' equal protection claim relies on a theory of selective prosecution, plaintiffs must prove that they were (1) "singled out for

prosecution from among others similarly situated" and (2) the prosecution was "improperly motivated" based on an arbitrary classification. *Branch Ministries v. Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000) (quoting *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983)). The burden to establish a selective prosecution claim "is a demanding one because 'in the absence of clear evidence to the contrary, courts presume that [government prosecutors] have properly discharged their official duties.'" *Id.* (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (alterations in original)). *Id.*

Here, the fact that plaintiffs seek to write their message "in a nearly identical format" to the words painted on the Black Lives Matter and Defund the Police murals does not establish that they were similarly situated to the individuals who created those murals. Am. Compl. ¶ 4; *see Frederick Douglass Found.*, 2021 WL 1166841, at *15 ("[T]he mere fact that Plaintiffs sought to mark public property with 'nearly identical words' as [other protesters] is not enough.") (citation omitted). As noted above, *see* Section I.B.1.a, plaintiffs are not similarly situated to the government, unnamed protesters who did not previously inform the District of their intent to deface public property, or others who drew messages on property with the owners' consent; thus, plaintiffs' equal protection claim cannot succeed. *See Branch Ministries*, 211 F.3d at 145 (rejecting plaintiff's selective prosecution claim because plaintiff had "failed to establish that it was singled out for prosecution from among others who were similarly situated"); *cf. Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 115 (D.D.C. 2017) (finding that because plaintiff

31

could not show that it was treated differently from "similarly situated religious groups," its equal protection claim failed "for the same reason that its inconsistent and discriminatory enforcement claim" failed under the First Amendment).

This conclusion is further supported by the D.C. Circuit's decision in *Henderson*, where the court rejected a similar equal protection claim based on the alleged selective enforcement of a ban on t-shirt sales on the National Mall. The plaintiffs' theory in *Henderson* was that they should be allowed to sell t-shirts on the Mall because certain vendors had been allowed to sell t-shirts during demonstrations, and the Park Service had not taken enforcement actions against those individuals. 253 F.3d at 17-18. However, the court rejected the plaintiffs' argument that the Park Service allowing vendors to sell concessions on the Mall was disparate treatment, finding that plaintiffs were not concessionaires and therefore were not similarly situated to these other individuals. *Id.* at 18. The court noted that "[i]n essence" plaintiffs were asking the court "to hold that equal protection requires the Park Service to ban t-shirt sales by all possible vendors, or by none," a claim that was doomed to fail because "[i]t is not a requirement of equal protection that all evils of the same genus be eradicated or none at all." *Id.* (quoting *Ry. Express Agency v. New York*, 336 U.S. 106, 110 (1949)) (alteration in original).

Additionally, much like the District here, the defendants in *Henderson* argued that "[w]henever violations are discovered ... action is taken to ensure compliance with permits and regulations." *Id.* Similar to the Park Service's efforts to enforce its t-shirt ban regulation, the public record indicates that MPD enforces *known*

32

violations of the Defacement Ordinance,[6] as when it enforced the Ordinance in response to the chalking at plaintiffs' protest. Like in *Henderson*, this is fatal to plaintiffs' equal protection claim.

Even if plaintiffs were similarly situated to other individuals who were not arrested, plaintiffs' equal protection claim still could not succeed because all plaintiffs have alleged is that there have been "lapses in enforcement," without any evidence of discriminatory motive, *id.* But to succeed on a selective prosecution claim, plaintiffs must show both that the government's discretionary enforcement decisions had a discriminatory effect *and* that they were motivated by a discriminatory purpose. *Wayte*, 470 U.S. at 608; *see Frederick Douglass Found.*, 2021 WL 1166841, at *16 (finding that "[e]ven if Plaintiffs could establish dissimilar treatment of similarly situated entities … their claim would still fail" because they could not establish that any dissimilar treatment in the District's enforcement practices was based on discriminatory intent).

In an effort to satisfy this requirement, plaintiffs state—once again, in conclusory fashion—that "[t]he District's enforcement of the Defacement Ordinance against Plaintiffs was improperly motivated by the desire to prevent Plaintiffs' exercise of their constitutional rights." Am. Compl. ¶ 118; *see also id.* ¶¶ 121-22

---

[6]     *See, e.g.*, [18-1] ("Members of the MPD Second District were assisting with a First Amendment march. S-1 was observed by MPD officers utilizing aerosol spray paint to tag the message 'ACAB FCK masons' … on the front wall structure … S-1 was … subsequently arrested … ."); [18-3] ("S1 was observed spray painting a building the numerals '12' twice in white colored paint. S1 was later stopped and placed under arrest."); [18-5] ("S1 was captured on [body-worn camera] spray painting numerous barriers during a First Amendment Assembly. S1 was … placed under arrest … .").

