UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE FREDERICK DOUGLASS
FOUNDATION, INC., *et al.,*

   Plaintiffs,

      v.                                        Civil Action No. 20-3346 (JEB)

DISTRICT OF COLUMBIA,

   Defendant.

## MEMORANDUM OPINION

With the paint barely dry on its earlier decision in this matter, the Court returns to the question of whether the District of Columbia improperly prohibited anti-abortion advocacy groups and their individual supporters from painting or chalking the message "Black Pre-Born Lives Matter" on city streets and sidewalks.  Plaintiffs — the Frederick Douglass Foundation, Students for Life of America, and three members of those organizations — contend that the District's enforcement of its ordinance prohibiting the defacing of public or private property against them but not against racial-justice protesters violated a slew of constitutional and statutory protections.

In March 2021, this Court denied Plaintiffs' motion for a preliminary injunction to require the District to allow them to paint their message at a rally that month.  See Frederick Douglass Found., Inc. v. District of Columbia, 2021 WL 1166841 (D.D.C. Mar. 26, 2021).  They now return with a somewhat different Amended Complaint, which Defendant moves to dismiss. As the Court's ultimate determination remains the same under the Rule 12(b)(6) standard —

1

even though some of its analysis differs — it concludes that Plaintiffs have failed to state a facially plausible claim on each of their counts and will dismiss the case.

## I.     Background

The backdrop for this case was laid out in this Court's March 2021 Opinion.  See Frederick Douglass Found., Inc., 2021 WL 1166841, at *1–4.  In light of the different factual information a court may consider at the preliminary-injunction stage, as opposed to on a motion to dismiss, the Court sketches a summary of events drawn from Plaintiffs' Amended Complaint and then recounts the procedural history.

### A.  Factual Background

Plaintiffs held a joint rally on August 1, 2020, at which they sought to paint a mural in front of the Planned Parenthood Carole Whitehill Moses Center, located in Northeast Washington, which would have read "Black Pre-Born Lives Matter."  ECF No. 26 (Am. Compl.), ¶ 2.  They wished "to recognize the fact that Planned Parenthood and the abortion industry kill tens of thousands of unborn African-American children in the womb each year." Id.; see also id., ¶ 56.  Expressing such a message is consistent with Plaintiffs' broader advocacy work.  "Frederick Douglass Foundation is a national education and public policy organization . . . that advocates free-market and limited-government ideas" and serves as a "liaison between black, faith-based organizations" and conservative politicians.  Id., ¶¶ 16, 19.  Students for Life of America is "the nation's largest youth pro-life organization."  Id., ¶ 26.  The three individual Plaintiffs are involved with these two organizations.  Id., ¶¶ 23, 24, 31.

Plaintiffs "applied for a permit for assembly with [D.C.] police" and received permission to use "bullhorns, [a] music stand, and signs with paint supplies."  Id., ¶ 58.  They also allege that they received verbal confirmation that they could paint their mural so long as they used

2

tempera paint, which washes out.  Id., ¶ 59.  When Plaintiffs arrived to begin painting, however, they were "confronted by myriad police cars and law-enforcement officers" and told that if they marked the streets or sidewalk, "they would be arrested" for violating the District's ordinance against defacing property.  Id., ¶ 3.  The Defacement Ordinance, codified at D.C. Code § 22-3312.01, states:

> It shall be unlawful for any person or persons willfully and wantonly . . . to write, mark, draw, or paint, without the consent of the owner or proprietor thereof, or, in the case of public property, of the person having charge, custody, or control thereof, any word, sign, or figure upon: Any property, public or private, building, statue, monument, office . . . dwelling or structure of any kind . . . .

Under the Ordinance, "property" includes streets and sidewalks.  Id. § 22-3312.05(9).  Two individuals nonetheless went forward with chalking the message and "were immediately arrested."  Am. Compl., ¶ 3.

On March 27, 2021, Plaintiffs held another rally for which they again sought permission from the District to paint or chalk "Black Pre-Born Lives Matter" in the same location.  Id., ¶ 71. They were again allowed to assemble with a bullhorn and music stand, but not to paint or draw their message.  Id.  Having been twice denied the opportunity to paint or chalk, they brought this as-applied challenge pursuant to 42 U.S.C. § 1983, alleging that the Defacement Ordinance has been unconstitutionally enforced to limit their activities, but not to punish others.  Id., ¶ 1.  They contend that the District targeted them because of their "religious and pro-life beliefs," id., ¶ 74, while failing to enforce the Ordinance against individuals expressing messages with which it agreed — namely, the racial-justice protesters last summer.  See, e.g., id., ¶ 53.

Those protests occurred in June 2020 amid the national response to the killing of George Floyd in Minneapolis.  At the time, D.C. Mayor Muriel Bowser "commissioned a mural, extending along 16th Street, NW" that read "Black Lives Matter" in yellow paint followed by the

D.C. flag.  Id., ¶ 35.  The following day, "protestors with Black Lives Matter D.C. painted the words 'Defund the Police'" next to the message and painted over the stars in the D.C. flag such that the text on the street read "Black Lives Matter = Defund the Police."  Id., ¶ 36.  The words "Defund the Police" remained through mid-August when they were removed for pre-planned roadwork; the stars, meanwhile, were quickly repainted.  Id., ¶¶ 37, 39.  Protesters added drawings, paintings, and graffiti on scaffolding along the side of the nearby headquarters of the U.S. Chamber of Commerce until this display was removed for preservation in August 2020.  Id., ¶ 44.  Later that summer, "public sidewalks and streets of the District were [again] marked with graffiti, street art, and street chalking," including at an event on August 16, 2020, when protesters sought to "reclaim[] the H Street Art Tunnel at BLM Plaza."  Id., ¶ 48.  Plaintiffs allege that the protesters did not seek advance permission from the District or the owners of private property to mark the streets and sidewalks, id., ¶¶ 40–41, 45–46, 50–51, that members of the Metropolitan Police Department were present during the painting of "Defund the Police" and the August 2020 street art, id., ¶¶ 38, 52–53, and that no one was punished for these actions.  Id., ¶¶ 42, 47, 52.

