## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FREDERICK DOUGLASS FOUNDATION, INC.**, *et al.*,

**Plaintiffs,**

v.

**DISTRICT OF COLUMBIA,**

**Defendant.**

Civil Action No. 20-3346 (JEB)

### <u>MEMORANDUM OPINION</u>

For the third time in five years, the Court considers claims brought by organizations whose members violated D.C.'s anti-defacement ordinance during their anti-abortion protest in the summer of 2020. Along their winding procedural path — including a trip up to the Circuit and a remand to this Court — Plaintiffs' claims against the District of Columbia have been narrowed to a single issue of alleged selective enforcement. They contend that the District impermissibly enforced the defacement ordinance against them while failing to do so against racial-justice protesters during the massive groundswell following the death of George Floyd that same summer. Faced with Cross-Motions for Summary Judgment and aided by a full evidentiary record, the Court now considers once again whether Plaintiffs have carried the heavy burden of making out a selective-enforcement claim. Unfortunately for them, the third time is not the charm: even looking at the evidence in the light most favorable to Plaintiffs, they have not shown that any violators were similarly situated to those arrested at their assembly. The Court will thus grant summary judgment to the District.

1

## I.  Background

Having penned two prior Opinions concerning the events giving rise to this case, the Court is well familiar with the general facts.  The specifics are drawn largely from video footage and the parties' agreed-upon recitations in their respective Statements of Undisputed Material Facts.  Where disputed, the Court views these facts in the light most favorable to Plaintiffs and draws all reasonable inferences in their favor.  Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).

In July 2020, the organizations Students for Life of America and the Frederick Douglass Foundation planned a protest in front of a Planned Parenthood building in the District of Columbia.  See ECF Nos. 71-1 (Def. Resp. Pls. SUMF), ¶ 27; 68-25 (SFLA Permit) at ECF p. 2; 68-28 (Bowser Letter) at ECF p. 2.  The organizations sought to "proclaim that 'Black Pre-Born Lives Matter,'" Def. Resp. Pls. SUMF, ¶ 27, and wanted to communicate that message by painting or chalking on the public street outside of the building.  See Bowser Letter.  Such markings are prohibited by D.C.'s anti-defacement ordinance.  See D.C. Code § 22-3312.01 ("It shall be unlawful for any person . . . to write, mark, draw, or paint [without consent] . . . any word, sign, or figure upon . . . [a]ny property, public or private . . .").

SFLA obtained a permit on July 23, 2020, to hold "an assembly on Saturday, August 1, 2020," outside of the Planned Parenthood location.  See SFLA Permit at ECF p. 2.  The permit authorized an assembly of "no more than 49 persons," and it allowed participants to use "bullhorns, a music stand, and signs" to communicate their message.  Id.  The permit expressly prohibited "[m]arking or painting the street."  Id.

During the permitted protest, two participants nonetheless began writing a message in chalk on the public sidewalk.  See generally ECF No. 66-29 (Aug. 1 BWC) at 1:29–:45.  All

agree that one of the Metropolitan Police Department officers present warned them to stop chalking and, when they continued, arrested the two protesters.  Id.  There is no indication that the protesters were ever charged.  See ECF No. 26 (Am. Compl.), ¶¶ 55–82.

This Court entered the picture when Plaintiffs planned a separate protest in March of 2021.  See ECF No. 8 (Mot. PI) at 28.  Again seeking to mark the sidewalk, the organizational Plaintiffs and three of their members prospectively sued the District and asked this Court for a preliminary injunction that would stop the City from enforcing the defacement ordinance against them.  See generally id.  The thrust of their argument was that the District had abdicated its enforcement of the defacement ordinance during the summer of 2020, in response to massive and sustained protests following the death of George Floyd at the hands of police officers in Minnesota.  See, e.g., id. at 5–8; id. at 14, 16 (arguing that District had "permitted protestors to paint and chalk . . . on D.C. streets and sidewalks with abandon" in "summer months following the death of George Floyd").  Plaintiffs thus contended that to selectively enforce the ordinance against them would have infringed upon their constitutional rights.  See generally id. at 13–22.

The Court found that Plaintiffs were unlikely to succeed on the merits of their claim and denied their request for a preliminary injunction.  Frederick Douglass Found., Inc. v. District of Columbia, 531 F. Supp. 3d 316, 339–40 (D.D.C. 2021) (discussing selective-enforcement claim); id. at 346 (denying Motion).  The March protest came and went without incident, as Plaintiffs did not attempt to paint or chalk their message on the public street.  See Am. Compl., ¶¶ 71–73. Undeterred, they subsequently returned to the Court to litigate the merits of their claims. Frederick Douglass Found., Inc. v. District of Columbia, 2021 WL 3912119, at *2 (D.D.C. Sept. 1, 2021).  They asserted a number of constitutional and statutory claims, including violations of their First and Fifth Amendment rights, viewpoint discrimination via selective enforcement of

the defacement ordinance, and violation of their religious freedom under the Religious Freedom Restoration Act, and sought injunctive relief and damages for those alleged injuries. See generally Am. Compl., ¶¶ 83–164; id. at 35. The District moved to dismiss Plaintiffs' suit. See ECF No. 27 (MTD).