(similar). But all plaintiffs have shown is that they were selected for prosecution because they "in effect selected themselves for prosecution," *Wayte*, 470 U.S. at 610, by notifying the government of their intent to break the law and then continuing to break the law after being warned by police officers that they would be arrested. Therefore, plaintiffs' equal protection claim cannot succeed.

Finally, because a municipal government cannot be sued under Section 1983 "for an injury inflicted solely by its employees or agents," plaintiffs must show that any selective prosecution was the result of an official District policy or custom. *See Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 691, 694 (1978); *cf. Brown*, 586 F.3d at 296 (holding that even if officer did not enforce Ordinance against other individual because of that individual's viewpoint plaintiff "would still need to show that the officer's inaction was the product of an unlawfully discriminatory governmental policy or custom"). Plaintiffs fail to satisfy this requirement. Even if their allegations were taken as true, plaintiffs do not explain how isolated examples of discretionary enforcement decisions by District employees establish an official policy of the District applying the Defacement Ordinance only to speech with which it "disagrees." Am. Compl. ¶ 76. Although plaintiffs allege that the Mayor or another District official acted as a "policymaker" for purposes of *Monell* liability and that the District "showed a deliberate indifference to the risk that the enforcement of the Defacement Ordinance would result in violations to Plaintiffs' constitutional rights," Am. Compl. ¶¶ 78, 80, these allegations are conclusory and not entitled to the

assumption of truth, *see Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

In addition, plaintiffs must show that there was an affirmative link between the official policy or custom and the alleged constitutional injury such that the official policy or custom was the "moving force" behind the alleged injury. *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). To satisfy this requirement, plaintiffs must do more than simply infer some nebulous policy from a single incident "and at the same time sanction[ ] the inference that the 'policy' was the cause of the incident"—an approach that would "circumvent[ ] *Monell*'s limitations altogether." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985). Plaintiffs fail to do so here. Thus, even if plaintiffs had shown that District employees committed a predicate constitutional violation—which they have not—the predicate constitutional violation would not be attributable to the District.

## III.   Plaintiffs' Fail To State a Freedom of Expressive Association Claim Because They Were Not Denied the Right to Freely Associate.

Plaintiffs contend that being prevented from defacing public property violates their right to "associate with others for the purpose of more effectively expressing that viewpoint." Am. Compl. ¶ 129. But plaintiffs' invocation of the right to expressively associate is inapt, because, as the term implies, it is a right to *associate*, and plaintiffs have not alleged that the enforcement of the Defacement Ordinance impairs their ability to associate with each other or any other group.

The Supreme Court has recognized the right to expressive association when government regulation affects individuals' membership in an organization, such as

by "seek[ing] to impose penalties or withhold benefits from individuals because of their membership in a disfavored group, ... attempt[ing] to require disclosure of the fact of membership in a group seeking anonymity, ... and [trying] to interfere with the internal organization or affairs of the group." *Roberts v. United States Jaycees*, 468 U.S. 609, 622-23 (1984) (internal citations omitted); *see, e.g.*, *Nat'l Ass'n for the Advancement of Colored People (NAACP) v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 462-63 (1958) (finding a government regulation requiring the names of NAACP members to be made public violated the members' expressive associational rights); *Roberts*, 468 U.S. at 622-23 (finding that right of expressive association was implicated when state required a private, all-male organization to admit women as full voting members); *Kusper v. Pontikes*, 414 U.S. 51, 58, 61 (1973) (finding that state law that "'locks' voters into a pre-existing party affiliation from one primary to the next" unless the voter forgoes voting in a primary for two years infringed upon voters' associational rights).

As these cases demonstrate, the expressive association right is appropriately applied to government intrusions in the *membership* of organizations. No such risks are present here. Indeed, plaintiffs' Amended Complaint notes that plaintiffs Cleveland and Gurley are members of FDF and plaintiff Whittington is a member of SFLA—organizations which, according to the Amended Complaint, are thriving with an active membership across the country—but the Amended Complaint does not allege that their membership with these groups or any other groups are burdened by the application of the Defacement Ordinance. Am. Compl. ¶¶ 22, 23, 24, 28, 31. Even

taking plaintiffs' factual allegations as true, plaintiffs "have not explained how [expressive association] rights are implicated at all in this case" and, thus, fail to state a freedom of association claim. *See Frederick Douglass Found., Inc.*, 2021 WL 1166841, at *16.