B.  Procedural Background

Plaintiffs first brought this challenge in November 2020 and moved that December for a preliminary injunction that would have allowed them to paint a mural during their rally outside Planned Parenthood on March 27, 2021.  See ECF No. 8 (Mot. for Preliminary Injunction) at 3. In March 2021, this Court denied that motion and held that Plaintiffs had not established a likelihood of success on the merits of any of their claims.  See Frederick Douglass Found., Inc., 2021 WL 1166841, at *1.  Plaintiffs then filed an Amended Complaint in April 2021, which the District now moves to dismiss.  See ECF No. 27 (Def. MTD).  That Complaint asserts five

4

counts, claiming abridgement of their freedom of speech, right to equal protection of the laws, freedom of association, rights under the Religious Freedom Restoration Act, and free exercise of religion.  Id., ¶¶ 83–164.

Although this pleading presents the same five claims that this Court addressed in its earlier decision, the Court is bound to consider them pursuant to the different and lower burden that a plaintiff bears when fending off a motion to dismiss rather than when seeking a preliminary injunction.

## II.  Legal Standard

To obtain a preliminary injunction, the moving party must "show, among other things, a substantial likelihood of success on the merits."  Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation and internal quotation marks omitted).  Further, when assessing such a motion, a court need not confine itself to the facts alleged in the complaint and may consider evidence outside of the complaint such as affidavits or witness testimony.  See LCvR 65.1(c) (outlining process for both parties to submit affidavits in preliminary-injunction motion).  In now evaluating Defendant's Motion to Dismiss, however, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff[s] 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Rule 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."  Although "'detailed factual allegations'" are not necessary to withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007)).  To do so, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555.

Given this lower standard and the restrictions on what a court can consider at this stage, a plaintiff can survive a motion to dismiss, but be denied a motion for a preliminary injunction.  See, e.g., Int'l Council of Shopping Centers, Inc. v. RECONCRE, LLC, 2021 WL 148387, at *2 (D.D.C. Jan. 14, 2021) (Plaintiff pled "enough facts to satisfy the low plausibility standard that governs motions to dismiss, but it fail[ed] to meet the much heavier burden of clearly showing that it is entitled to a preliminary injunction."); see also Swanson Grp. Mfg. LLC v. Jewell, 195 F. Supp. 3d 66, 79 (D.D.C. 2016) (plaintiff survived motion to dismiss but had not established substantial likelihood of success on merits).  In denying Plaintiffs' original motion for a preliminary injunction, the Court considered extrinsic evidence, did not take all well-pleaded allegations as true, and held Plaintiffs to the more stringent "substantial likelihood of success" standard.  Although this was "correct for determining whether or not to grant the motion for preliminary injunction[,] . . . [it is] incorrect for determining whether to dismiss the case in its entirety."  Food & Water Watch, Inc., 808 F.3d at 912.

This Court, accordingly, will proceed with its analysis under the motion-to-dismiss standard, taking as true all well-pleaded facts in the Amended Complaint.  While this may appear

to prioritize form over substance — and create needless work as the Court again analyzes the same issues — it is nonetheless what our Federal Rules of Civil Procedure require.

## III.   Analysis

In its discussion, the Court does not set out in detail all of the doctrinal frameworks applicable to the five counts, but assumes the reader's familiarity with its earlier Opinion, which did so.  In addition, while that Opinion spent most of its time on the First Amendment, this one focuses on the Fifth Amendment because the Court concludes that the analysis of Plaintiffs' central claim is most appropriately handled there.  The Court then addresses the issue of municipal liability and finishes with Plaintiffs' last three counts regarding freedom of association, RFRA, and free exercise.

### A.   Count One: Freedom of Speech

Plaintiffs' free-speech claim under the First Amendment turns entirely on how the city enforced the Defacement Ordinance, as the Ordinance itself is facially content neutral, see Mahoney v. Doe, 642 F.3d 1112, 1118 (D.C. Cir. 2011) (Defacement Ordinance "is indisputably content neutral" because it bans activities "without reference to the message the speaker wishes to convey"), and facially viewpoint neutral.  Frederick Douglass Found., Inc., 2021 WL 1166841, at *6 ("The Court will therefore 'assum[e]' that the First Amendment supports an as-applied challenge to a neutral law where a plaintiff alleges discriminatory enforcement based on content and/or viewpoint.") (emphasis added).  Plaintiffs do not allege otherwise.  Rather, they maintain that the District "enforce[s] the Defacement Ordinance against speech it disagrees with" and not "against speech it prefers."  Am. Compl., ¶ 98.

This Court's prior Opinion addressed at length the question of the appropriate constitutional provision (First vs. Fifth Amendment) under which to examine such a claim.  Last

go-round, it acknowledged "harbor[ing] doubts" about "whether Plaintiffs' claim is properly analyzed under the First Amendment at all." Frederick Douglass Found., Inc., 2021 WL 1166841, at *5 (noting also "that the parties never adequately develop" this question). With the benefit of more complete briefing, these doubts have been magnified. In any event, as the Court now explains, Plaintiffs suffer no prejudice from such categorization given that the critical factors here are essentially the same in the analysis under the First or Fifth Amendment.

As noted in March, the "D.C. Circuit does not appear to have conclusively weighed in on which doctrinal framework governs claims of the precise sort raised here." Id. at *6. The Circuit's limited pronouncements, however, suggest that Plaintiffs' claim is better considered within the selective-enforcement framework of the Fifth Amendment than within that for as-applied First Amendment viewpoint-discrimination challenges. In Sanjour v. EPA, 56 F.3d 85 (D.C. Cir. 1995), the *en banc* Circuit explained that "[t]he critical inquiry in [selective-enforcement] cases is thus not whether legislation is constitutional 'as applied' to a particular set of facts[, which would be a traditional as-applied challenge], but rather whether the government may constitutionally 'apply' the same rule to some individuals but not to others similarly situated." Id. at 92 n.9. The Circuit added that "a plaintiff may prevail on a 'selective enforcement' claim by showing that the government's motive in selectively prosecuting him was to 'prevent or paralyze [the] . . . exercise of [his] constitutional rights' . . . including First Amendment rights[, but that] . . . does not transform an equal protection 'selective enforcement' claim into a First Amendment 'as-applied' challenge." Id. Plaintiffs here similarly do not argue that there is a particular set of facts to which the Ordinance cannot constitutionally apply, but instead maintain that the District's enforcement of the law against them was intended to prevent

the exercise of their constitutional rights by "censor[ing] the message of Plaintiffs" in a way that was "impermissibly content and viewpoint based."  Am. Compl., ¶ 90.