The Court granted the District's Motion to Dismiss in full. Frederick Douglass Found., 2021 WL 3912119, at *14. Relevant here, it reasoned that Plaintiffs' selective-enforcement claim was best analyzed under the Fifth Amendment. Id. at *6–7 (noting that "impermissibly subjecting Plaintiffs to unequal treatment" is in essence an "equal-protection claim") (cleaned up). Fifth Amendment selective-prosecution or selective-enforcement claims require a plaintiff to show a discriminatory effect and purpose; because the Court held that, as alleged, Plaintiffs had not demonstrated such purpose (though it had made out a discriminatory effect), it dismissed that claim. Id. at *9–10; see also United States v. Dixon, 486 F. Supp. 2d 40, 45 (D.D.C. 2007) (applying same standards for selective-prosecution and selective-enforcement claims).

The D.C. Circuit disagreed. It held that selective-enforcement claims based on an alleged First Amendment violation require only a discriminatory effect, not a discriminatory purpose. Frederick Douglass Found., Inc. v. District of Columbia, 82 F.4th 1122, 1143 (D.C. Cir. 2023) (selective-enforcement claim "under the First Amendment" does not "require a plaintiff to demonstrate intentional discrimination"). As this Court had previously concluded, Frederick Douglass Found., 2021 WL 3912119, at *7–9, the Circuit held that Plaintiffs had sufficiently alleged a discriminatory effect at the motion-to-dismiss stage. Frederick Douglass Found., 82 F.4th at 1138. The Circuit thus reversed this Court's dismissal of the selective-enforcement claim and remanded for discovery, while affirming the dismissal of all other claims. Id. at 1151.

The parties then proceeded to discovery on the selective-enforcement allegation alone. Discovery now having closed, the parties cross-move for summary judgment. See ECF Nos. 66 (Def. MSJ), 68 (Pls. MSJ). The Court takes up this claim once more, aided for the first time by a fully compiled evidentiary record.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb, 433 F.3d at 895. A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). On a motion for summary judgment, the court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be

supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor.  Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  Liberty Lobby, 477 U.S. at 249–50.

## III.    Analysis

Plaintiffs face a "particularly demanding" standard in making out a selective-enforcement claim.  Frederick Douglass Found., 82 F.4th at 1137.  They must show that they were "similarly situated in material respects to other individuals against whom the law was not enforced" and that the enforcement "infringed a constitutional right."  Id. at 1136.  The Court need only address the first element because "[i]f there was no one to whom [plaintiff] could be compared in order to resolve the question of [enforcement] selection, then it follows that [plaintiff] has failed to make out one of the elements of its case."  Branch Ministries v. Rossotti, 211 F.3d 137, 144–45 (D.C. Cir. 2000).

As to that element, Plaintiffs must demonstrate "unequal treatment of people in similar circumstances."  Att'y Gen. v. Irish People, Inc., 684 F.2d 928, 946 (D.C. Cir. 1982) ("Discrimination cannot exist in a vacuum.").  Proper comparators need not be identical; they must only be similarly situated in "material respects."  Frederick Douglass Found., 82 F.4th at 1136.

As the D.C. Circuit has acknowledged, material factors that distinguish comparator groups "will vary and cannot be reduced to a singular list."  Id. at 1137.  At root, a material factor is one that could justify the "legitimate" exercise of enforcement discretion.  Branch

6

Ministries, 211 F.3d at 145.  For example, courts have long recognized that threats to officer and public safety are permissible factors in officer decisionmaking.  See Graham v. Connor, 490 U.S. 386, 396 (1989).  It follows that proposed comparators are not similarly situated when they present different safety concerns.  See United States v. Judd, 579 F. Supp. 3d 1, 7–8 (D.D.C. 2021) (two groups attacking federal buildings not similarly situated when one group "endangered hundreds of federal officials").  Other factors, like the need to maintain public order or conserve officer resources, might likewise justify different enforcement decisions.  See Fuller v. Salt Lake City, 775 F. Supp. 3d 1212, 1225 (D. Utah 2025); Frederick Douglass Found., 82 F.4th at 1139 (differing enforcement permissible when arrests "would drain police resources").  The requirement that "no distinguishable legitimate [enforcement] factors" differ between comparators, Branch Ministries, 211 F.3d at 145 (emphasis added), "cabin[s]" selective-enforcement claims and "allow[s] courts to review [such claims] without second-guessing decisions based on [enforcement] discretion."  Frederick Douglass Found., 82 F.4th at 1145.

"Determining whether a plaintiff is similarly situated to those not prosecuted will be a fact-intensive and case-specific comparative inquiry."  Id. at 1138.  While the existence of a comparator "'ordinarily presents a question of fact for the jury,' the Court may grant summary judgment if no reasonable juror could find that the plaintiff and the comparators were similarly situated."  Steele v. Vought, 2025 WL 3687598, at *8 (D.D.C. Dec. 19, 2025) (quoting George v. Leavitt, 407 F.3d 405, 414 (D.C. Cir. 2005)).  Because the Court so holds here, it need not examine Plaintiffs' Cross-Motion for Summary Judgment.