Moreover, the implications of shoehorning plaintiffs' argument into an expressive association legal framework show that the approach in unsupported in law. Plaintiffs' interpretation would expand that right to preclude the government from regulating *any* expressive conduct by *any* group of individuals unless it satisfied strict scrutiny. As this Court noted, "[t]hat, of course, is not the law." *Id.* at *17. "It seems difficult to maintain, as Plaintiffs would, that where individual speech is permissibly barred, group speech cannot be without violating association rights," and because plaintiffs cannot "coherently link the protested enforcement to their expressive-association rights," *id.*, their freedom of expressive association claim must fail.

Even if plaintiffs were correct that the application of the Defacement Ordinance constituted a burden on their right to expressive association, the Defacement Ordinance would still be constitutional. *Roberts*, 468 U.S. at 623 (holding that the "right to associate for expressive purposes" is not "absolute" because "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms"). As discussed above, *see* Section I.B.2, the District would satisfy the burden of showing

37

that the Ordinance furthers a compelling government interest with the least restrictive means.

## IV.   Plaintiffs Fail To State a RFRA Claim Because Enforcement of the Defacement Ordinance Is Not a Substantial Burden on Plaintiffs' Religious Conduct.

Plaintiffs argue that the District's enforcement of the Defacement Ordinance against them violates RFRA because it substantially burdens their exercise of religion. Am Compl. ¶ 139. But plaintiffs' assertion is meritless. The District has not pressured or compelled plaintiffs to violate their religious beliefs or engage in activity their religion forbids. And without showing a substantial burden on plaintiffs' religious conduct, plaintiffs cannot succeed on their RFRA claim.[7]

RFRA provides that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it can demonstrate the application of the burden: "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b).12.[8] But plaintiffs do not show that the Defacement Ordinance substantially burdens their exercise of religion and, even if plaintiffs could, the Ordinance furthers a compelling government interest while using the least restrictive means to do so.

---

[7]    Only plaintiffs Whittington, Cleveland and Gurley bring claims under RFRA and the Free Exercise Clause.

[8]    Although the Supreme Court struck down the portion of RFRA regulating state and local governments, *City of Boerne v. Flores*, 521 U.S. 507 (1997), RFRA remains applicable to the District as a "covered" federal entity, *see* 42 U.S.C. § 2000bb-2(1)-(2); *Potter v. District of Columbia*, 558 F.3d 542, 546 (D.C. Cir. 2009).

To demonstrate a substantial burden on their religious exercise, plaintiffs would have to show that the District "put[ ] 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)). "RFRA decisions turn on an element of compulsion," *Archdiocese of Wash.*, 281 F. Supp. 3d at 114, and the element of compulsion required to establish a substantial burden under RFRA is not present here.

The circumstances here are aptly compared to the well-established line of cases in this Circuit holding that a prohibition on one particular means of spreading the gospel is not a "substantial burden" on the exercise of religion. *See Mahoney*, 642 F.3d at 1121 (finding that application of Defacement Ordinance to prevent chalking anti-abortion messages on sidewalks was not a substantial burden); *Henderson*, 253 F.3d at 17 (rejecting a challenge to regulations preventing individuals from selling t-shirts on the National Mall even though plaintiffs alleged that their religion required them to spread the gospel by "all available means"); *Archdiocese of Wash.*, 281 F. Supp. 3d at 115 (finding that ban on religious advertisements on public transit vehicles was not a substantial burden). Under binding precedent in this Circuit, "when a restriction merely prohibits one of a multitude of methods of spreading the gospel, and it does not 'force[] [parties] to engage in conduct that their religion forbids' or prevent 'them from engaging in conduct their religion requires,' those parties are not 'substantially burdened.'" *Mahoney*, 642 F.3d at 1121 (alterations original) (quoting *Henderson*, 253 F.3d at 16). In *Mahoney,* the D.C. Circuit found that the Defacement

39

Ordinance did not substantially burden the plaintiff's religious exercise because "the District's threatened use of the Defacement [Ordinance] prohibits only 'one of a multitude of means' of conveying [plaintiff's] religious message." *Id.* The D.C. Circuit concluded that the plaintiff could "still spread his message through picketing, a public prayer vigil, or other similar activities in which he has previously engaged." *Id.* The same is true here, *see* Section I.B.3 above, and the prohibition of one form of communication is not a substantial burden. As this Court found, the principles espoused in *Mahoney, Henderson and Archdiocese of Wash.* "squarely foreclose" plaintiffs' RFRA claim. *Frederick Douglass Found., Inc.*, 2021 WL 1166841, at *18.