Looking beyond the D.C. Circuit for guidance, this Court finds that other Courts of Appeals are divided over how to categorize claims in which law enforcement is alleged to have selectively enforced restrictions on speech-related activities based on viewpoint.  Compare Hoye v. City of Oakland, 653 F.3d 835, 854–55 (9th Cir. 2011) (explaining that Circuit has "generally classified . . . as selective enforcement equal protection claims" certain claims brought as as-applied First Amendment challenges, such as one brought by a "sidewalk counselor" who alleged an ordinance was selectively enforced against anti-abortion speakers), with McGuire v. Reilly, 386 F.3d 45, 61 (1st Cir. 2004) (treating as a distinct category of First Amendment as-applied challenge one where the "law itself is neutral and constitutional in all fact situations, but [plaintiff alleges] that it has been enforced selectively in a viewpoint discriminatory way" in case involving anti-abortion activists outside clinics).

Despite these different classifications, however, when a statute is facially neutral, the Circuits rely on tests that require some degree of intent and a showing that certain speech is disproportionately affected.  For example, the First Circuit has explained that it requires demonstrating intent in such cases because "[u]nless government actors were to intentionally enforce the statute unequally, then any evidence of inequality that plaintiffs were to show would merely indicate a 'disproportionate burden' that would not signify viewpoint discrimination." McGuire, 386 F.3d at 63 (internal citation omitted).  Similarly, the Tenth Circuit has explained that "[w]here . . . the government policies are themselves viewpoint-neutral but in tandem create a disparate impact, plaintiffs must show that the policies were brought together for the purpose of discriminating against or in favor of a particular viewpoint."  Pahls v. Thomas, 718 F.3d 1210,

1236 (10th Cir. 2013) (addressing viewpoint-discrimination claims arising when protesters with different messages were placed in different locations).

Additionally, as here, the cases addressing the relationship between selective-enforcement and as-applied claims often arise in the context of municipal liability under 42 U.S.C. § 1983 for enforcement actions taken by police or other officials.  As a result, the tests under both the First and Fifth Amendment often share the requirement of a discriminatory <u>policy or practice</u>, which is necessary to show municipal liability.  <u>See, e.g.</u>, <u>Brown v. City of Pittsburgh</u>, 586 F.3d 263, 294 (3d Cir. 2009) ("[T]o establish municipal liability for selective enforcement of a facially viewpoint- and content-neutral regulation, a plaintiff whose evidence consists solely of the incidents of enforcement themselves must establish a pattern of enforcement activity evincing a governmental policy or custom of intentional discrimination on the basis of viewpoint or content."); <u>Hoye</u>, 653 F.3d at 855 ("[P]laintiff must show that a municipality's content-discriminatory enforcement of an ordinance is the result of an intentional policy or practice," generally "by extrapolating from a series of enforcement actions.").  Each of these tests varies in exact phrasing, but they all require some element of governmental intent. This Court thus concluded in its previous Opinion that, for an as-applied viewpoint-discrimination claim, "Plaintiffs must establish 'a pattern of unlawful favoritism,' by showing that they were 'prevented from speaking while someone espousing another viewpoint was permitted to do so.'"  <u>Frederick Douglass Found., Inc.</u>, 2021 WL 1166841, at *9 (quoting <u>Thomas v. Chicago Park Dist.</u>, 534 U.S. 316, 325 (2002), and <u>McCullen v. Coakley</u>, 573 U.S. 464, 485 n.4 (2014)).  That pattern must also "evinc[e] a governmental policy or custom of intentional discrimination on the basis of viewpoint or content."  <u>Brown</u>, 586 F.3d at 294.

Such a showing is consistent with guidance from the Supreme Court, which has made clear that simply noting a disproportionate effect on certain speakers is not enough to render a regulation content or viewpoint discriminatory, but that purpose will often need to be considered as well.  See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."); Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 763 (1994) ("That petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order. It suggests only that those in the group whose conduct violated the court's order happen to share the same opinion regarding abortions being performed at the clinic.").

Plaintiffs nonetheless maintain that the Court cannot collapse its examination of the viewpoint-discrimination question into the selective-enforcement analysis because unlike the latter, viewpoint-discrimination claims do not require a showing of intent.  See ECF No. 30 (Pl. Opp.) at 16–17.  They argue that "the Supreme Court does not require a finding of intentional discrimination for content or viewpoint discrimination." Id. at 16.  To support this conclusion, they cite to Reed v. Town of Gilbert, 576 U.S. 155 (2015), and National Institute of Family and Life Advocates v. Becerra, 138 S. Ct. 2361 (2018), but the reason that neither of those cases included an intent requirement was because they dealt with situations not analogous to the current circumstances.  National Institute of Family and Life Advocates, for example, centered on an entirely different set of issues regarding compelled speech and professional speech where intent did not factor in.  Id. at 2371 (addressing whether strict scrutiny should apply to content-based notice that lower court treated as "professional speech").  In Reed, meanwhile, the Supreme Court explained that intent should not be considered before a court had analyzed

11

whether a law was facially content based, not that intent was not relevant at all.  See 576 U.S. at
165 (explaining this order of analysis because "[a] law that is content based on its face is subject
to strict scrutiny regardless of the government's benign motive").  The Supreme Court explicitly
distinguished its analysis from that in another case where, faced with a "facially content-
neutral ban," it "looked to governmental motive."  Id. at 167; see also Am. Freedom Def.
Initiative v. Wash. Metro. Area Transit Auth., 901 F.3d 356, 365 (D.C. Cir. 2018) (stating post-
Reed that "[t]he question is how to identify the Government's intent" in as-applied challenge
where guidelines presumed to be viewpoint neutral).  In this case, given that the Defacement
Ordinance is indisputably neutral on its face, consideration of motive is proper.

At the end of the day, this Court need not decide the exact relationship between a
selective-enforcement claim involving speech and an as-applied First Amendment viewpoint-
discrimination claim because "[a]ny difference between these two approaches is, at least in this
case, semantic rather than substantive."  Hoye, 653 F.3d at 855.  Under either framework,
Plaintiffs need to state a plausible claim that Defendant has engaged in an intentionally
viewpoint-discriminatory pattern of enforcement.  As a result, Plaintiffs' success on Count One
depends on their success on Count Two, which the Court proceeds to analyze.