A.    Plaintiffs' Protest

Before the Court can weigh Plaintiffs' circumstances against those of potential comparators, it must describe the events leading up to Plaintiffs' arrest.  Their conduct and the

surrounding circumstances are largely undisputed.  All agree that Plaintiffs sought permission twelve days in advance to protest in front of Planned Parenthood.  <u>See</u> Def. Resp. Pls. SUMF, ¶ 34.  Individuals affiliated with the organizational Plaintiffs sent a separate letter to Mayor Bowser and various MPD officers "request[ing] permission to paint Black Pre-Born Lives Matter" on the street.  <u>See</u> Bowser Letter at ECF p. 2.  It is also undisputed that MPD granted Plaintiffs a permit for their August 1 protest but specifically denied them permission to "[m]ark[] or paint[] the street."  ECF No. 66-25 (Pls. Permit).

The District asserts — and Plaintiffs do not dispute — that "approximately 30" MPD officers were present at Plaintiffs' protest site on the morning of August 1.  <u>See</u> ECF No. 66-3 (Def. SUMF), ¶ 23.  Prior to the start of the protest, the officers closed the street to vehicle traffic.  <u>Id.</u>, ¶ 22.  By 5:15 a.m., six protesters had arrived.  <u>Id.</u>, ¶ 25.  That number grew to approximately 20 by the event's 6:00 a.m. start time and held steady until at least 7:30 a.m.  <u>Id.</u>, ¶¶ 26, 28; <u>see also</u> ECF No. 68 (Pls. Resp. Def. SUMF), ¶¶ 22–29 (not disputing District's account of Plaintiffs' protest circumstances).

The parties also agree that one of the individual Plaintiffs asked an MPD officer whether the protesters could paint the street or chalk the sidewalk.  The officer denied both requests.  <u>See</u> Def. SUMF, ¶ 25; ECF No. 66-27 (Lieutenant Fleming Email).  At 6:15 a.m., the same Plaintiff asked a different MPD officer for permission to chalk the sidewalk; that officer denied the request and informed Plaintiff that chalking was "an arrestable offense."  Def. SUMF, ¶ 27.  Police officers still outnumbered protesters, and the street remained closed to traffic.  <u>Id.</u>, ¶ 22; ECF No. 66-16 (Lieutenant Mejia Deposition) at 55:3–7, 75:9–14.  The parties agree that around 7:20 a.m., two protesters knelt and began marking the sidewalk with chalk.  <u>See</u> Def. SUMF, ¶ 28.  Nor do they dispute what happened next: Lieutenant Mejia ordered the two to stop

chalking, but they continued to do so.  Id.; Mejia Dep. at 82:1–19; Aug. 1 BWC at 1:29–:45.

MPD officers then placed the two chalkers under arrest, handcuffed them, and transported them

from the site via police car.  See Def. SUMF, ¶ 28; Aug. 1 BWC at 1:45–2:30.  The protest

continued without additional arrests.  See Def. SUMF, ¶ 29; see also generally Pls. Resp. Def.

SUMF, ¶¶ 23–29.

> B.    Proposed Comparators

This Court previously held that Plaintiffs had alleged facts sufficient to show that they

"may be similarly situated to the racial-justice protesters."  Frederick Douglass Found., 2021 WL

3912119, at *9.  The D.C. Circuit agreed, noting that Plaintiffs had "plausibly alleged" that they

"were similarly situated to the Black Lives Matter advocates."  Frederick Douglass Found., 82

F.4th at 1138.  Plaintiffs' allegations, however, only propelled them through the motion-to-

dismiss stage, where the courts' analyses were confined to the four corners of the Complaint.

Frederick Douglass Found., 2021 WL 3912119, at *3.  The Circuit itself acknowledged that

factual discovery might reveal "legitimate prosecutorial factors" that separated Plaintiffs'

circumstances from those of their proposed comparators, and that the courts would consider

those at a later time.  Frederick Douglass Found., 82 F.4th at 1139.

That time has arrived.  Faced with dueling Motions for Summary Judgment, the Court

surveys the evidentiary record to determine "whether the Foundation has demonstrated its

members were similarly situated . . . . to at least some of the Black Lives Matter protesters."  Id.

It first looks at Plaintiffs' general allegations and then at the more specific ones.

> 1.    General Comparators

Plaintiffs broadly assert that MPD "consistently declined to enforce the Defacement

Ordinance" against protesters associated with the Black Lives Matter movement, "even at

peaceful gatherings showing no discernible threat of violence." Pls. MSJ at 2–3. They refer generally to "most BLM protests" as being similar to their August 1 protest, id. at 6, and invoke "prolonged and prominent violations" throughout the summer of 2020. Id. at 8. Generalized assertions of uneven enforcement, however, do not satisfy the similarly-situated-comparators requirement. See United States v. Stone, 394 F. Supp. 3d 1, 34 (D.D.C. 2019); United States v. Young, 2024 WL 3030656, at *4 (D.D.C. June 17, 2024) (no comparator when defendant generally referenced "literally thousands" of Black Lives Matter protesters "who were not arrested or charged at all"); cf. Ill. Republican Party v. Pritzker, 470 F. Supp. 3d 813, 822 (N.D. Ill. 2020) (dismissing selective-enforcement claim when plaintiff did not present specific evidence that state officials enforced order). Only the "specific identification of an alleged comparator" or "specific examples of differential treatment" can satisfy this element. Richardson v. Didok, 2020 WL 5602526, at *3 (E.D. Pa. Sept. 17, 2020).