Moreover, the sincerity of plaintiffs' belief that they should engage in pro-life advocacy is not in dispute. *See* Am. Compl. ¶ 137. Plaintiffs' characterization that the inability to chalk sidewalks with their chosen message is a "substantial burden," *see id.* ¶ 139, is a "legal conclusion, cast as a factual allegation," which does not provide "facts sufficient to state a substantial burden," *Kaemmerling*, 553 F.3d at 679. In other words, "the existence of [a] belief, and even the sincere desire to act in accordance with it, is not enough to sustain a [RFRA] claim." *Archdiocese of Wash.*, 281 F. Supp. 3d at 114. Here, as in *Henderson*, *Mahoney* and *Archdiocese of Washington*, the Court may again acknowledge the sincerity of plaintiffs' belief that it should engage in pro-life advocacy, but find that the prohibition on one form of that expression in a particular place is not a substantial burden on plaintiffs' religious exercise when plaintiffs have other means available for advocacy. Indeed, in finding that plaintiffs' RFRA claim in their motion for preliminary injunction had no

likelihood of success, the Court did not "question the sincerity of these beliefs" but relied on the fact that "Plaintiffs never allege[d] that their sincerely held religious beliefs include engaging in pro-life advocacy 'through the specific medium' of painting or chalking a public street." *Frederick Douglass Found., Inc.*, 2021 WL 1166841, at *18 (quoting *Mahoney*, 662 F. Supp. 2d at 96-97). Plaintiffs' Amended Complaint still fails to allege any facts which suggest that painting and chalking messages on streets is a tenet of their sincerely held religious beliefs. Accordingly, the Court should once again reject plaintiffs' RFRA claim because "Plaintiffs have not established that the District has or will substantially burden their religious exercise." *Id.*

Even if the Court found that the Defacement Ordinance constitutes a substantial burden on plaintiffs' exercise of religion, the District satisfies its burden to show that the Ordinance furthers a compelling government interest with the least restrictive means, as discussed in Section I.B.2 above.

V.    **Plaintiffs Fail To State a Free Exercise Clause Claim Because the Defacement Ordinance Has Not Imposed a Substantial Burden on Plaintiffs' Religious Exercise and the Ordinance Is Neutral and Generally Applicable.**

Plaintiffs contend that the District's application of the Defacement Ordinance violates the Free Exercise Clause because the District enforces the Ordinance against religiously-motivated defacement but not non-religious defacement. Am. Compl. ¶¶ 153, 154. That, too, is incorrect. The District has not violated plaintiffs' free exercise rights because:  (1) the Ordinance does not substantially burden plaintiffs' religious practice; and (2) the District's application of the Ordinance is neutral and generally applicable. As a result, plaintiffs cannot succeed on their free exercise claim. *See All.*

*for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 179 (D.D.C. 2000) ("neutral laws of general applicability do not violate the Free Exercise Clause, even if the laws incidentally burden religion.").

First, plaintiffs must make a "threshold showing" that "a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice" before the Free Exercise Clause is implicated. *Levitan v. Ashcroft*, 281 F.3d 1313, 1320 (D.C. Cir. 2002). In evaluating whether a law imposes a substantial burden on a plaintiff's religious exercise, courts must find that "[t]he litigant's beliefs [are] sincere and the practices at issue [are] of a religious nature," and that the law "burden[s] a central tenet or important practice of the litigant's religion." *Id.* For the reasons described above, *see* Section IV, plaintiffs cannot show that the prohibition on defacing public sidewalks and streets substantially burdens their religious practice. This alone defeats their claim.

Second, even if the Court found that the Defacement Ordinance substantially burdened plaintiffs' religious exercise, plaintiffs' free exercise claim could not succeed because the District's application of the Ordinance is neutral and generally applicable. The First Amendment "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Archdiocese of Wash.*, 281 F. Supp. 3d at 112 (quoting *Emp't Div. Dep't of Human Res. of Oreg. v. Smith*, 494 U.S. 872, 879 (1990), and citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 531-32 (1993)). A law is neutral "if the object

42

of a law is [not] to infringe upon or restrict practices because of their religious motivation." *Lukumi Babalu*, 508 U.S. at 533. And a law is generally applicable if it "cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 543.