B.  Count Two: Selective Enforcement

Plaintiffs argue that they "have plausibly alleged two claims under the Fifth Amendment:
(1) a violation of the guarantee of equal protection, and (2) impermissible selective
enforcement."  Pl. Opp. at 25.  This is in essence one challenge, however, as all of their equal-
protection claims arise from their allegation that the District selectively enforced the law "[b]y
applying the Defacement Ordinance to Plaintiffs, but not to other individuals or organizations
similarly situated," thus "impermissibly subject[ing] Plaintiffs to unequal treatment from

similarly situated individuals and organizations."  Am. Compl., ¶ 106; see also Frederick
Douglass Found., Inc., 2021 WL 1166841, at *16 ("[R]egardless of the technical fashion in
which [Plaintiffs] caption their pleadings, their own description of their equal-protection
challenge betrays its true nature" as a selective-enforcement claim).

As the Court indicated in March, the District of Columbia, "by virtue of the Fifth
Amendment's guarantee of due process of law" must comply with the "Fourteenth Amendment's
Equal Protection Clause[, which] requires States to treat similarly situated persons alike."
Women Prisoners of D.C. Dep't of Corr. v. District of Columbia, 93 F.3d 910, 924 (D.C. Cir.
1996).  When determining whether the Clause has been violated because of selective
enforcement or prosecution, plaintiffs must establish two factors: "that (1) [they were] singled
out for prosecution from among others similarly situated and (2) that [the] prosecution was
improperly motivated, i.e., based on race, religion or another arbitrary classification."  Branch
Ministries v. Rossotti, 211 F.3d 137, 144 (D.C. Cir. 2000) (internal citation omitted); see also
Wandering Dago, Inc. v. Destito, 879 F.3d 20, 40 (2d Cir. 2018) (applying similar test in context
of selective-enforcement viewpoint-discrimination claim).  The Court addresses each of these
requirements separately before turning to the question of municipal liability under Monell v.
Dep't of Social Services, 436 U.S. 658 (1978).

### 1.  *Treatment of Similarly Situated Individuals*

Plaintiffs rely on three examples of similarly situated individuals who wrote similar
messages "in a nearly identical format" without punishment.  See Am. Compl., ¶ 4.  These are:
1) the painting of the "Defund the Police" mural in June 2020; 2) paintings and graffiti on the
side of the U.S. Chamber of Commerce headquarters in the summer of 2020; and 3) street art
placed along H Street on August 16, 2020.  For the reasons discussed in the prior Opinion, the

"Black Lives Matter" mural on 16th Street commissioned by the District need not be addressed because it was government speech, rather than speech by private individuals.  See Frederick Douglass Found., Inc., 2021 WL 1166841, at *9; see also Am. Compl., ¶ 35 ("Mayor Bowser commissioned a mural.").

Before turning to each of these remaining examples, the Court briefly addresses the overarching question of what it means to be "similarly situated" to Plaintiffs.  Parties are "'similarly situated' for purposes of a selective enforcement claim 'when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.'"  United States v. AT & T Inc., 290 F. Supp. 3d 1, 4 (D.D.C. 2018) (quoting Branch Ministries, 211 F.3d at 145) (addressing argument criminal defendant can make in asserting selective-prosecution defense).  As described below, drawing the precise boundaries of who is similarly situated to Plaintiffs is a challenging endeavor and ultimately one the Court need not resolve given that it finds that Plaintiffs have not plausibly alleged improper motive or a municipal policy or practice of selective enforcement.  The Court first considers each of Plaintiffs' specific examples, which suggest why they may be similarly situated to other protesters, before zooming out to more general arguments offered by Defendant, which bring the scales back into equipoise.

a.  Defund-the-Police Mural

The Amended Complaint first describes how the day after the District's "Black Lives Matter" mural was painted, protesters added their own text next to it so that the message read "Black Lives Matter = Defund the Police."  Am. Compl., ¶ 36.  Plaintiffs allege that the protesters did not seek a permit to paint "Defund the Police" or otherwise notify the city, id., ¶¶ 41–42, and that "[o]fficers with the MPD were present during the painting of the" mural but

did not punish anyone.  Id., ¶ 38; see also id., ¶ 42 (alleging lack of punishment).  Notably,

Plaintiffs have added the allegation about MPD's presence since the Court last considered their

claims.  See Frederick Douglass Found., Inc., 2021 WL 1166841, at *11 ("Plaintiffs never even

allege the bare minimum of police observing the painting and declining to act.").  They also

allege that the MPD officers "refused to enforce the Defacement Ordinance against those

creating the mural because of the District's agreement with the message," not "due to a concern

for officer safety or due to being outnumbered by protestors."  Am. Compl., ¶ 38.

    As an initial matter, the Court again rejects "Defendant's attempt to deem this design

government speech" for the reasons laid out previously.  Frederick Douglass Found., Inc., 2021

WL 1166841, at *10.  Nor does the city's citation of new caselaw change this analysis given how

the D.C. mural differs from that in its cited decision.  See Def. MTD at 17–18; compare Women

for Am. First v. de Blasio, 2021 WL 634695, at *8 (S.D.N.Y. Feb. 18, 2021) (holding "Black

Lives Matter" murals painted on New York City streets to be government speech because mayor

had tweeted support for them and provided funding for some), with Frederick Douglass Found.,

Inc., 2021 WL 1166841, at *10 (noting that mayor had explicitly stated "Defund the Police" was

not part of city's mural); see also Penkoski v. Bowser, 2021 WL 2913132, at *9 (D.D.C. July 12,

2021) (finding "Black Lives Matter" mural to be government speech but noting with respect to

"Defund the Police" mural that "the Mayor [does not] support this adopted-speech theory with

evidence," and "[t]he Court doubts that the District endorsed that Black Lives Matter 'equals'

Defund the Police, as this litigation position suggests").