Without details about a given event, moreover, Plaintiffs cannot point to evidence in the record showing that MPD officers even witnessed any specific defacement during protests. If no officers witnessed protesters painting or chalking messages in violation of the ordinance, Plaintiffs would obviously not be similarly situated. In other words, it would have been impossible for MPD to enforce the defacement ordinance contemporaneously to the defacement itself if it did not "even kn[o]w of" the violation as it was occurring. Daubenmire v. City of Columbus, 507 F.3d 383, 390 (6th Cir. 2007) (affirming dismissal of selective-prosecution claim when plaintiff did not allege City's awareness of comparator violation); see also Sheets v. Jimenez, 2025 WL 807345, at *3 (M.D. Fla. Mar. 13, 2025) (no comparator when no allegation relevant officers "were even present at the time" of similarly situated violation).

Plaintiffs rejoin that even if no MPD officers were present during a specific violation, the Department always could have investigated the wrongdoers and enforced the ordinance afterwards. See ECF No. 75 (Pls. Resp. MSJ) at 1–2, 5. But a violation that requires investigation for later enforcement inherently concerns different "relevant [enforcement] factors," Frederick Douglass Found., 82 F.4th at 1137, from a contemporaneous arrest. The former requires different, and likely more, department resources. The Department might weigh the "general deterrence value" of an immediate response versus a later-in-time arrest, or consider the "strength of [a] case" reliant on third-party video rather than officer-eyewitness testimony — legitimate factors that could drive prosecutorial discretion. Id. (quotation marks removed). Two situations concerning different enforcement mechanisms are thus unlikely to be comparators in respects material to enforcement decisions. See, e.g., Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 210–11 (2d Cir. 2004) (mask-wearing protesters who were not arrested not similarly situated to plaintiff seeking permit for masked protest); Geller v. Cuomo, 476 F. Supp. 3d 1, 19 (S.D.N.Y. 2020) (similar, though plaintiff had not yet applied for permit); cf. also Wayte v. United States, 470 U.S. 598, 609–10 (1985) (non-registrants for draft who did not self-report and were not investigated not similarly situated to self-reported non-registrants who were prosecuted). Only specific instances of non-enforcement, therefore, are eligible as potential comparators for purposes of Plaintiffs' selective-enforcement claim.

### 2. *Specific Comparators*

Not conceding yet, Plaintiffs offer three specific instances of non-enforcement as potential comparators. See ECF No. 68 (Pls. SUMF), ¶¶ 7–8 (citing record evidence referencing three events). All three constitute individual violations of the District's defacement ordinance during nationwide protests following the death of George Floyd in the summer of 2020. Id.

Drawing on facts undisputed by the parties and resolving any disputes and competing inferences in favor of Plaintiffs, the Court outlines each instance of non-enforcement in turn and considers its suitability as a comparator.

>    a.    "= Defund the Police"

The first specific instance Plaintiffs cite occurred on June 6, 2020.  Days prior, Mayor Bowser had commissioned a large mural of the words "Black Lives Matter" painted in yellow on 16th Street, N.W., across several blocks.  See Pls. SUMF, ¶ 5; Def. Resp. Pls. SUMF, ¶ 5. During the evening of June 6, an unidentified person or persons appended "= Defund the Police" to the mural in similar yellow paint.  See Pls. SUMF, ¶ 6; Def. Resp. Pls. SUMF, ¶ 6; see also Michael E. Miller, Protesters Paint 'Defund the Police' on D.C. Street, Washington Post (June 6, 2020), [https://perma.cc/FM5A-7ZQK] (June 6 Video).  It is undisputed that: 1) the painting of "= Defund the Police" violated the defacement ordinance; 2) MPD neither received a request for nor granted a permit for the painting; and 3) MPD did not arrest anyone in connection with the painting.  See Pls. SUMF, ¶ 6; ECF No. 43 (Answer), ¶¶ 40–42.

The parties do contest several facts about this event, most notably whether any MPD officers witnessed the defacement.  The District notes that Plaintiffs offer no direct evidence that any officers were present; indeed, a video of the event that Plaintiffs entered into the record shows no MPD officers.  See generally June 6 Video.  Plaintiffs counter with deposition testimony that officers were typically present in the general area in the summer of 2020, given the volume of Black Lives Matter and related protests.  See Pls. Resp. Def. SUMF, ¶ 30; ECF No. 68-4 (Commander Glover Deposition) at 144:21–145:5; see generally ECF Nos. 68-2 (Commander Bagshaw Deposition) at 60:20–65:6 (discussing increased officer response in summer of 2020); 68-3 (Chief Carroll Deposition) at 87:13–89:1.  The site of this protest,

moreover, was an undisputed central location both in the District in general and for protesting in particular — a point made obvious by Mayor Bowser's selection of that block for the mural placement. <u>See</u> Def. SUMF, ¶ 39. Taken together, and drawing all inferences in favor of Plaintiffs, the Court holds that a reasonable jury could find that officers were either present during the painting of "= Defund the Police" or were aware of the protest and could have responded.