Here, plaintiffs argue that the Defacement Ordinance is not neutrally applied because the District applied the Ordinance to "silence pro-life religious beliefs" and "would not allow Plaintiffs to paint or chalk 'Black Pre-Born Lives Matter' on the street or sidewalk, but permitted other messages ... to be created without punishment." Am. Compl. ¶ 153. Indeed, plaintiffs have offered no evidence or allegation that MPD targeted or will target plaintiffs for enforcement of the Ordinance because of plaintiffs' religious conduct. *Compare Frederick Douglass Found., Inc.*, 2021 WL 1166841, at *20 ("Contrary to Plaintiffs' conclusory contention ... the record contains no evidence suggesting that the District enforced the Ordinance against them because their conduct was undertaken for religious reasons.") (internal quotation and citation marks omitted), *with Lukumi Babalu*, 508 U.S. at 534 (finding that "suppression of the central element of the Santeria worship service was the object of the ordinances" when "the only conduct subject to ordinances ... is the religious exercise of Santeria church members."), *and Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 167-68 (3d Cir. 2002) (finding that a city's ordinance that prohibited affixing materials to utility poles was not neutral when the city removed religious but not non-religious items). Thus, plaintiffs cannot show that

the District has made enforcement decisions based on the religious nature of the message. The application of the Defacement Ordinance against plaintiffs was neutral.

Similarly, plaintiffs argue that the Defacement Ordinance is not generally applicable because the District "applied the Defacement Ordinance to religious pro-life speech but did not apply it to other substantially similar non-religious messages." Am. Compl. ¶ 154. But this argument is "yet another effort to repurpose their failed selective-enforcement claim." *See Frederick Douglass Found., Inc.*, 2021 WL 1166841, at *19. "Plaintiffs must show more than a mere handful of instances of non-enforcement in circumstances dissimilar to their own in order to establish that the city has 'target[ed] religious ... speech to an extreme degree.'" *Id.* at 20 (quoting *Am. Family Ass'n, Inc. v. FCC*, 365 F.3d 1156, 1171 (D.C. Cir. 2004)). Plaintiffs have made no such showing, and "the District has enforced the facially neutral law dozens of times throughout 2020, including against secular messages." *Id.* As described above, *see* Sections I.B.1.a, II, plaintiffs' assertions about selective enforcement are incorrect, and the District's enforcement of the Ordinance is generally applicable.

In sum, because the application of the Defacement Ordinance does not impose a burden on plaintiffs' religious conduct and the Ordinance is neutral and generally applicable, there can be no violation of the Free Exercise Clause. *See Adair v. England*, 183 F. Supp. 2d 31, 53 (D.D.C. 2002) (finding that if the challenged law is both neutral and generally applicable, it "need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice"). But even if the Court found that the District did not

satisfy those requirements—which would subject the Defacement Ordinance to strict scrutiny to determine whether it violates the Free Exercise Clause—the District has a compelling government interest in applying the Ordinance and does so using narrowly tailored means.[9] *See* Section IV above; *Lukumi Babalu*, 508 U.S. at 546 ("A law burdening religious practice that is not neutral or not of general application must ... be narrowly tailored in pursuit of [a compelling government interest].").

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiffs' Amended Complaint with prejudice.

Dated:  May 17, 2021.                  Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Acting Deputy Attorney General
Public Interest Division

*/s/ Gavin N. Palmer*
GAVIN N. PALMER [1619264]
PAMELA A. DISNEY [1601225]
Assistant Attorneys General
Equity Section
400 Sixth Street, N.W., Suite 10100

---

[9]      For the reasons described in Sections I, III and IV, the District's application of the Defacement Ordinance is not subject to heightened scrutiny because of violations of plaintiffs' "hybrid rights under the Free Exercise Clause in conjunction with their rights to Free Speech and Free Association," *see* Am. Compl. ¶ 160, because plaintiffs have failed to state a claim under any of those theories, *see Archdiocese of Washington v. Washington Metro. Area Transit Auth*., 897 F.3d 314, 331 (D.C. Cir. 2018) (finding appellant's hybrid rights claim fails "because it requires independently viable free speech and free exercise claims, and 'in law as in mathematics zero plus zero equals zero.'" (quoting *Henderson,* 253 F.3d at 19)).

Washington, D.C. 20001
(202) 805-7440
gavin.palmer@dc.gov

*Counsel for Defendant*