    Returning to Plaintiffs' allegations, "[w]e begin our analysis by identifying the

allegations in the complaint that are not entitled to the assumption of truth."  Iqbal, 556 U.S. at

680.  Here, Plaintiffs allege that the police "refused to enforce the Defacement Ordinance against

those creating the mural because of the District's agreement with the message," not because of the large scale of the protests or safety concerns.  See Am. Compl., ¶ 38.  Such a claim is a "bare assertion" of Defendant's motive not supported by any facts.  Iqbal, 556 U.S. at 681.  While the Court need not accept Plaintiffs' legal conclusion as to why MPD failed to enforce the Ordinance, it does take as true the remaining factual claims that permits were not sought, MPD officers were present, and no one was punished.  Unlike at the preliminary-injunction stage, the Court cannot look to extrinsic evidence about MPD's safety concerns or rely on other potentially more plausible explanations for MPD's behavior.  See Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (citation omitted) ("A complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'"); cf. Frederick Douglass Found., Inc., 2021 WL 1166841, at *11 (at preliminary-injunction stage explaining that "it seems reasonable to conclude . . . that the decision not to enforce the Ordinance was a legitimate exercise of law-enforcement discretion driven not by the message being painted, but rather by public-safety imperatives in unique circumstances").  Giving Plaintiffs "the benefit of all inferences that can be derived from the facts alleged," Sparrow, 216 F.3d at 1113 (citation omitted), they may well have pled enough to plausibly allege that other similarly situated protesters expressing a message through writing on a street were not punished despite MPD's awareness of their activities.

           b.   Protest Art on the Chamber of Commerce

        Plaintiffs also allege that "protest art" was placed along "construction scaffolding located on the southern side of the U.S. Chamber of Commerce headquarters . . . without prior permission of the property owner."  Am. Compl., ¶ 44.  Again, they allege that permission was not sought from the District, id., ¶¶ 45–46, and that "no punishment resulted from such unlawful

activity." Id., ¶ 47.  Defendant counters that this display does not implicate the Ordinance

because it was mainly on private property, and "the Chamber [] consented to its presence and

even worked with activists to have it replaced after it was removed."  Def. MTD at 19.  To

establish this fact, the District points to a statement from the Chamber in August 2020 describing

plans to preserve the artwork placed on the building.  See U.S. Chamber of Commerce, U.S.

Chamber to Preserve Historic Black Lives Matter Artwork in Partnership with Washington D.C.-

based Institutions (Aug. 10, 2020), available at https://bit.ly/3sNvZqi.

The Court may take judicial notice of this statement, which was incorporated into

Plaintiffs' Amended Complaint.  See Am. Compl., ¶ 44 n.8 (citing to Chamber's statement); see

also EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997) (courts can

consider materials incorporated into complaint at 12(b)(6) stage).  The statement, however,

establishes only that the Chamber was working to preserve the art in August; it says nothing

about whether permission was granted in June when the art was put up.  Taking the Amended

Complaint's well-pleaded facts as true and crediting Plaintiffs with the inferences derived from

those facts, the Court finds that they have likely alleged enough — without considering the larger

contexts of the protests discussed below — to support a plausible claim that protest art was

placed on the Chamber by potentially similarly situated individuals in violation of the Ordinance

and that no one was punished as a result.

c.   Protest Art on 17th and H Streets

Plaintiffs' last example is the graffiti and other paintings placed on and around 17th and H

Streets, Northwest, on August 16, 2020.  See Am. Compl., ¶¶ 48–49.  Once again, they allege

that no permission was sought for these markings, id., ¶¶ 50–51, and that "[n]o arrests were

made and no one was cited," even though "MPD was present . . . and observed the violations of

the Defacement Ordinance." Id., ¶ 52.  Defendants counter that "plaintiffs make no allegations regarding the content of the graffiti messages or the identities of the individuals who created the artwork" and that "the pictures included in the Amended Complaint do not provide any additional information."  ECF No. 32 (Def. Reply) at 8.  Contrary to this assertion, the pictures in the Amended Complaint show messages clearly related to the Black Lives Matter protests, such as "Protect Black Youth" and "What's the difference between a cop and a klansman."  Am. Compl., ¶ 49 (including picture of graffiti).  The Court can thus safely group this display with the other allegations about violations of the Ordinance by racial-justice protesters.  Taking as true Plaintiffs' aforementioned factual allegations, but not their conclusory statement that the District failed to enforce the Ordinance because it agreed with messages expressed, id., ¶ 53, the Court finds that the allegations may well suffice to state a plausible claim that members of MPD, although present, did not enforce the Ordinance against potentially similarly situated protesters on August 16, 2020.

*       *       *

Despite the preceding discussion of how Plaintiffs may be similarly situated to the racial-justice protesters, there are two important ways in which the groups may differ.  These differences ultimately make this decision too close to call.  First, the city contends that Plaintiffs, who applied for a permit, are not similarly situated to "unnamed protesters who did not previously inform the District of their intent to deface public property," Def. MTD at 31, because "MPD enforces known violations of the Defacement Ordinance" like Plaintiffs' rather than unknown violations.  Id. at 32–33.  Yet Plaintiffs allege that MPD was present at the scene for various violations of the Ordinance and still did not enforce the law.  See, e.g., Am. Compl., ¶¶ 38, 52.  Since Plaintiffs' allegations must be taken as true, the Court agrees that it does not make

a substantial difference whether the police were notified in advance since they were present in the moment to enforce "known violations."

Second, and more importantly, Plaintiffs' situation can be distinguished because their August 2020 and March 2021 protests were not part of ongoing, large-scale, and national demonstrations.  The Court may take judicial notice of the size and prominence of the protests that occurred in D.C. last summer following the death of George Floyd since the existence of such protests is a fact "not subject to reasonable dispute because it [] is generally known within the trial court's territorial jurisdiction."  Fed. R. Evid. § 201(b)(1); see also § 201(c)(1) ("The court [] may take judicial notice on its own.").  Indeed, Plaintiffs themselves note that "[f]ollowing the death of George Floyd[,] . . . the District of Columbia experienced significant protest activity."  Am. Compl., ¶ 34.  In contrast, Plaintiffs' one-day protests were permitted for between 25 to 50 people.  See ECF No. 26-1 (Am. Compl., Exh. A) at 1 (permit granted for 49 participants for August 2020 protest); see also Am. Compl., ¶ 71 (permit for assembly of 25 people granted in March 2021).  The difference in scale and duration of the protests suggests that Plaintiffs and the racial-justice protesters may not be "similarly situated," as their circumstances arguably present "distinguishable legitimate" factors that would result in different enforcement decisions.  In other words, the Court need not close its eyes to the obviously dissimilar facts on the ground.   Because it need not make a definitive determination on this question in light of the other shortcomings in Plaintiffs' pleadings, the Court will leave the analysis here.