Still, even under Plaintiffs' characterization of the racial-justice protest at which the "= Defund the Police" painting occurred, it was dissimilar from Plaintiffs' protest in at least four interrelated ways. First, there were hundreds of protesters at the June 6 event, compared to Plaintiffs' roughly twenty. <u>Compare</u> June 6 Video at 0:00–:42, <u>with</u> Def. SUMF, ¶¶ 25–26, 28. The video Plaintiffs themselves offer shows a square of the street cordoned off with caution tape, within which a handful of individuals paint the "= Defund the Police" message and at least a dozen more dance, while hundreds of onlookers flood the street and encircle the cordoned area. <u>See generally</u> June 6 Video. Second, in part because of the high attendance, the racial-justice protest was very loud, thus inhibiting officers' ability to coordinate or interact with protesters at a normal conversational volume. <u>Id.</u> Third, the time and location (at night, on a centrally located street) was the opposite of Plaintiffs' early-morning event on a closed-off side street. <u>Id.</u> Fourth, any police would have been vastly outnumbered by the protesters at the "= Defund the Police" painting, while the ratio of officers to protesters was approximately even at Plaintiffs' planned protest. <u>Compare id.</u>, <u>with</u> Aug. 1 BWC at 0:24–1:15, 5:25–:39, <u>and</u> Def. SUMF, ¶¶ 23–28.

The Court nonetheless acknowledges that those descriptive dissimilarities do not necessarily determine the comparator analysis. Violations that take place under nominally different circumstances can still be appropriate comparators for purposes of a selective-

13

enforcement claim if their differences present "no distinguishable legitimate . . . factors" that would "justify making different . . . decisions" in the two circumstances. United States v. Hastings, 126 F.3d 310, 315 (4th Cir. 1997) (quoting United States v. Olvis, 97 F.3d 739, 744 (4th Cir. 1996)).

Plaintiffs argue that certain enforcement factors were indeed consistent across the two scenarios and thus should have counseled in favor of enforcement against the Black Lives Matter protesters. They focus on commonly discussed factors in a selective-prosecution claim — namely, the strength of a potential prosecutorial case against both sets of individuals and the relative deterrence value of each potential arrest. See generally Pls. MSJ at 7–9; see also Wayte, 470 U.S. at 607 (highlighting "strength of the case" and "general deterrence value" as relevant factors in selective-prosecution claim). Plaintiffs are right that the cases' strength is similar: it is undisputed that spray-painting "= Defund the Police" in the street and chalking "Black Pre-Born Lives Matter" both violated the defacement ordinance, see Answer, ¶¶ 40–42; Pls. SUMF, ¶ 28, and it would be easy to identify the violators in court via either video footage or police-eyewitness testimony.

The deterrence value of arresting the spray-painters, conversely, is not immediately clear. On one hand, "enforcing the law against large-scale, visible defacement . . . has obvious deterrence value." Pls. MSJ at 8. On the other hand, the deterrence value in arresting violators at Plaintiffs' protest is arguable higher: the chalkers — unlike their racial-justice counterparts — persisted in violating the defacement ordinance even after MPD reminded them during the permitting process and on the day of the protest that marking the street was not allowed. See Def. SUMF, ¶¶ 20, 25–28. The deterrent value of arresting such flagrant violators might reasonably outweigh that of arresting violators who did not directly defy a warning against

defacement.  Courts have found that violators who are unresponsive to government officials' warnings are not similarly situated to violators who are responsive or received no warning.  See, e.g., Juluke v. Hodel, 811 F.2d 1553, 1555, 1562 & n.28 (D.C. Cir. 1987) (defendant who continued violation not similarly situated to violators who came into "voluntary compliance" with regulation after warning); Occupy Nashville v. Haslam, 949 F. Supp. 2d 777, 804 (M.D. Tenn. 2013) (no valid comparators when plaintiff-protesters "refused to vacate the Plaza after being notified to do so on pain of arrest" and no warnings issued during proposed comparators' use of Plaza), rev'd on other grounds, 769 F.3d 434 (6th Cir. 2014).  This Court is thus "hesitant" to conclude that the "general deterrence value" of arrests in both scenarios is equivalent, mindful that such calculations are "not readily susceptible to the kind of analysis the courts are competent to undertake."  Wayte, 470 U.S. at 607.

What is more, Plaintiffs focus on relevant factors in selective-prosecution claims — that is, cases where the Government has chosen to charge and prosecute a defendant with the benefit of time, investigation, and consultation with other officials.  Those factors are less applicable in selective-enforcement cases like this one.  In our case, other legitimate concerns unique to the in-the-moment decision to arrest or not arrest a violator move to the fore: the officers' safety, an arrest's likely impact on crowd control, and the violation's effect on daily life, to name a few.  Cf. Figuero v. City of Saratoga Springs, 2025 WL 460784, at *14 (N.D.N.Y. Feb. 11, 2025) (noting that differences like protesting "in the street" would warrant different enforcement responses); Fuller, 775 F. Supp. at 1225 (outlining permissible factors, "such as maintaining public safety and order," for enforcement discretion).  In addition, Plaintiffs do not dispute that MPD "weighs several factors when determining whether to make an arrest," including "whether officers have sufficient resources," "whether the arrests can be made without endangering officer

or public safety," and whether an arrest could "create a more dangerous situation."  Def. SUMF, ¶ 8; Pls. Resp. Def. SUMF, ¶ 8.  The D.C. Circuit, moreover, has recognized that "ensuring public safety" or preserving "police resources" are "legitimate" factors governing officers' enforcement discretion.  Frederick Douglass Found., 82 F.4th at 1139.  Differences in public-safety or resource considerations would thus undermine the similarity of a comparator group.