### 2. *Improper Motive*

Plaintiffs must clear an additional hurdle if their selective-enforcement claim is to survive: pleading sufficient facts to suggest that the District plausibly acted with an improper motive in enforcing the Defacement Ordinance against them.  See Branch Ministries, 211 F.3d at

19

144 (requiring showing "that [the] prosecution was improperly motivated").  Here is where Plaintiffs stumble.  They allege that "Mayor Bowser supports Planned Parenthood and it's [*sic*] 'pro-choice' agenda," Am. Compl., ¶ 64; that in enforcing the ordinance, "District officials targeted the Plaintiffs' religious and pro-life beliefs," id., ¶ 74; that the "enforcement of the Defacement Ordinance against Plaintiffs was improperly motivated by the desire to prevent Plaintiffs' exercise of their constitutional rights," id., ¶ 118; and that "[t]he District had a discriminatory purpose and intent when it enforced the Defacement Ordinance against Plaintiffs but not others similarly situated,"  id., ¶ 121.  All but the first of these statements are "no more than conclusions" about why the District acted in a certain way.  Iqbal, 556 U.S. at 679.

Acting with a discriminatory purpose "involves a decisionmaker's undertaking a course of action 'because of, not merely in spite of, [the action's] adverse effects upon an identifiable group.'"  Iqbal, 556 U.S. at 676–77 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)).  Although Mayor Bowser's purported support for Planned Parenthood and the Black Lives Matter movement is potentially "consistent with" an improper motive to direct MPD to enforce the Defacement Ordinance against Plaintiffs, but not others, because of their beliefs, the facts alleged "'stop[] short of the line between possibility and plausibility of 'entitlement to relief.'"  Id. at 678 (quoting Twombly, 550 U.S. at 557).  Plaintiffs allege no non-conclusory facts to indicate that Bowser was involved in decisions about how or when to enforce the Ordinance.  Nor is there any factual support from which to infer that the Mayor or another District official enforced the Ordinance against Plaintiffs because of a desire to block their message.  Based on these allegations, the Court cannot reasonably conclude that Defendant "was improperly motivated by [a] desire to discriminate against the viewpoint" or content of the proposed message.  BEG Invs., LLC v. Alberti, 85 F. Supp. 3d 13, 38 (D.D.C. 2015).  Plaintiffs

have plausibly alleged that there were "lapses in enforcement," but there is "no indication"

beyond the realm of possibility "that these were attributable to impermissible discrimination."

Henderson v. Kennedy, 253 F.3d 12, 18 (D.C. Cir. 2001) (finding at summary judgement that

selective-enforcement claim was not established by evangelical Christians prohibited from

selling message-bearing t-shirts on National Mall).

### 3. *Liability Under 42 U.S.C. § 1983*

Even if Plaintiffs had pled a plausible selective-enforcement claim, they still have not

sufficiently alleged that the District itself is liable under 42 U.S.C. § 1983 for the actions of MPD

officers in enforcing or not enforcing the Defacement Ordinance.  See Monell, 436 U.S. at 694;

see also Am. Compl., ¶ 1 ("This case is an as-applied federal civil rights action brought pursuant

to 42 U.S.C. § 1983.").  "Plaintiffs who seek to impose liability on local governments under

§ 1983 must prove that 'action pursuant to official municipal policy' caused their injury."

Connick v. Thompson, 563 U.S. 51, 60 (2011) (quoting Monell, 436 U.S. at 691). "Official

municipal policy includes the decisions of a government's lawmakers, the acts of its

policymaking officials, and practices so persistent and widespread as to practically have the force

of law."  Id. at 61.  The inquiry into whether a municipal "policy or custom" led a plaintiff to be

deprived of his rights "applies in § 1983 cases irrespective of whether the relief sought is

monetary or prospective," such as the declaratory and injunctive relief Plaintiffs here seek in

addition to damages.  Los Angeles Cnty. v. Humphries, 562 U.S. 29, 39 (2010); see also Am.

Compl. at 35 (listing relief Plaintiffs seek).

A "two-step inquiry" is required to determine whether Plaintiffs "ha[ve] stated a claim

for municipal liability."  Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003).

"First, the court must determine whether the complaint states a claim for a predicate

constitutional violation.  Second, if so, then the court must determine whether the complaint

states a claim that a custom or policy of the municipality caused the violation."  Id. (citation

omitted).  The Court just addressed the first inquiry and did not find a "predicate constitutional

violation."  As to the second, Plaintiffs have not pled sufficient facts to support the claim "that a

custom or policy of the municipality caused the violation" or that it was caused by actions of a

policymaker.  Id.

 They allege repeatedly that "[t]he District has a policy and practice of enforcing the

Defacement Ordinance against speech expressing views it disagrees with and not enforcing the

Ordinance against speech expressing views it prefers."  Am. Compl. ¶ 76; see also id., ¶ 98

(making same allegation); ¶ 77 (alleging that District instituted policy and practice); ¶ 78 ("As a

policymaker, Mayor Muriel Bowser and/or District officials" directed such enforcement.); ¶ 79

(policy and practice adopted when District "knowingly failed" to enforce Ordinance against

preferred messages); ¶ 80 (District showed "deliberate indifference to risk that" enforcing

Ordinance would violate Plaintiffs' rights).  Although the Amended Complaint recites the

various ways that a municipality can establish a "policy" under which it is liable pursuant to

§ 1983, see Baker, 326 F.3d at 1306 (listing ways), Plaintiffs do not support these claims with

facts to show that any such actions occurred.

 There are several avenues through which the policy or practice alleged by Plaintiffs could

have taken shape: 1) through a policy or practice of denying permits to advocates expressing

views with which the District disagreed, but granting them to others; 2) through a policy or

practice of punishing violations of the Ordinance only when the District disagreed with the

message expressed; or 3) through a combination of the two.  With respect to the first, Plaintiffs

never allege that favored speakers applied for and received permits to paint or chalk on the

streets or sidewalk; as a result, the Court cannot infer that any policy or practice of discriminatory permit-granting existed.