Here, Plaintiffs' violation of the defacement ordinance differed from the painting of "= Defund the Police" in material respects.  Most critically, their protest was sparsely attended, and the ratio of MPD officers to protesters was approximately 1:1.  See Def. SUMF, ¶¶ 23–29; Pls. Resp. Def. SUMF, ¶¶ 23–29.  Making an arrest thus posed no safety risk to the officers.  At the racial-justice protest, by contrast, police seeking to arrest the painters would have had to squeeze their way through throngs of protesters and draw a crowd's attention as they arrested violators within an already-cordoned-off area at the center of a massive protest.  See June 6 Video at 0:01–:20.  The safety calculus for any officers present was obviously different.  The Court agrees with Plaintiffs that the District cannot rely on a "broad 'enflaming-passions' theory" to neutralize any possible comparator groups by citing generalized concerns about energizing a crowd with an arrest.  See Pls. MSJ at 10.  But where, as here, the size and scale of the protest, and the protesters' awareness of police presence, are polar opposites, any arresting officer would plainly face different risks.

One material difference between proposed comparator groups is enough to defeat the similarly situated requirement.  Gilani v. Matthews, 843 F.3d 342, 348 (8th Cir. 2017) (comparator group must be similarly situated "in all relevant respects") (emphasis added).  The Court, however, sees additional factors that would legitimately weigh on arrest decisions that are worth mentioning.  First, the time and location of Plaintiffs' protest (early in the morning, on a

16

street closed to traffic) reduced the number of people around and thus any public-safety concerns that would arise when attempting to make arrests during a protest in a hub of activity. On top of that, the "= Defund the Police" painting occurred in an area that was a hotbed for large, unplanned protests during the summer of 2020. See Am. Compl., ¶¶ 34–35 (noting "significant protest activity" that prompted original "Black Lives Matter" mural); Def. SUMF, ¶ 39; Pls. Resp. Def. SUMF, ¶ 39. Courts in this district have found that the time of day and location of otherwise similar violations can render them unsuitable as comparators. See United States v. Judd, 579 F. Supp. 3d 1, 7 (D.D.C. 2021) (distinguishing unlawfully attacking Capitol filled with people in "broad daylight" from nighttime assault on "vacant" building).

Second, as discussed above, MPD had repeatedly and explicitly informed Plaintiffs that marking public property was not permitted. There is no evidence in the record, conversely, that the painters of "= Defund the Police" received a warning about the ordinance, either prior to or during the violation. Arresting violators in the former scenario but not the latter fulfills a valid enforcement priority: responding to flagrant violations immediately following an officer's warning. Through the lens of that legitimate priority, the choice to enforce the defacement ordinance by arresting chalkers at Plaintiffs' protest — whether out of concern for the example such defiance would set for other protesters or the desire to limit willfully violative behavior — would not counsel in favor of arrest at the "= Defund the Police" protest.

The Court is convinced that, based on the undisputed characterizations of the "= Defund the Police" protest, no reasonable jury could find that this protest was similarly situated to Plaintiffs' event. In one circumstance the police (if they were even present) faced a spontaneously gathered and substantial crowd of people in the middle of a centrally located street late at night. In the other, the police stood with as many fellow officers as protesters and

watched two of those protesters violate the defacement ordinance in the early morning, on a

previously closed side street, after already having been warned that chalking on the public

sidewalk was not permitted by the ordinance.  Compare June 6 Video at 0:01–:42, with Aug. 1

BWC at 1:30–2:10.  The "= Defund the Police" protest is thus not a comparator that would

demonstrate a discriminatory effect by MPD's enforcement.

> b.    August 16, 2020

The second proposed comparator event took place on August 16 of the same summer.

That event featured a gathering of individuals on H Street, NW, near the United States Chamber

of Commerce, where at least two protesters spray-painted messages on the street in violation of

the defacement ordinance.  See Pls. SUMF, ¶ 10; Def. Resp. Pls. SUMF, ¶ 10.  Most of the

information about the event comes from a body-worn-camera video excerpt submitted by

Plaintiffs, see generally ECF No. 68-16 (Aug. 16 BWC) (on file with Court), and the parties do

not dispute the circumstances and events that the video shows.

From the video, the Court can discern several critical facts.  First, the gathering took

place during the day, and it comprised dozens of individuals on the sidewalk and spilling into the

street.  Id. at 0:45–:52; 1:18–:35.  Second, the police presence also numbered in the dozens,

though protesters outnumbered MPD officers.  Id. at 0:02–:25, 1:26–:35.  Third, the officers

were arranged in a line between protesters and the street, which was open to vehicle traffic; cars

can be seen driving down the street as the protest was ongoing.  Id. at 0:45–:56.  Fourth, the

BWC clip shows protesters drawing or painting on signs, walking or skateboarding through the

gathering, and at several points engaging with the lined-up officers.  See, e.g., id. at 0:45–:57,

1:41–2:59.  Fifth, during the BWC clip, at least two protesters can be seen spray-painting on the

street in clear view of MPD officers.  Id. at 1:53–:58, 3:16–:20.  Finally, it is undisputed that the

spray painting violated the defacement ordinance and that no arrests were made on that afternoon for defacement.  See Def. Resp. Pls. SUMF, ¶¶ 10–12.