Turning to enforcement, the Court recognizes that "extrapolat[ing] from enforcement data" to determine if a policy exists is "in many cases a formidable task," Hoye, 653 F.3d at 855, but the handful of instances alleged of non-enforcement by MPD officers does not lead to a plausible inference that the District has a policy or practice of enforcing the Ordinance only against disfavored messages.  Plaintiffs have at most alleged that Mayor Bowser commissioned a Black Lives Matter mural, see Am. Compl., ¶ 2, that she has supported Planned Parenthood, id., ¶ 64, that MPD did not enforce the Ordinance against certain protesters in three instances closely linked in circumstances and location,  id., ¶¶ 36, 44, 49, and that the District did not permit Plaintiffs to paint or chalk their message.  Id.  ¶¶ 65, 71.  Plaintiffs do not allege any facts, however, to support their claim that Bowser or another official was acting as a "policymaker" or was even aware of the decision to enforce the Ordinance against Plaintiffs and not against racial-justice protesters.  Nor do they allege any other instances where the speech of anti-abortion or other religious groups was targeted for enforcement of the Ordinance beyond their own rallies in August 2020 and March 2021.  The Court cannot conclude from these incidents alone that the District had a policy of unconstitutional enforcement of the Ordinance and also conclude that "the 'policy' was the cause of the incident."  City of Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985).  To do so would be "a means for circumventing Monell's limitations altogether," id., since in essence Plaintiffs would have the Court rule that the District developed its policy of enforcing the Ordinance against disfavored speech solely through its enforcement against Plaintiffs.  Nor can the Court infer from the handful of closely related instances of non-enforcement a practice so "persistent and widespread" as to constitute official municipal policy.

23

Connick, 563 U.S. at 61; see also Sanders v. District of Columbia, 522 F. Supp. 2d 83, 88

(D.D.C. 2007) (finding one incident of alleged retaliation insufficient because "[t]he policy or

custom must be pervasive to support municipal liability").

The arrest data from the District that both sides point to does not alter this analysis, as

each places more weight on it than it can bear.  The data "indicates that there were 22 arrests for

violations of the Defacement Ordinance between May 30, 2020 and December 31, 2020," and

Plaintiffs allege that "[n]one of these arrests were for speech or expression with which the City

agrees."  Am. Compl., ¶ 54.  The Court takes as true the allegation about the number of arrests

but need not credit the conclusion about the District's motive, as Plaintiffs plead no facts to

support why any of these 22 arrests were made or what speech was involved.  The District,

meanwhile, asks the Court to take judicial notice of arrest data and Public Incident Reports

indicating enforcement of the Ordinance during the racial-justice protests, including "6 arrests

made in connection with" them.  See Def. MTD at 23.  None of the cited records provides any

indication that the arrests occurred in connection with the protests, and thus the Court need not

reach the question of whether it can take judicial notice of these documents.  These statistics

ultimately cannot assist in establishing a "pervasive" policy of selective enforcement against

certain disfavored messages.  Sanders, 522 F. Supp. 2d at 88.

In sum, the Court concludes that Plaintiffs' "spare facts and allegations . . . simply do

'not permit the court to infer more than the mere possibility of misconduct'" and do not suffice

to clear the pleading bar for a Monell claim.  Atherton v. D.C. Off. of Mayor, 567 F.3d 672, 688

(D.C. Cir. 2009) (quoting Iqbal, 556 U.S. at 679).  It will thus dismiss Plaintiff's Fifth

Amendment count.  For the same reasons, Plaintiffs have not alleged enough to plausibly suggest

a pattern that "evinc[es] a governmental policy or custom of intentional discrimination on the

basis of viewpoint or content," <u>Brown</u>, 586 F.3d at 294, and so the freedom-of-speech claims in

Count One will also be dismissed.

    C.   <u>Count Three: Freedom of Association</u>

    Leaving the boggy swamp of selective enforcement and <u>Monell</u> liability behind, the

Court finds an easier path in addressing Plaintiffs' three remaining claims, beginning with

expressive association.  In its prior Opinion, it explained that Plaintiffs had left the "$64,000

question" unaddressed by failing to allege "how the District's enforcement of the Ordinance at

all interfered with Plaintiffs' ability to engage in . . . 'group association' for the purpose of

expressing their views."  <u>Frederick Douglass Found., Inc.</u>, 2021 WL 1166841, at *17.  In

reaching this conclusion, the Court did not rely on evidence outside the Complaint and focused

only on the deficiencies in Plaintiffs' own pleadings.

    In their Amended Complaint, Plaintiffs have not shored up this weakness, leaving the

Court to dismiss this count for the same reasons as stated in its earlier Opinion.  Plaintiffs again

allege that they "hold views respecting the dignity and sanctity of human life, including

opposition to abortion in all forms, and they associate with others for the purpose of more

effectively expressing that viewpoint."  Am. Compl., ¶ 129.  They further allege that they

"desired to come together to promote their message that 'Black Pre-Born Lives Matter,' and

associate with others who share those ideals," <u>id.</u>, but that "[t]he application of the Defacement

Ordinance to Plaintiffs chills, deters, and restricts Plaintiffs from participating in activities

organized around their shared beliefs," <u>id.</u>, ¶ 130.  These allegations do not provide anything

beyond conclusory statements as to how the city's reliance on the Ordinance to refuse a permit

prevented Plaintiffs from associating as a group to express their views.  While they correctly

state in their Opposition that "[t]he freedom of expressive association . . . reach[es] activities that

affect a group's ability to express its message by making group membership less attractive,"
Rumsfeld v. Forum for Acad. and Institutional Rights, 547 U.S. 47, 49 (2006); see also Pl. Opp.
at 32, they never allege that the inability to chalk messages has made "group membership less
attractive" or otherwise impeded Plaintiffs' ability to associate.  This count does not survive.