Plaintiffs contend that this event was a "comparable protest[]" to theirs because it was a "small, peaceful BLM demonstration."  Pls. MSJ at 10.  They further assert that, because the two protests were sufficiently similar, MPD's failure to arrest defacers at the BLM protest reveals impermissible targeting of Plaintiffs for their speech.  Id.

The Court agrees that the two events are indeed similar in certain respects.  Unlike the "= Defund the Police" protest, approximately two dozen officers are visibly present near the Chamber of Commerce.  The BWC camera footage of both Plaintiffs' anti-abortion protest and the gathering on August 16 shows officers in a line, close in proximity to the protesters.  See Aug. 1 BWC at 9:30–:45; Aug. 16 BWC at 0:02–:25.  If police officers had decided to make arrests on August 16, they would not have faced the same threat to officer safety inherent in wading through a packed crowd.  Finally, the footage shows frequent officer-protester interaction, making clear — as with Plaintiffs' protest — that the protesters were aware of the substantial police presence.  Compare Aug. 16 BWC at 1:55–2:10, with Aug. 1 BWC at 1:40–:55.

Despite their similarities, however, two factors made the August 16 protest markedly different — and presented distinct enforcement trade-offs — from Plaintiffs'.  Most notably, the parties do not dispute that MPD closed the street prior to Plaintiffs' planned, permitted event.  See Def. SUMF, ¶¶ 20–22.  The street outside the Chamber of Commerce, by contrast, remained open to traffic, and MPD officers formed a line between the gathered protesters and the cars traversing the block.  See generally Aug. 16 BWC at 0:53–1:07.  The parties also agree that evidence in the record reflects officers' concern about pedestrians' safety from passing cars.  See

ECF No. 75 (Pls. Reply) at 14; ECF No. 66-9 (Captain Caron Deposition) at 101:4–102:17

(explaining safety concern in high-traffic area).  Closing a section of H Street without advance

notice, in the middle of the day, would have caused considerably more disruption.  Perhaps for

this reason, Plaintiffs do not contend that MPD should have closed the street in response.  They

do note that officers "could have initiated an investigation to identify the perpetrators and arrest

them later," Pls. Reply at 14 — but for the reasons explained *supra*, post-event investigation is

not comparable to concurrent arrest.  And although Plaintiffs contend that both events had a

"traffic buffer around the protestors," id. at 14 n.2, the footage of the August 16 protest clearly

shows that this buffer was provided by the police officers themselves — the same officers who

would have needed to leave the buffer to arrest spray-painters.

Further, as the undisputed spray-painting violation occurred, officers were engaged in

conversation with several protesters who were not violating the defacement ordinance but were

expressing displeasure with police actions generally and at the protest.  See Aug. 16 BWC at

2:08–:16 (another protester asking officers to "go back on the other side of the street").  At one

point, a protester asked officers why they were "killing us" and "murdering" people, presumably

in reference to the deaths of George Floyd and other Black individuals that sparked the wave of

Black Lives Matter protests.  Id. at 2:22–:31, 3:04–:06.  The same protester referred to the police

presence as "intimidating" and "crazy."  Id. at 3:14–:32.  The District contends that those

interactions triggered a "cost-benefit" analysis for officers on the scene that weighed "attempting

to make an arrest" against "the potential for that attempt to turn a peaceful event into a violent

one."  ECF No. 71 (Def. Reply) at 8.

The Court agrees.  The vocal criticism of police on August 16 generally gave rise to

specific concerns about maintaining a peaceful protest that were not a factor during the lead-up

to the arrests at Plaintiffs' protest.  To be sure, the content of a protester's speech is not a legitimate factor upon which enforcement decisions can rest in general.  Frederick Douglass Found., 82 F.4th at 1141.  But here the critical protesters were not violating the defacement ordinance — instead, their words and actions contributed to the circumstances surrounding the violation.  And those circumstances revealed a discontent with police presence that — as it had during other protests in the summer of 2020 — risked imminently escalating the gathering into a violent affair.

Risks to civil order prompt the type of "challenging circumstances" that the D.C. Circuit has recognized "require difficult decisions about allocating limited police resources."  Id. at 1145 (quotation marks removed); see also Fuller, 775 F. Supp. 3d at 1225 (when city lacks "ability or bandwidth" to enforce ordinance globally, "maintaining public safety and order" can guide enforcement decisions).  On August 16, 2020, MPD officers faced a decision: arrest violators of the defacement ordinance or maintain orderly conversations with protesters.  They faced no such decision point at Plaintiffs' protest.  Because protection of public safety is a legitimate enforcement factor, Frederick Douglass Found., 82 F.4th at 1145, no jury could find that the August 16 protest was similarly situated to Plaintiffs'.

This concern is especially persuasive against the backdrop of "ongoing, large-scale, and national demonstrations," of which the August 16 protests were a part.  Frederick Douglass Found., 2021 WL 3912119, at *9.  Those demonstrations required crowd control and mediating the relationship between protesters and police that other protests (like Plaintiffs') did not.  A gathering that was undeniably part of an unprecedented mass movement thus creates different concerns from a one-off, permitted protest.