D.  Count Four: RFRA

Under RFRA, the "Government shall not substantially burden a person's exercise of
religion" unless "it demonstrates that application of the burden . . . (1) is in furtherance of a
compelling governmental interest; and (2) is the least restrictive means of furthering that
compelling governmental interest."  42 U.S.C. § 2000bb–1; see also id. § 2000bb–2(2) (RFRA
applies to District of Columbia).  A challenger under RFRA thus has the initial burden to show
that the Government's policy or activity "substantially burdens his religious exercise."  Holt v.
Hobbs, 574 U.S. 352, 361 (2015) (discussing burdens in Religious Land Use and
Institutionalized Persons Act action, which applies same standard as RFRA).  Last March, in
finding that Plaintiffs were not likely to succeed on the merits of this claim, the Court held that
they "never allege that their sincerely held religious beliefs include engaging in pro-life
advocacy 'through the specific medium' of painting or chalking a public street."  Frederick
Douglass Found., Inc., 2021 WL 1166841, at *18 (citing Mahoney, 662 F. Supp. 2d at 96–97).
The Court reached this conclusion based on no extrinsic evidence, save for Plaintiffs' own
declaration.

Assessed under the lower motion-to-dismiss standard, Plaintiffs' allegations meet the
same fate for the reasons previously described.  In their Amended Complaint, Plaintiffs allege
that the three individuals "share sincerely held religious beliefs that all life, from the moment of
conception, is precious" and "therefore engage in pro-life advocacy and witness as part of their

religious beliefs, including organizing and participating in the August 1, 2020 rally." Am.
Compl., ¶ 137. They further allege that the "District's enforcement of the Defacement
Ordinance against the individual Plaintiffs substantially burdens their religious exercise." Id.,
¶ 139. The latter statement, however, is "no more than [a] conclusion[], [and is] not entitled to
the assumption of truth." Iqbal, 556 U.S. at 679. Taking as true the remaining factual
allegations that the individual Plaintiffs hold religious beliefs about abortion that motivate their
organizing and other activities, Plaintiffs still do not allege any facts to support the claim that
painting or chalking the street is needed to express those beliefs. See Frederick Douglass
Found., Inc., 2021 WL 1166841, at *18; see also Mahoney, 642 F.3d at 1120–21 (affirming
dismissal of RFRA claim because accepting as true that "proposed chalking was motivated by a
sincere religious belief," plaintiffs had not alleged that "chalk was the exclusive medium through
which" to express those beliefs); Henderson, 253 F.3d at 16 (finding at summary-judgment stage
no evidence that plaintiffs' sincere religious belief "demand[ed] that they sell t-shirts" in a range
of locations). Count IV will thus be dismissed.

     E. Count Five: Free Exercise

     The individual Plaintiffs' free-exercise claim cannot advance for the same reasons. As
the Court noted in its initial Opinion, "[N]ot all constraints on religiously motivated conduct give
rise to a First Amendment claim." Frederick Douglass Found., Inc., 2021 WL 1166841, at *19.
Rather, such constraints implicate "the Free Exercise Clause" only "when a law or regulation
imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice,"
which would entail "burden[ing] a central tenet or important practice of the litigant's religion."
Levitan v. Ashcroft, 281 F.3d 1313, 1320 (D.C. Cir. 2002); see also Branch Ministries, 211 F.3d
at 142 ("To sustain its claim under either the [Free Exercise Clause] or [RFRA], [a plaintiff]

must first establish that its free exercise right has been substantially burdened."); but see

Brandon v. Kinter, 938 F.3d 21, 32 & n.7 (2d Cir. 2019) (applying substantial-burden

requirement but questioning whether it survives Employment Division, Department of Human

Resources v. Smith, 494 U.S. 872 (1990)).

As this Court stated in March and as remains true today, while Plaintiffs allege that the

District's enforcement of its refusal to permit the chalking "substantially burdens the individual

Plaintiffs' religious exercise," Am. Compl., ¶ 149, they have nowhere alleged that expressing

pro-life messages through paint or chalk is a "central tenet" or "important practice" in their

religion. Levitan, 281 F.3d at 1320. As with their RFRA claim, the individual Plaintiffs allege

only that they "share sincerely held religious beliefs" about the preciousness of life and "engage

in pro-life advocacy and witness as part of" those beliefs. See Am. Compl., ¶ 147. Taken as

true, this statement does not establish that the inability to paint or chalk substantially burdened

their religious exercise.

Plaintiffs' remaining allegations state that the District's application of the Defacement

Ordinance satisfies each element of a free-exercise claim. Id., ¶¶ 149–54 (alleging that the

application chills religious exercise and is neither neutral nor generally applicable). Even if the

Court were to reach these allegations — which it need not because Plaintiffs have not plausibly

alleged facts to state a substantial burden — Plaintiffs' claims that the application of the

Ordinance to them was neither neutral nor generally applicable would not succeed. For the same

reasons discussed earlier in this Opinion, they have failed to plausibly allege that applying the

Ordinance was not neutral or motivated by hostility because Defendant's "object . . . [was] to

infringe upon or restrict practices because of their religious motivation." Church of the Lukumi

Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533 (1993); see also Archdiocese of

Washington v. Washington Metro. Area Transit Auth., 897 F.3d 314, 332 (D.C. Cir. 2018)
(explaining that "[n]othing in the record indicates [that WMATA regulation] was motivated by
the 'hostility' that motivated the city ordinance in Lukumi Babalu" since no showing that
policymakers "harbored any discriminatory intent or pro- or anti-religion bias in its
decisionmaking process").  Similarly, and for the same reasons the Court dismissed the selective-
enforcement claim, Plaintiffs' allegations, taken as true, also do not suffice to support an
inference that the Ordinance was not generally applicable.  Plaintiffs have not pled facts
sufficient to show that the District has "in a selective manner impose[d] burdens only on conduct
motivated by religious belief" or "fail[ed] to prohibit nonreligious conduct that endangers [the
government's] interests in a similar or greater degree than" the prohibited religious conduct does.
Lukumi Babalu, 508 U.S. at 543; see also Fulton v. City of Philadelphia, 141 S. Ct. 1868, 1877
(2021) ("A law also lacks general applicability if it prohibits religious conduct while permitting
secular conduct that undermines the government's asserted interests in a similar way."); Am.
Fam. Ass'n, Inc. v. FCC, 365 F.3d 1156, 1171 (D.C. Cir. 2004) (finding "[t]he differential
impact of [FCC regulation] on [petitioner's] religion is neither similarly severe and targeted nor
so unrelated to the [respondent's] legitimate regulatory interests as to be a religious
gerrymander" in case where regulation's point system disadvantaged some religious groups).
The individual Plaintiffs' free-exercise claim will thus be dismissed.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss.  A
separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  September 1, 2021

29