Plaintiffs retort that "[b]y the Government's logic, officers could forgo making an arrest

at any event simply because it might provoke tension."  Pls. Reply at 15.  But the August 16

protest, and those of its ilk, was not "any event" — it was part of the fallout from the

"immediate, spontaneous outpouring of righteous anger tha[t] reverberated around the globe"

following George Floyd's death.  Geller, 476 F. Supp. 3d at 14.  Although the parties dispute the

precise percentage of Black Lives Matter protests that gave way to violence or other disruptive

activity, Plaintiffs concede that at least 30 percent were not peaceful.  See Pls. MSJ at 8; Pls.

SUMF, ¶ 3.  Later litigation in this District and others attests to a multitude of clashes between

racial-justice protesters and police during the summer of 2020.  See, e.g., Goodwin v. District of

Columbia, 2025 WL 637467, at *4–5 (D.D.C. Feb. 27, 2025); Ferris v. District of Columbia,

2023 WL 8697854, at *2–3 (D.D.C. Dec. 15, 2023) (describing protests resulting in use of

pepper spray, sting-ball munitions by MPD); Judd, 579 F. Supp. 3d at 6 n.5 (recounting

allegations that protester "threw a firecracker at police during a Black Lives Matter protest in

August 2020").  The Court "need not close its eyes to the obviously dissimilar facts on the

ground," Frederick Douglass Found., 2021 WL 3912119, at *9 — namely, the unique concern

officers faced that an arrest could rapidly escalate tensions during racial-justice protests that was

not present at Plaintiffs' one-off, permitted protest.  To hold that those events could be similarly

situated would be to ignore "critical context" and "miss[] the proverbial forest for the trees."

Goodwin, 2025 WL 637467, at *17.

    All told, the officers at the August 16 gathering faced two priorities not present during

Plaintiffs' protest: promoting public safety by maintaining the separation between ongoing

vehicle traffic and a large group of protesters, and reducing the risk of escalating interactions

between protesters and police.  Either of these priorities could have overcome the perceived

benefit to enforcing the defacement ordinance by arresting violators.  Plaintiffs' second proposed

comparator thus does not pass muster.

           c.     August 28, 2020

The final discrete event that Plaintiffs raise as a possible comparator is a spontaneous protest that occurred on August 28, 2020. See Pls. SUMF, ¶¶ 14–16. This daytime protest took place on Pennsylvania Avenue, NW. Id.; see Def. Reply at 8. Based on the video of the event that Plaintiffs put into the record, one protester spray-painted on the street in the middle of dozens of, if not over one hundred, people. See Leftist Spray-Paints 'Black Lives Matter,' 'Jacob Blake' Outside Department of Justice During 2020 March on Washington, available at https://jwp.io/s/wU4Xrxd2 [https://perma.cc/36XU-DHPA] (last visited Feb. 9, 2026) (Aug. 28 Video) at 2:40–3:36. The eight-lane, bidirectional street is at least partially open to traffic, and people surround the protesters, both as event participants and as pedestrians or observers on the sidewalk and street. See generally id. at 4:30–5:36.

Unlike the "= Defund the Police" protest discussed *supra*, it is undisputed that officers were present in the general area of the protest. But, as with that proposed comparator, any police officers seeking to intervene and arrest violators would have needed to navigate a significant crowd that was many times the size of the police group. Id. at 5:20–:36; see also id. at 5:52 (showing six officers on scene). At the time of the violation, the officers were across an intersection and on the other side of the street from the spray painter, who was crouching down amidst a group of standing people who were yelling, chanting, and engaging in other, non-violative expressive activity. Id. at 5:49–6:47. Any move to enforce the defacement ordinance would have newly engaged the officers with the protesters, in a heavily trafficked area and in full view of passersby. The officers would have undisputedly been significantly outnumbered by protesters. This scenario raises all the same concerns of public safety, crowd control, and

drawing attention to officer presence that the "= Defund the Police" event did. It, too, cannot pass muster as a comparator.

\*       \*       \*

At root, each of Plaintiffs' proffered comparator events involved fundamentally different trade-offs among officer priorities. All agree that, at First Amendment assemblies, those priorities include officer safety, public safety, maintaining peaceful activity during protests, and enforcing the defacement ordinance and other laws. See Def. SUMF, ¶ 8; Pls. Resp. Def. SUMF, ¶ 8. One could readily argue that the officers did not respond to the safety or deterrence concerns in the different events <u>correctly</u> — but the point of the similarly situated requirement is that those differences <u>existed</u>. <u>See</u> <u>United States v Rundo</u>, 108 F.4th 792, 803 (9th Cir. 2024) ("judiciary is not well-equipped to second-guess" enforcement decisions when "provide[d] with a facially neutral explanation"); <u>Goodwin</u>, 2025 WL 637467, at \*18 (crediting MPD choice to protect commercial area despite dispute over "[w]hether such concern was reasonable").

The role of the Court is not to second-guess how officers apply their enforcement discretion when faced with scenarios that implicate different legitimate enforcement factors. Here, the Court finds that no reasonable jury could conclude that any of the three protests that Plaintiffs point to was similarly situated to theirs. Without an appropriate comparator, Plaintiffs cannot prevail on their selective-enforcement claim. <u>Branch Ministries</u>, 211 F.3d at 145.

**IV.    Conclusion**

For the foregoing reasons, the Court will grant the District's Motion for Summary Judgment and deny Plaintiffs' Cross-Motion for Summary Judgment. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  February 24, 2026